IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Chapter 11 |
| Greenpoint Tactical Income Fund LLC | Case No. 19-29613 |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| GP Rare Earth Trading Account LLC | Case No. 19-29617 |
| Debtor. | |

**MOTION OF THE U.S. SECURITIES AND EXCHANGE COMMISSION
FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE
OR, ALTERNATIVELY, TO CONVERT THE CASE TO CHAPTER 7**

The U.S. Securities and Exchange Commission ("SEC" or the "Commission"), by its undersigned attorneys, hereby moves for the immediate appointment of a Chapter 11 trustee over the Debtors, Greenpoint Tactical Income Fund LLC ("GPTIF") and its subsidiary, GP Rare Earth Trading Account LLC ("GPRE")[1] or, in the alternative, to convert the cases to Chapter 7. *See* 11 U.S.C. §§1104(a)(1) and 1112. In support of this motion, the Commission respectfully states as follows:

## INTRODUCTION

1. The appointment of a Chapter 11 trustee is required under the standards set forth in Section 1104(a) of the Bankruptcy Code. Here, there is compelling evidence of fraud, dishonesty and gross mismanagement of the affairs of the Debtors. GPTIF is a private

---

[1] Since the Debtors' cases have not yet been jointly administered (although the Debtors have moved for joint administration), the SEC separately requests appointment of a Chapter 11 trustee in both cases. The SEC believes it would be most prudent to appoint the same trustee to administer both cases.

investment fund whose managers have engaged in a scheme to unlawfully enrich themselves at the expense of investors, many of whom were on fixed incomes, older individuals, and others for whom risky illiquid investments were not appropriate. GPTIF's managing members are Greenpoint Asset Management II, LLC ("GAM II") and Chrysalis Financial, LLC ("Chrysalis"), which are controlled, respectively, by Michael Hull ("Hull") and Christopher Nohl ("Nohl"). GAM II, Chrysalis, Hull, and Nohl (collectively, "Debtors' Managers") are all defendants in a pending enforcement action, *SEC v. Bluepoint Investment Counsel, LLC, et al.*, No. 3:19-cv-109 (W.D. Wis.) (filed Sept. 30, 2019), in which the SEC alleges that the Debtors' Managers made materially false and misleading statements to investors and GPTIF's former auditor, engaged in undisclosed self-dealing, and breached their fiduciary duties. (A copy of the SEC's Complaint is attached as Exhibit 1).[2] Since the beginning of 2017 alone, Debtors' Managers have withdrawn more than $5.9 million from GPTIF, while at the same time telling many investors that GPTIF lacked liquidity to meet redemption requests even where investors expressed that they were in dire financial straits. (SEC Compl. ¶ 9). Their actions demonstrate that they are unfit to manage the Debtors and a Chapter 11 trustee must be appointed or, in the alternative, the cases should be converted to Chapter 7, to ensure that assets are preserved and a competent and disinterested fiduciary is in charge of the estates. Moreover, the trustee can seek to recover significant payments to insiders for the benefit of the estate and GPTIF investors.

2.  Debtors' Managers portrayed GPTIF as an "income" fund that "invests primarily in assets that produce investment return through interest payments, trading profits, or operational cash flow." (SEC Compl. ¶ 37). Contrary to those representations, GPTIF's holdings are almost entirely non-income-generating and illiquid assets. (SEC Compl. ¶ 38). As of June 30, 2018—

---

[2] The other defendant in the SEC's enforcement action is an investment adviser controlled by Hull, Bluepoint Investment Counsel, LLC.

the most recent date for which GPTIF has financial statements—52% of GPTIF's purported value was a gem and mineral collection held through GPRE and 46% of GPTIF's purported value was a portfolio of debt and equity securities of private companies, primarily consisting of a now defunct and worthless Wisconsin environmental remediation company ("Private Company 1"). (SEC Compl. ¶ 4).

## FACTUAL BACKGROUND

**Management of the Debtors was marked by dishonesty, breach of fiduciary duty, gross mismanagement, self-dealing and fraud.**

3. From April 25, 2014 through June 2019, GPTIF raised approximately $52.783 million from approximately 129 investors. (SEC Compl. ¶ 1). During that same period, GPTIF paid over $13.7 million in fees to entities owned or controlled by Hull or Nohl. (SEC Compl. ¶ 9). Almost all of the money GPTIF paid to Hull's and Nohl's entities came from funds invested by investors because less than 5% of GPTIF's returns were actual realized gains, as opposed to unrealized paper gains. (SEC Compl. ¶ 109).

4. Debtors' Managers have lived lavish lifestyles with the money they withdrew from GPTIF. For example, during the time he has been managing GPTIF, Hull purchased three automobiles for more than $100,000 each, including a $280,000 Bentley Continental. He also purchased a $58,000 sapphire for his wife and a Steinway piano. (SEC Compl. ¶ 179). He owns millions of dollars of real estate in Wisconsin and the United Kingdom and financed one of his three homes by taking a personal loan from GPTIF.

5. GPTIF's most recent audited financial statements are for the fiscal year ending December 31, 2016. (SEC Compl. ¶¶ 127, 140). Its most recent financial statements of any sort are for the quarter ending June 30, 2018. (SEC Compl. ¶ 35; A redacted copy of the June 30, 2018 unaudited financials is attached as Exhibit 2). In the unaudited financials for June 30,

2018, GPTIF reported a net asset value of $135.3 million based almost entirely on unrealized gains reported on two assets—a collection of gems and minerals held by Debtor GPRE and a now-worthless position in a private company. (SEC Compl. ¶ 36).

6. GPTIF's largest asset is the gem and mineral collection held by GPRE. According to GPTIF, that collection was worth $68.3 million as of June 30, 2018, consisting of $21.9 million in original cost and $46.4 million in unrealized gains. (SEC Compl. ¶ 36). The valuations of GPRE's gems and minerals failed to comply with the minimal valuation procedures contained in GPTIF's operating agreements. (SEC Compl. ¶¶ 180-86). GPTIF reported gains on specimens that GPRE did not own or possess. (SEC Compl. ¶¶ 61-64). Nohl also repeatedly interfered in the appraisal process to generate higher appraised values, and misrepresented the appraisal process to investors and GPTIF's auditor. (SEC Compl. ¶¶ 187-229).

7. GPTIF's second-largest asset was its approximately 42% ownership of Private Company 1. Hull and Nohl were both members of the board of directors for Private Company 1 from at least the third quarter of 2016. (SEC Compl. ¶ 231). As of June 30, 2018, based on purported valuations by Nohl and Hull, GPTIF reported that its position in Private Company 1 was worth $46.2 million, composed of $9 million in original cost and $37.2 million in unrealized gains. (SEC Compl. ¶ 230). More than $27.9 million of those unrealized gains were recorded in the first two quarters of 2018—*after* Private Company 1's primary subsidiary defaulted on two bank loans secured by all of its assets and guaranteed by Private Company 1. (SEC Compl. ¶¶ 381-403). On July 5, 2018—just five days after the end of GPTIF's second quarter—the bank sued to foreclose its liens on Private Company 1's assets. (SEC Compl. ¶ 399). The bank obtained a default judgment on October 2, 2018. (SEC Compl. ¶ 400). Private Company 1 is

4

now defunct and worthless. (SEC Compl. ¶ 401). GPTIF has yet to prepare financial statements disclosing its $46.2 million loss on Private Company 1. (SEC Compl. ¶ 401).

### Since June 30, 2018, Debtors' Managers reported inflated asset values of at least $46.2 million as part of their fraudulent scheme.

8. Hull and Nohl drastically overstated the value of Private Company 1 by ignoring and failing to disclose material negative facts regarding the company. As of December 31, 2017, Hull and Nohl valued GPTIF's interest in Private Company 1 at $18,285,637—just over double GPTIF's paid-in-capital. (SEC Compl. ¶ 369). That valuation was misleading, unreasonable, and lacked an objective basis. (SEC Compl. ¶ 369). Among other things, by December 31, 2017, Private Company 1: (1) could not meet payroll; (2) was behind in paying its vendors, several of whom were pursuing collections; and (3) had its primary project canceled without ever having received any payment. (SEC Compl. ¶ 371).

9. GPTIF was consistently behind on its funding commitments to Private Company 1, which needed the money to operate and perform its remediation contracts. (SEC Compl. ¶ 262). Rather than provide funding on the agreed-upon schedule, GPTIF made late and small payments on an irregular schedule. (SEC Compl. ¶¶ 307-09). For example, GPTIF was supposed to pay $1.374 million to Private Company 1 by September 30, 2016. (SEC Compl. ¶¶ 307-09). Instead, GPTIF made eight payments ranging from $20,000 to $300,000 between December 23, 2016 and April 19, 2018, failing to fulfill the commitment until 18 months after it was due. (SEC Compl. ¶¶ 307-09). Private Company 1 needed money and, in November 2016, its primary subsidiary took out a $1.85 million line of credit from Bank Number 1. (SEC Compl. ¶ 342). The line of credit was secured by all of the subsidiary's assets and guaranteed by Private Company 1 and all of its other subsidiaries. (SEC Compl. ¶ 342). GPTIF's entire investment in Private Company 1 became subordinated to Bank Number 1's liens, which were recorded under

5

the Uniform Commercial Code and filed with the Wisconsin Department of Financial Institutions. (SEC Compl. ¶ 342). However, Nohl and Hull failed to inform investors that the interest in its largest single asset was subordinated. (SEC Compl. ¶¶ 343-45).

10. By mid-2017, Private Company 1's line of credit was maxed out. (SEC Compl. ¶ 371). In September 2017, Nohl, attended a meeting with representatives of Bank Number 1 and Private Company 1. (SEC Compl. ¶¶ 373-74). During that meeting, Bank Number 1 informed Nohl and the other employees of GPTIF in attendance that the line of credit would not be renewed and would need to be repaid when it matured in November 2017. (SEC Compl. ¶ 373). Private Company 1 failed to pay off the line of credit at maturity. (SEC Compl. ¶ 375). On or about December 8, 2017, Bank Number 1 sent a notice of default to Private Company 1. (SEC Compl. ¶ 379).

11. Despite knowing by December 2017 that Private Company 1's main subsidiary was in default on the line of credit, Hull and Nohl *increased* the value of GPTIF's equity interest in Private Company 1 by approximately $20.1 million in the first quarter of 2018, from $18.3 million to $38.5 million. (SEC Compl. ¶ 382). On March 2, 2018, Bank Number 1 proposed a standstill agreement to a GPTIF employee under which it would defer legal action in exchange for $500,000 followed by a payment plan. (SEC Compl. ¶ 389). The Debtors' Managers failed to facilitate the $500,000 payment, and the standstill agreement was never executed. (SEC Compl. ¶ 389).

12. In May 2018, Nohl hired a debt workout firm to try to negotiate a settlement with Bank Number 1. (SEC Compl. ¶ 398). On June 21, 2018, Bank Number 1 sent a demand letter to Private Company 1. (SEC Compl. ¶ 398). Knowing that legal action against Private Company 1 by Bank Number 1 was imminent, Hull and Nohl yet again *increased* the value of

6

GPTIF's interest in Private Company 1 by another $7.1 million—to $46,192,616 as of June 30, 2018. (SEC Compl. ¶ 398).

13.  On July 5, 2018—just five days after the end of GPTIF's second quarter—Bank Number 1 sued to foreclose on the loan. (SEC Compl. ¶ 399). On October 2, 2018, Bank Number 1 obtained a default judgment against Private Company 1 and its subsidiaries, which included a monetary judgment for just over $1.9 million and a judgment of replevin for all of its assets. (SEC Compl. ¶ 400). Private Company 1 is now defunct and worthless. (SEC Compl. ¶ 401). GPTIF has yet to prepare financial statements for the third quarter of 2018 disclosing the $46.2 million loss on GPTIF's interest in Private Company 1. (SEC Compl. ¶¶ 401-02).

> **Debtors' Managers raised $4.1 million from investors since June 30, 2018 by making false statements and misrepresentations, while paying themselves almost $1.8 million of those funds.**

14.  Hull and Nohl continued to use the June 30, 2018 financial statements to sell new interests in GPTIF, without disclosing that GPTIF sustained a $46.2 million loss on Private Company 1. (SEC Compl. ¶¶ 83, 148). Between August 3, 2018 and May 29, 2019, GPTIF received more than $4.1 million in new investor funds. (*See* Declaration of John Kustusch, attached as Exhibit 3, at ¶¶ 7-9).

15.  Since June 30, 2018, GPTIF's management used $1,782,962 of the investor funds received to pay fees to entities controlled by Hull or Nohl. (Kustusch Declaration, ¶¶ 10-11).

16.  One of the most recent investments of which the SEC is aware was a $538,500 contribution by Investor Number 3 from his retirement account on May 29, 2019.[3] In the two days following that contribution, GPTIF disbursed $368,000 to two entities owned by Hull and

---

[3] Investor Number 1 and Investor Number 2 are referenced in the SEC's Complaint and below. To avoid confusion, the SEC is using the same references for those individuals in this motion as it used in the Complaint.

two other affiliated funds managed by Hull. Of the remaining funds, $20,000 was transferred to GPTIF's subsidiary, GPRE, and $150,000 was wired to three unknown recipients. As of May 31, 2019, GPTIF's bank account balance was down to approximately $13,300. (Kustusch Declaration, ¶¶ 12-14).

### Debtors' Managers prioritized paying themselves to the detriment of GPTIF's investors.

17. Debtors' Managers prioritized paying themselves instead of honoring redemption requests from investors, regardless of the investors' needs for the money.

18. For example, on September 25, 2017, Investor Number 4 emailed Hull to request an immediate redemption of $50,000, or else he would have to discontinue several long-standing charitable commitments to needy families. Investor Number 4 noted that he had been asking for a complete liquidation of his accounts for more than six months. On April 4, 2018, Investor Number 4 emailed Hull to report that he was selling his house because he needed money. (Redacted copies of the emails are attached as Exhibit 4).

19. As another example, Investor Number 5 wrote a letter to Hull dated March 28, 2017 in which she "expressed my discomfort with the high risk that the investment with your firm represents. As I had mentioned, it is all of my savings. Apparently having 100% of my assets in an 'illiquid, high risk' investment strategy at my age (and marital status) is not appropriate." (A redacted copy of the letter is attached as Exhibit 5).

20. In another example, Investor Number 6 sent an email to Hull's administrator dated October 30, 2017 in which she stated: "I really need cash flow for myself. Michael [Hull] knew this when he convinced me to sign my money over to him. . . . I feel totally lied to. I don't know how many times and angles I need to ask to get my money. I feel like absolutely no on[e]

is listening. I've been now asking for over a year." (A redacted copy of the email is attached as Exhibit 6).

21. On information and belief, the redemption requests of Investor Number 4, Investor Number 5, and Investor Number 6 still have not been fulfilled. These requests are only examples—numerous other investors have likewise had their redemption requests go unfulfilled.

22. Investors even pursued legal action to attempt to recover their funds. On November 16, 2017, one of GPTIF's largest investors filed suit in Wisconsin state court (later referred to arbitration) alleging that Debtors' Managers "have grossly mismanaged the assets of GPTIF", "have made material misrepresentations", and "have perpetrated a valuation fraud upon [investors] with Ponzi-like features in order to enrich themselves." (Complaint at ¶ 11, attached as Exhibit 7). A settlement was reached in the arbitration, which required GPTIF to redeem the investor's approximately $15 million contribution either in cash or, alternatively, in gems and minerals. After GPTIF failed to make the required cash payment, the parties agreed on an appraiser to conduct a valuation of the specimens to be transferred. The appraiser determined a group of gems and minerals valued at $45 million by Debtors' Managers were actually worth only $15,539,000. After the appraiser failed to support GPTIF's inflated asset values, Debtors' Managers sued her for fraud in Illinois state court, (*see* Exhibit 8), and filed this bankruptcy proceeding apparently to stay the arbitration. On information and belief, there are other similar pending arbitration proceedings brought by other investors, all of which were stayed as a result of the Debtors' bankruptcy filing.

> **Since 2017, Debtors' Managers paid themselves $5.9 million from GPTIF, even as GPTIF failed to meet its obligations.**

23. The conduct of Debtors' Managers since June 30, 2018 continues a troubling pattern where Debtors' Managers have routinely put their own interests ahead of both GPTIF and

9

its investors. Since the beginning of 2017, GPTIF has paid $5.9 million to entities owned by Hull or Nohl. (SEC Compl. ¶ 9). During that same period, GPTIF has failed to meet its investment commitments, to the detriment of GPTIF. For example, as discussed above, GPTIF failed to fulfill its funding commitments to Private Company 1, and its managers did nothing to protect GPTIF's investment in Private Company 1 from foreclosure. Nevertheless, in the time between when the standstill agreement was proposed on March 2, 2018 and when Bank Number 1's lawsuit was filed on July 5, 2018, Debtors' Managers found a way to pay themselves $515,000. (Kustusch Declaration, ¶¶ 15-16).

24. In another example, GPTIF through GPRE agreed to buy three mineral specimens from a mineral dealer in February 2015. (SEC Compl. ¶ 61). The contract called for the $6.8 million purchase price to be paid in installments between February and October 2015. (SEC Compl. ¶ 61). GPRE failed to make the required payments. (SEC Compl. ¶ 62). GPRE did not obtain possession of the third and final specimen until February 2019 when it finally paid most of what it owed, plus a $500,000 late fee, after the dealer threatened to sue. (SEC Compl. ¶ 62). Had Debtors' Managers prioritized paying GPTIF's obligations instead of paying themselves, GPTIF would not have incurred the $500,000 late fee and would not have had to wait four years to obtain possession of the final mineral specimen.

**Debtors' Managers engaged in rampant undisclosed self-dealing.**

25. GPTIF's managers also engaged in extensive self-dealing with GPTIF and concealed numerous related-party transactions from investors. (SEC Compl. ¶¶ 149-79). In the last two years alone, Nohl and Chrysalis made at least five personal loans to GPTIF at annualized interest rates as high as 104%. (SEC Compl. ¶¶ 159-64). Hull approved all of those loans on behalf of GPTIF. (SEC Compl. ¶¶ 159-63).

26. GPTIF has also borrowed money from certain investors in GPTIF without disclosing those transactions to other investors. (SEC Compl. ¶¶ 174-77). In one case, GPTIF borrowed $250,000 from Investor Number 2. On June 19, 2017, Hull agreed that GPTIF would pay Investor Number 2 $25,000 to extend the due date of that loan by a little over three months. (SEC Compl. ¶ 176). Investor Number 2 then gifted that payment to his son, Investor Number 1, who owed Nohl $25,000 for an engagement ring purchased from a separate gem and mineral business run by Nohl. (SEC Compl. ¶ 176). Nohl wrote a $25,000 check to his entity from GPTIF's bank account, thus using investor funds to satisfy a personal debt owed to him by Investor Number 1. (SEC Compl. ¶ 176).

27. Nohl and Hull also regularly engaged in other undisclosed transactions with GPTIF. They own an entity that, until recently, employed GPTIF's accountant. (SEC Compl. ¶ 106). GPTIF paid that entity more than the accountant received in compensation, and Hull and Nohl received approximately $100,000 from the excess fees. (SEC Compl. ¶ 106). Hull took a personal loan from GPTIF (on which Nohl was paid an origination fee) on the same day another fund managed by Hull granted Nohl a lucrative commission agreement. (SEC Compl. ¶¶ 152-53). Hull caused another fund he manages to lend money to GPTIF. (SEC Compl. ¶¶ 165-73). Nohl and Hull have also each purchased more than $100,000 in physical assets from GPTIF without disclosing those transactions to investors. (SEC Compl. ¶¶ 178-79).

**Debtors' Managers improperly valued GPRE's mineral collection.**

28. The offering materials for GPTIF falsely and misleadingly represent to investors and prospective investors that GPTIF is actively engaged in selling mineral specimens, and that many of its transactions are short term in nature and provide significant cash flow. (SEC Compl. ¶ 94). In reality, few of the mineral transactions were short term in nature and few, if any,

11

generated significant cash flow. (SEC Compl. ¶ 94). The offering materials for GPTIF falsely represented that the market for high-end mineral specimens "is truly a seller's market" in which "possessors get whatever price they demand for the very best in existence and get the same without delay or negotiation." (SEC Compl. ¶ 78). GPTIF had no reasonable expectation of getting, and has not gotten, "whatever price they demand[ed]" "without delay or negotiation" in the sale of mineral specimens." (SEC Compl. ¶ 78). The offering materials also falsely boasted of arbitraging mid-range minerals in "rapid succession," typically realizing returns of 10-30% within hours or days or 100-300% within 30 days. (SEC Compl. ¶ 79). GPTIF rarely, if ever, sold gems and minerals in "rapid succession", within hours or days, or for profits of 100-300% within 30 days of acquiring them." (SEC Compl. ¶ 79).

29. GPTIF through GPRE committed $21.9 million between mid-2013 and early 2015 to purchase gems and fine mineral specimens. (SEC Compl. ¶ 58). Since that time, Debtors' Managers have recorded large unrealized gains on that collection, which GPTIF valued at $68.3 million as of June 30, 2018. (SEC Compl. ¶ 36). (A photograph of one of GPTIF's mineral specimens is contained in the SEC's Complaint at ¶ 60).

30. Investors and GPTIF's former auditor were led to believe the minerals and gems were valued using an objective market-based approach. The audit reports state that the minerals and gems "are valued using third party appraisals based on market driven events," that estimates of fair market value are based on "public and semi-public transactions" from "market driven sales shows and special events", and that the valuations are "further evaluated throughout the year as of the reporting date based on other market data available." (SEC Compl. ¶¶ 117, 124).

31. The reality of the gem and mineral appraisal process was far different. (SEC Compl. ¶¶ 187-90). Debtors' Managers recorded gains in violation of GPTIF's operating

12

Case 19-29613-gmh    Doc 17    Filed 10/11/19    Page 12 of 18

agreements, (SEC Compl. ¶¶ 180-86), and recorded gains on specimens GPTIF neither owned nor possessed, (SEC Compl. ¶ 64). Nohl engaged in undisclosed and prohibited business transactions with one appraiser while the appraiser was conducting appraisals for GPTIF. (SEC Compl. ¶¶ 193-204). Nohl rejected appraisals he deemed too low, (SEC Compl. ¶¶ 205-16), and pushed appraisers to increase the valuations, (SEC Compl. ¶¶ 226-29). He had some specimens appraised by multiple appraisers and cherry-picked the higher valuations. (SEC Compl. ¶¶ 217-220). Debtors' Managers also relied on altered appraisal reports that increased the values of specimens without any indication that the original values had been changed. (SEC Compl. ¶¶ 221-25). Debtors' Managers misrepresented the appraisal process to GPTIF's former auditor and failed to disclose Nohl's repeated interference in the valuation of the gems and minerals. (SEC Compl. ¶¶ 187-90).

## THE COURT SHOULD ORDER THE APPOINTMENT OF A CHAPTER 11 TRUSTEE OR, ALTERNATIVELY, CONVERT THE CASES TO CHAPTER 7

32. Section 1104(a) of the Bankruptcy Code contains independent grounds for the appointment of a Chapter 11 trustee. First, the court shall appoint a trustee for cause, including (but not limited to) fraud, dishonesty, incompetence or gross mismanagement by the debtor. *See* 11 U.S.C. §1104(a)(1). Second, a trustee is required if the appointment would be in the interests of creditors, equity holders and other interests of the estate. *See* 11 U.S.C. §1104(a)(2). Appointment of a trustee is a fact-sensitive determination that must be made on a case-by-case basis. *In re LHC, LLC*, 497 B.R. 281, 291 (Bankr. N.D. Ill. 2013) (*citing In re 4 C Solutions, Inc.*, 289 B.R. 354, 370 (Bankr. C.D. Ill. 2003)). In making this determination, the court may examine both pre- and post-petition conduct. *Id*. (*citing Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988)). Under the circumstances of

this case, a Chapter 11 trustee is warranted under *each* of these provisions – any of which would be sufficient, by itself, to warrant a trustee.

> **I.  Cause Exists to Appoint a Chapter 11 Trustee Based on the Fraudulent Scheme and Mismanagement of the Debtors.**

33.     Section 1104(a)(1) of the Bankruptcy Code requires the appointment of a Chapter 11 trustee, for cause. Cause has been established in these cases by the fraudulent and dishonest acts committed by Nohl, Hull and their entities as the Debtors' Managers as detailed in the SEC's District Court action and outlined above. A determination of whether "cause" exists to appoint a trustee "is within the discretion of the court and due consideration must be given to the various interests involved in the bankruptcy proceeding." *LHC*, 497 B.R. at 291 (*citing In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994), *aff'd.*, 1994 U.S. Dist. LEXIS 17409, 1994 WL 687474 (N.D. Ill. Dec. 8, 1994)). However, once the court finds that cause exists under Section 1104(a)(1), the appointment of a trustee becomes mandatory; there is no discretion. *In re Cajun Electric Power Coop, Inc.,* 191 B.R. 659, 661 (Bankr. M.D. La. 1995), *aff'd*, 74 F.3d 599 (5th Cir. 1996). *See also In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989)("11 U.S.C. §1104(a) mandates appointment of a trustee when the bankruptcy court finds cause").

34.     Cause includes, but is not limited to, fraud, dishonesty, incompetence or gross mismanagement and courts may also consider "whether: (1) the alleged misconduct was material; (2) the debtor treated insiders and affiliated entities better or worse than other creditors or customers; (3) the debtor made pre-petition voidable preferences or fraudulent transfers; (4) the debtor was unwilling or unable to pursue causes of action belonging to the estate; (5) conflicts of interest on the part of management interfered with its ability to fulfill its fiduciary duties to the debtor; and (6) management engaged in self-dealing or squandering of corporate

assets." *LHC*, 497 B.R. at 292 (*citing In re Intercat, Inc.*, 247 B.R. 911, 921 (Bankr. S.D. Ga. 2000)).

35. Here, cause exists for the appointment of a Chapter 11 trustee under Section 1104(a)(1). This case is replete with specific allegations of fraud, dishonesty, and gross mismanagement by Hull, Nohl and their entities as the Debtors' Managers. Their continuing breach of their fiduciary duties constitutes gross mismanagement of the Debtors' business and affairs and requires appointment of a Chapter 11 Trustee. *See In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (chapter 11 trustee appointed due to debtors' "failure to assume [fiduciary] duties" and acrimony with creditors). It is clear that they have "played fast and loose" with documents, property and money. *In re Klein*, 79 B.R. 769, 774 (N.D. Ill. 1987). Moreover, the payment of excessive fees and interest to themselves, while the Debtors' current assets were diminishing is further evidence of gross mismanagement. *Sharon Steel*, 871 F.2d at 1226-27. Given the Debtors' Managers' track record of fraudulent and dishonest actions, they should not be in fiduciary positions charged with protecting the economic interests of others.

36. Finally, cause exists to appoint a Chapter 11 trustee where there is acrimony between management and creditors and creditors lack confidence in the debtor's management. *See In re Madison Mgmt*, 137 B.R. 275, 281 (Bankr. N.D. Ill. 1992); *Marvel*, 140 F.3d at 473. As evidenced by the investors' distress in communications with GPTIF and the litigation filed by investors, it is apparent that they lack confidence in the Debtors' management.

**II.     Appointing a Chapter 11 Trustee is in the Best Interests of the Debtors' Creditors.**

37. Even if cause does not exist to appoint a trustee under Section 1104(a)(1), the court possesses broad discretion to appoint a trustee "if such appointment is in the interests of creditors, any equity security holders and other interests of the estate." 11 U.S.C. §1104(a)(2).

When analyzing whether a trustee is in the creditors' best interests, the court should consider both the protections that will be afforded by the appointment of a trustee and the relative cost that is associated with the appointment. *See Cajun*, 191 B.R.at 661. But when the need for a trustee becomes unavoidable to protect parties in interest, then the cost/benefit factor carries little weight, since the goal of protecting creditor interests is paramount to the goal of minimizing costs to the estate. *Id.* ("If the appointment of a trustee becomes unavoidable in the protection of parties in interest, the cost/protection factor must necessarily supersede a cost/benefit factor, even to the extent of a depletion of the estate.") (citations and internal quotations omitted). In this case, a consideration of the creditors and investor interests overwhelmingly supports appointing a Chapter 11 trustee.

38. The court must examine a debtor's present and past conduct to determine its management competency as well as whether the debtor has undertaken acts that are "in wanton and reckless disregard of the financial reality of the business and its creditors." *In re PMH Corp.,* 116 B.R. 644, 646-47 (Bankr. N.D. Ind. 1989)(*quoting, In re La Sherene, Inc.,* 3 B.R. 169, 175-76 (Bankr. N.D. Ga. 1980)). That examination is critical in this case where, as here, management has demonstrated a history of dishonesty, self-dealing and fraud.

### III. Grounds Exist to Convert or Dismiss this Case Under Section 1112 of the Bankruptcy Code.

39. In this case, cause for dismissal or conversion under Section 1112 exists because, among other grounds, the estate has been grossly mismanaged. 11 U.S.C. §1112(b)(4)(A) and (B). In the event the Court determines that cause exists under Section 1112, but that the creditors are not best served by a Chapter 11 trustee, then in the alternative, the Commission requests that this case be converted to a case under Chapter 7. As explained above, Hull, Nohl and their entities acting as Debtors' Managers have a rich history of fraud and dishonesty. Moreover, the

16

Case 19-29613-gmh    Doc 17    Filed 10/11/19    Page 16 of 18

creditors and investors have lost confidence in existing management and need the appointment of a third party fiduciary.

## CONCLUSION

WHEREFORE, for the reasons set forth herein and in the attached exhibits, the Commission respectfully requests that this Court enter an order appointing a Chapter 11 Trustee in this case or, in the alternative, conversion of the case to Chapter 7 and granting such other and further relief as this Court deems just and proper.

Dated: Chicago, Illinois
       October 11, 2019

                              Respectfully submitted,

                              */s/ Angela D. Dodd*
                              Angela D. Dodd (dodda@sec.gov)
                              Senior Bankruptcy Counsel

                              Doressia L. Hutton (HuttonD@sec.gov)
                              Charles J. Kerstetter (KerstetterC@sec.gov)
                              Christopher H. White (WhiteCh@sec.gov)
                              COUNSEL FOR SECURITIES
                              AND EXCHANGE COMMISSION
                              Chicago Regional Office
                              175 W. Jackson Blvd., Suite 1450
                              Chicago, IL 60604
                              Telephone: (312) 353-7390

## **CERTIFICATE OF WORD LIMIT**

I, Angela Dodd, do hereby certify that the foregoing MOTION OF THE U.S. SECURITIES AND EXCHANGE COMMISSION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE OR, ALTERNATIVELY, CONVERTING THE CASE TO CHAPTER 7 does not exceed the limit set forth Local Rule 9004(a). At the time of filing, the word count in the body of the document, including all footnotes and other references was 5,299 words.

/s/ Angela Dodd
Counsel for the
Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-7400
E-mail: dodda@sec.gov