FILED
11-16-2017
CIRCUIT COURT
DANE COUNTY, WI
~~2017CV002826~~
~~Honorable Josann M.~~
Reynolds
Branch 2

STATE OF WISCONSIN       CIRCUIT COURT       DANE COUNTY

ERICK J. HALLICK,

█████████████████,

        Plaintiff,

    v.

GREENPOINT TACTICAL INCOME FUND LLC
c/o its Registered Agent Chrysalis Financial LLC
111 East Kilbourn Avenue, FL 28
Milwaukee, Wisconsin 53202-6633,

GREENPOINT FINE ART FUND LLC
c/o its Registered Agent Lauren Kelly
22 E. Mifflin Street, Suite 302
Madison, Wisconsin 53703,

GREENPOINT REAL ESTATE DEVELOPMENT
FUND LLC
c/o its Registered Agent Bluepoint Investment
Counsel, LLC
22 E. Mifflin Street, Suite 302
Madison, Wisconsin 53703,

       and

GREENPOINT GLOBAL MITTELSTAND FUND
I LLC
c/o its Registered Agent Lauren Kelly
22 E. Mifflin Street, Suite 302
Madison, Wisconsin 53703,

        Defendants.

Case No.:

Case Code: 30703

---

## COMPLAINT

---

Plaintiff Erick J. Hallick, by his undersigned attorneys, Hansen Reynolds LLC, for his

complaint against defendants, alleges and states as follows:

1

## THE PARTIES

1.     Plaintiff Erick J. Hallick is an adult individual residing at ███████████ ███████████████████████ .

2.     Defendant Greenpoint Tactical Income Fund LLC ("GTIF") is a Wisconsin Limited Liability Company with the office of its registered agent Chrysalis Financial LLC located at 111 E. Kilbourn Avenue, FL 28, Milwaukee, Wisconsin 53202-6633 and its principal office address located at 22 E. Mifflin Street, Suite 302, Madison, Wisconsin 57303. The managing members of GTIF are Greenpoint Asset Management II LLC and Chrysalis Financial LLC. Greenpoint Asset Management II is a wholly owned subsidiary of Greenpoint Asset Management LLC, which is owned and operated by Michael Hull and Patrick Hull.  Chrysalis Financial LLC is 99% owned and operated by Christopher Nohl.

3.     Defendant Greenpoint Fine Art Fund LLC ("GFAF") is a Wisconsin Limited Liability Company with the office of its registered agent and principal office address located at 22 E. Mifflin Street, Suite 302, Madison, Wisconsin 53703. The managing members of GFAF are Greenpoint Asset Management IV LLC and Jennifer Weissbach. Greenpoint Asset Management IV LLC is a wholly owned subsidiary of Greenpoint Asset Management LLC, which is owned and operated by Michael Hull and Patrick Hull.

4.     Defendant Greenpoint Real Estate Development Fund LLC ("GREDF") is a Wisconsin Limited Liability Company with the office of its registered agent Bluepoint Investment Counsel, LLC and principal office address located at 22 E. Mifflin Street, Suite 302, Madison, Wisconsin 53703. The managing member of GREDF is Greenpoint Asset Management LLC, which is owned and operated by Michael Hull and Patrick Hull.

5.     Defendant Greenpoint Global Mittelstand Fund I LLC ("GGMF") is a Wisconsin

Limited Liability Company with the office of its registered agent Greenpoint Asset Management LLC and its principal office address located at 22 E. Mifflin Street, Suite 302, Madison, Wisconsin 53703. The managing members of GGMF are Greenpoint Asset Management V LLC and Mittelstand Fund LLC. Greenpoint Asset Management V LLC is a wholly owned subsidiary of Greenpoint Asset Management LLC, which is owned and operated by Michael Hull and Patrick Hull. Mittelstand Fund LLC is owned by Teresa Esser.

## JURISDICTION AND VENUE

6.     This Court, as a court of general jurisdiction, has subject-matter jurisdiction over this action pursuant to Wis. Const. Art. VII, § 8, Wis. Stat. § 753.03.

7.     This Court has also jurisdiction over this matter because this is an action for judicial dissolution of GTIF, GFAF, GREDF, and GGMF and each of their operating agreements provides that absent agreement by the members and managing members, "[t]he Company shall be dissolved upon . . . (b) the entry of a decree of judicial dissolution pursuant to section 183.0902 of the WLLCL."

8.     The Defendants are each subject to personal jurisdiction in this Court because each engaged in substantial and not isolated activities within Wisconsin. Wis. Stat. §§ 801.05(1)(d), 801.05(3).

9.     Venue is appropriate in this Court because at least one Defendant does substantial business in Dane County, Plaintiff's claims arose here, and Dane County is the county where the Defendants' principal offices, or registered offices, are located. Wis. Stats. § 801.50(2)(a), (c), § 183.0902. Venue is also appropriate in this Court because it is the county designated by the Plaintiff. Wis. Stat. § 804.50(2)(d).

3

## FACTUAL ALLEGATIONS

### Introduction

10.     Erick Hallick is an investor in and member of GTIF, GFAF, GREDF, and GGMF (together "the Greenpoint Funds"). The Greenpoint Funds were the brainchild of Michael Hull, Hallick's investment advisor.[1] Hull designed the Greenpoint Funds around Hallick's substantial assets and advised Hallick to invest in them. The Greenpoint Funds are managed through a web of limited liability companies, owned and controlled by Michael Hull and his brother Patrick Hull, and certain other individuals. *See supra* ¶¶ 2–5.

11.     As described in detail below, Hallick has learned that Michael Hull and other managers of the Greenpoint Funds have grossly mismanaged the assets of the funds, have made material misrepresentations to Hallick and other investors in the Greenpoint Funds, have perpetrated a valuation fraud upon Hallick and other investors with Ponzi-like features in order to enrich themselves, and are currently under investigation by the Federal Bureau of Investigation, the Securities and Exchange Commission, and other regulatory authorities for criminal activities in their management of the Greenpoint Funds.

12.     In light of these troubling circumstances, Hallick requests that this Court immediately appoint a receiver to assume plenary control over the Greenpoint Funds and all assets of the funds pursuant to Wis. Stat. § 813.16. Hallick further requests that the Court enter an order or decree dissolving the Greenpoint Funds pursuant to Wis. Stat. § 183.0902, directing the receiver to wind up the funds and take all other actions necessary to protect Hallick and the other investors' interests in the Greenpoint Funds pursuant to Wis. Stats. §§ 183.0902, 183.0903, *et seq.*

---

[1] The Hulls' investment advisory company is called Bluepoint Investment Counsel, LLC.

4

**Background**

13.     In 2011, Erick Hallick became a client of Morgan Stanley Smith Barney ("MSSB"), investing in excess of $18 million in a balanced portfolio of funds overseen by his MSSB advisor Michael Hull.

14.     In or about June of 2012, Michael Hull was terminated by MSSB for recommending unsuitable investments for his clients.

15.     Michael Hull and his brother Patrick Hull ("the Hulls") had been investigated by the Securities and Exchange Commission in connection with investment advice they provided to the Wisconsin Funeral Trust fund, leaving that fund with a $24.5 million shortfall.

16.     The Wisconsin Department of Financial Institutions also investigated the Wisconsin Funeral Trust, commenced an action against the Trust and related parties for investment fraud and other causes of action, and successfully had a receiver appointed to wrest control of the Trust's investments from Bluepoint and the Hulls. *See* Dane County Circuit Court Case No. 12-CX-44.

17.     Michael Hull did not disclose his termination, the reason for his termination, or his involvement with the Wisconsin Funeral Trust to Hallick. Rather, Michael Hull represented to Hallick that he voluntarily left MSSB to start a new investment advisory firm, Bluepoint Investment Counsel, LLC ("Bluepoint"), with his brother Patrick Hull. Michael Hull informed Hallick that MSSB was pressuring him to invest in MSSB funds and he wanted to be free from that pressure so that he could better serve his clients by offering them a broader scope of investment options.

18.     Michael Hull also represented to Hallick that many of his clients, with accounts valued at approximately $100 million, were leaving MSSB and following him to Bluepoint

where Hull would continue to serve as their investment advisor.

19. On June 18, 2012, Hallick executed a Discretionary Investment Management Agreement with Bluepoint, under which Michael Hull offered him investment advisory services and agreed to act as Hallick's fiduciary in exchange for an annual fee of 1% of assets under management.

20. At all times material, under the Discretionary Investment Management Agreement, and as an SEC registered investment advisory firm, Bluepoint and its principals, the Hulls, owed Hallick a fiduciary duty of the utmost good faith, fair dealing, and loyalty, as well as an affirmative obligation to employ reasonable care to avoid misleading him, to act in his best interests, and to provide him with suitable investment advice.

21. As is detailed below, Bluepoint and the Hulls breached all of these duties to Hallick.

22. Instead of acting in Hallick's best interests, Bluepoint and the Hulls advised Hallick to invest the vast majority of his portfolio in a series of investment funds that the Hulls created, owned, and operated: the Greenpoint Funds.

**The Greenpoint Funds**

23. The Hulls designed the Greenpoint Funds around Hallick's substantial assets. Contrary to representations from Michael Hull that other clients of his had invested in the Greenpoint Funds, Hallick was the primary investor in each of the Greenpoint Funds, which the Hulls would likely not have created but for Hallick's commitment to invest.

24. As explained below, the Greenpoint Funds are structured principally to benefit the Hulls and other fund managers by tying up Hallick's funds in illiquid and often unusual assets that are difficult to value and therefore easy to manipulate with subjective and unverifiable

6

appraisals.

25.     The Greenpoint Funds are also structured to deny Hallick, and other investors, the ability to sell their interests and exit the investments.

26.     The Greenpoint Funds pay their managers (including the Hulls through the various shell entities they created) substantial management fees and engage in other profit sharing devices, purportedly based on the fair value of the invested assets, as determined by appraisals and other devices controlled by the managers.

27.     As such, Hallick's investment advisors, the Hulls, paid themselves for their management of the Greenpoint Funds based on valuations they controlled of the illiquid assets acquired by the Greenpoint Funds, essentially creating a risk-free annuity for themselves at Hallick's expense while returning no real investment gains to Hallick and other investors.[2]

### Hallick's Investments in the Greenpoint Funds

28.     Hallick is the largest investor in the Greenpoint funds, having invested a total of $14,470,000 in them: $6,875,000 in GTIF; $3,125,000 in GFAF; $2,970,000 in GREDF; and $1,500,000 in GGMF.

29.     On the advice of Bluepoint and Michael Hull, from June 1, 2013, to February 17, 2015, Hallick invested a total of $ 6,875,000 in GTIF.  A copy of the June 1, 2013, GTIF Confidential Investment Letter is attached as Exhibit 1, and a copy of the November 7, 2013, GTIF Amended and Restated Operating Agreement is attached as Exhibit 2.

30.     According to its business plan, GTIF was supposed to be structured to create stable current cash flow as well as long and short term capital gains. Investments were

---

[2] In addition, on information and belief, Bluepoint has and continues to charge Hallick up to 1% of Hallick's assets under management for investment advisory services — creating another layer of fee revenue for the Hulls based on the assessed value of Hallick's investments in the Greenpoint Funds.

purportedly to be 80% in tangible assets such as real estate, and 20% in petrochemical intermediaries, proven domestic mining operations, and rare earths and gems. A copy of GTIF's business plan is attached as Exhibit 3. A 2013 letter from Michael Hull describing the great success of the fund that year is attached as Exhibit 4.

31.     On the advice of Bluepoint and Michael Hull from September 2, 2013, to May 23, 2014, Hallick invested a total of $ 3,125,000 in GFAF.  A copy of the GFAF Confidential Investment Letter is attached as Exhibit 5, and a copy of the GFAF Operating Agreement is attached as Exhibit 6.

32.     According to its business plan, GFAF was designed to acquire a diversified pool of art, "20-35 exceptional pieces, each priced between $100,000 and $5 million" and offer a "solid investment return[,]" "with the goal of generating strong, stable long term capital gains." The GFAF business plan further provides that: "[a]ll art would be bought within 2 ½ years of the fund's inception and sold within 3-5 years." A copy of the GFAF business plan is attached as Exhibit 7. The Notes to the 2013 Financial Statements stated that the fund's current asset was a single painting valued at $2,922,298. A copy of the 2013 audited financial statement is attached as Exhibit 8.

33.     On the advice of Bluepoint and Michael Hull, from May 24, 2013, to July 26, 2013, Mr. Hallick invested a total of $ 2,970,000 in GREDF.  A copy of the April 1, 2013, GREDF Confidential Investment Letter is attached as Exhibit 9, and a copy of the March 6, 2013, GREDF Operating Agreement is attached as Exhibit 10.

34.     According to its business plan, GREDF was designed to focus on buying and developing existing properties, then updating and renovating them to provide upscale rental units. The goal was to "generat[e] a strong, stable balance of current cash flow and long term

8

capital gains." A copy of GREDF's business plan is attached as Exhibit 11.

35.     On the advice of Bluepoint and Michael Hull, on December 22, 2013, Hallick invested a total of $1,500,000 in GGMF.  A copy of the GGMF Confidential Investment Letter is attached as Exhibit 12, and a copy of the GGMF Operating Agreement is attached as Exhibit 13.

36.     According to its business plan, GGMF was designed to use the "significant business relationships on both sides of the Pacific Ocean" to invest in companies in the U.S. and South Korea having the "potential to develop into niche-focused, global manufacturing, and export-heavy powerhouses."  The fund promised "all investors liquidity on a quarterly basis." A copy of the GGMF business plan is attached as Exhibit 14.

### Hallick's Funds Remain in the Greenpoint Funds

37.     On more than one occasion, Michael Hull represented to Hallick that he could liquidate Hallick's interests in any of the Greenpoint Funds with six months' notice.

38.     In September 2016, Hallick requested a $500,000 distribution from GTIF.

39.     On or about October 7, 2016, Hallick requested to redeem, withdraw, or liquidate all his shares in GTIF.

40.     On or about January 25, 2017, Hallick requested to redeem, withdraw, or liquidate all his shares in GFAF, GREDF, and GGMF.

41.     To date, despite his request to redeem, withdraw, or liquidate all of his shares, Hallick has had less than 1% of the purported value of his investments in the Greenpoint Funds returned to him. Hallick remains a member of the Greenpoint Funds and the funds he invested remain under the control of the Hulls and other managers who continue to pay themselves management fees.

9

**FBI Investigation of Michael Hull, Patrick Hull, and Christopher Nohl**

42.     In March 2017, Hallick learned that Bluepoint's offices had been raided by the Federal Bureau of Investigation.

43.     Hallick called, texted, and emailed Michael Hull to learn what had happened. Hull called Hallick back and informed him that there was no FBI raid and that the Securities and Exchange Commission was simply conducting a routine audit of Bluepoint.

44.     Hallick subsequently learned that in addition to the raid on the Bluepoint offices, the FBI had executed a raid upon a storage facility wherein certain minerals, gems, and rare earths acquired by GTIF were kept, as well as Christopher Nohl's residence.

45.     On April 24, 2017, GAM sent a communication to its investors regarding the FBI raid and investigation of GTIF. A copy of that communication is attached as Exhibit 15.

46.     Hallick subsequently obtained a copy of the Application for a Search Warrant, executed by FBI Special Agent Allen J. Pettigrew in connection with the FBI Raid. A copy of the Application for a Search Warrant is attached as Exhibit 16.

47.     The Application contains an Affidavit detailing Special Agent Pettigrew's investigation and probable cause analysis.

48.     The Application for a Search Warrant was signed by U.S. Magistrate Judge David E. Jones in the United States District Court for the Eastern District of Wisconsin on March 20, 2017, and the requested Search Warrant was issued.

49.     In his Affidavit, Special Agent Pettigrew explains that in 2016 the Securities and Exchange Commission in Chicago conducted an audit of Bluepoint and GAM. Ex. 16, at 4–5.

50.     After discovering suspicious valuation and accounting practices, (particularly with respect to certain gems and minerals acquired by GTIF), the SEC referred the investigation

to the FBI in Madison. *Id*. at 4.

51.     According to the FBI: "[t]hese suspicious practices include[d] significant unrealized gains claimed as profit and incentive fees allocated to the Fund's managing members, appraisals with insufficient detail regarding value inputs, promotional or sales literature-style appraisals, the use of replacement value appraisals instead of fair value appraisals, and insurance that is insufficient to cover the reported fair values of the gems and minerals." *Id.* at 5.

52.     Under the GTIF Operating Agreements, GTIF allocated "profits" on a quarterly basis based on share ownership. Investors, including Hallick, were sold Class A Units, but the Hulls (through GAM II) and Nohl (through Chrysalis) owned Class B Units that provide them with a fixed 30% ownership of GTIF regardless of the number of Class A Units issued to investors. *Id.* at 10.

53.     Under the GTIF Operating Agreements, the Hulls (through GAM II) and Nohl (through Chrysalis) also each received one percent of assets under management on a quarterly basis as a management fee. *Id.*

54.     The value of the GTIF assets was to be determined annually based on both realized gains and unrealized gains in the fair market value of the investments. *Id.* at 11.

55.     Under the GTIF profit-sharing and ownership structure, the Hulls, (through GAM II), and Nohl, (through Chrysalis) paid themselves millions of dollars without actually realizing any gains for their investors, based largely on dubious appraisals overvaluing GTIF's investments. *Id.* at 12–13.

56.     According to the FBI:

> **Creating Unrealized Gains Based on Misstatements and Improper Appraisals**
>
> 23. Between the Fund's inception in early 2014 to December 31, 2015, Chrysalis and GAM II removed in cash over $5.85 million from the Fund, according to the 2015 Report. Specifically, Chrysalis and GAM II have received $4.39 million in cash distributions, and an additional $1.46 million in cash management fees. The vast majority of the cash paid to Chrysalis and GAM II came directly from the approximately $40 million in investor contributions. Accordingly, by December 31, 2015, a minimum of 15% of every investor dollar had been transferred to Chrysalis and GAM II because the Fund has realized gains of only $310,035 in cash from actual sales of investments between its inception and December 31, 2015.[4] During that period, the Fund reported over $43.1 million in unrealized, paper gains, largely on the basis of appraisals. According to the 2015 Report, by December 31, 2015, Chrysalis and GAM II had allocated over $6.5 million in additional funds to themselves on paper, which will allow them to withdraw even more cash from the Fund without realizing any gains for investors. Based on the 2015 Report, the Fund reported these distributions and allocations almost entirely on the basis of appraisals Nohl solicited for gems and minerals.

*Id.* at 13.

57. GTIF represented to its investors, including Hallick, that it would value its investment assets based on fair market value and that it operated in accordance with the Accounting Standards Codification ("ASC"), a component of U.S. Generally Accepted Accounting Principles maintained by the Financial Accounting Standards Board. *Id.* at 13–14.

58. GTIF did not follow ASC definitions and methods to determine the fair value of its investments. *Id.* at 13–14.

59. Instead, GTIF and a GTIF controlled entity, GP Rare Earth, relied on

unsubstantiated appraisals to artificially inflate the fair value of its investments, posting

unrealized gains of 313% in the reported value of its minerals and gems in less than three years.

*Id.* at 15–16.

60.     According to the FBI's review of the appraisals, many of them were by appraisers

with little qualification or experience, and many of the appraisals themselves indicate they were

for replacement value and insurance purposes, not fair market value. Nevertheless, GTIF relied

on the appraisals to establish the fair value of the gems and minerals in order to create the

illusion of asset appreciation. *Id.* at 16–18. GTIF "relied on these appraisals alone to take

unrealized gains of over $5 million." *Id.* at 17.

61.     In addition to conflating replacement value with fair value, a practice that could

be "significantly misleading" to investors, the FBI investigation unearthed other troubling issues

with the appraisals. *Id.* at 18.

62.     Despite claiming impartiality, one appraiser sold $250,000 of minerals to GTIF

just days before he provided appraisals to GTIF, which GTIF relied on for "gains" of 140.8% in

less than three months. *Id.* at 18–19.

63.     The FBI also reviewed an insurance underwriter's notes noting that the former

CFO of GP Rare Earth indicated he was no longer with that company "due to unethical and

possible illegal activities" and that "new inventory was inflated and may be a set up for a claim

or misleading investors." *Id.* at 21.

64.     Another appraiser that GTIF relied upon to inflate asset valuations emailed to

Nohl: "[a]lso please give an idea of what you might need for numbers[,]" *Id.* at 22, indicating

that the appraisals he provided were not impartial and may have had direct input from Nohl.

65.     The FBI retained a gemologist, Shelly Sandler, who previously worked with the

Case 19-29613-gmh    Doc 17-7    Filed 10/11/19    Page 13 of 22

FBI on other matters, *Id.* at 2, who opined that the appraised valuations were "extraordinary" and that she would not have expected to see increases in valuation of the sort claimed by GTIF over such a short period of time. *Id.* at 22.

66.     The higher the appraised value of the gems and minerals, the more fees and profit distributions were available to the GTIF managing members, the Hulls (through GAM II) and Nohl (through Chrysalis), creating a perverse system in which they were highly incentivized to inflate values through false or fraudulent appraisals and financial statements. *Id.* at 23.

67.     The Hulls (through GAM II) and Nohl (through Chrysalis) "have distributed to themselves $6.79 million or 17% of all the dollars contributed to the fund" a sum wildly disproportionate to "the small interest income ($167,459) and real gains ($310,035)" of the fund. *Id.* at 24.

68.     As additional evidence that the appraisals overvalued GTIF investment assets, the FBI determined that they are inadequately insured. Specifically, the FBI found that "the cost of the minerals and gems is underinsured by approximately $8,352,631, and the reported fair value of the minerals and gems is underinsured by over $50 million." *Id.* at 25.

69.     Ultimately, the FBI determined that based on their investigation, there was probable cause to believe that the Hulls and Nohl engaged in a scheme to defraud GTIF investors:

**PROBABLE CAUSE**

6.    Based on my investigation, there is probable cause to believe that Nohl and Michael and Patrick Hull have engaged in a scheme to defraud investors by systematically overvaluing assets held by the private investment fund that Nohl and the Hulls manage, in order to increase their management fees and profit allocations from the fund, which are each based on the valuation of assets held by the fund. Nohl and the Hulls represented to potential investors that the fund would invest primarily in distressed housing assets. Instead, they actually invested in purportedly rare gems and minerals whose valuations are more easily manipulated as discussed below. Nohl and the Hulls overvalued the assets by obtaining false or misleading appraisals that did not comply with their representations to investors. This included: (1) Using replacement value appraisals, but representing them as fair market value appraisals; and (2) reporting unrealized gains within the first calendar year of a purchase, but representing to investors that no such gains would be reported until after the first calendar year of a purchase.

*Id.* at 3.

70.    The Internal Revenue Service Criminal Investigative Unit is also investigating GTIF, the Hulls, and Nohl. *Id.* at 28.

71.    The FBI investigation has revealed that GTIF has not followed its business plan as it has invested the vast majority of its assets in rare earths and minerals, rather than real estate and other investments that create stable current cashflow.

72.    On or about April 6, 2017, the Milwaukee Journal Sentinel published an article regarding the FBI investigation and the Hulls' prior history of investment mismanagement of the Wisconsin Funeral Trust fund. The article is attached as Exhibit 17.

73.    On or about April 24, 2017, Michael Hull sent a letter on behalf of the Greenpoint

Funds to investors, including Hallick, attempting to spin the Milwaukee Journal Sentinel article and the FBI's return of some of the seized gems and minerals as a "good outcome" affirming the legitimacy of the GTIF investments. The government did not affirm the legitimacy of the GTIF investments or valuations.

74.　　On or about May 15, 2017 and May 22, 2017, Michael Hull wrote to Hallick (through his counsel) on behalf of all the Greenpoint Funds, formally acknowledging Hallick's request to liquidate his interests in GTIF, GFAF, GREDF, and GGMF, and proposing various plans and strategies to liquidate assets and take out loans to raise sufficient funds to acquire Hallick's shares. The letters are attached as Exhibits 18 and 19.

75.　　To date, despite repeated inquiries and requests, Hallick has received no proof or reasonable assurances that GTIF, GFAF, GREDF, and GGMF are actually proceeding with the plans and strategies laid out by Hull in the letters.

76.　　Hallick has attempted on numerous occasions to redeem his shares in GTIF, GFAF, GREDF, and GGMF, but has received less than 1% of the remuneration he has requested and has been informed that the funds do not have the ability to pay him.

77.　　GFAF, GREDF, and GGMF contain nearly identical compensation and "profit" sharing structures for the managing members as GTIF.  Exs. 1, at 17; 5, at 14; 9, at 15; 12, at 15.

78.　　GFAF, GREDF, and GGMF are also like GTIF in that each of the funds purportedly acquired illiquid assets that are prone to subjective valuations and relied on appraisals to determine the "profits" and management fees for funds.  Exs. 3, 7, 11, 14.

79.　　Because of this structure the Hulls (through various shell entities) and other managers of GTIF, GFAF, GREDF, and GGMF have the ability to exert control over the valuation of the funds in ways that are subjective, unverifiable by those outside the funds, and

easily manipulated to their financial advantage, at the direct expense of Hallick and other investors.

80. As of the date of the FBI investigation detailed above, GTIF managing members removed over $5.85 million from the fund in management fees and cash distributions, and allocated an additional $6.5 million to themselves on paper, enabling them to withdraw additional funds despite not realizing gains for investors. Ex. 16, at 13. Hallick and other GTIF investors have no way to verify the accuracy of the FBI's conclusions and no way to accurately determine how much the GTIF managing members have paid themselves *since* the March 20, 2017, Application for Search Warrant.

81. Hallick was also informed that the Hulls and Nohl paid their attorneys over $700,000 from GTIF funds in connection with their defense to the criminal allegations by the FBI.

### Recent Events and Disclosures Demonstrating Fraud and Mismanagement of the Greenpoint Funds

82. In September 2017, Hallick received appraisals of certain of the most valuable gems that GTIF acquired, which indicated that the appraisals had been *starkly* reduced from the prior calendar year:

| | | | SKU | SPECIES | GEM APPRAISALS 2017 | | | | | | | | APPRAISAL | DATE | VALUE 2016 | APPRAISAL | DATE | VALUE 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AF | TO | F1 | 807130002 | Tourmaline | | 20.71 | cts | 19.60 | 12.10 | 10.44 | mm | Afghanistan | GEMWORLD | 7/18/16 | $18,725.00 | GEMWORLD | 8/15/2017 | $18,725.00 |
| AF | AP | F1 | 121150001 | Red Apatite | | 36.020 | cts | 22.35 | 21.55 | 12.89 | mm | Afghanistan | GEMWORLD | 7/18/16 | $14,410.00 | GEMWORLD | 8/15/2017 | $15,500.00 |
| TA | TA | F1 | 903140006 | Bi-Color Tanzanite | | 6.700 | cts. | 10.89 | 10.6 | 6.19 | mm | Tanzania | GEMWORLD | 7/18/16 | $7,236.00 | GEMWORLD | 8/15/2017 | $8,442.00 |
| AF | TO | F1 | 807130003 | Tourmaline | | 6.14 | cts | 11.76 | 9.98 | 7.80 | mm | Afghanistan | GEMWORLD | 7/18/16 | $6,900.00 | GEMWORLD | 8/15/2017 | $6,900.00 |
| BR | TO | F1 | 807130005 | Tourmaline | | 48.42 | cts | 42.00 | 12.57 | 9.99 | mm | Brazil | GEMWORLD | 7/18/16 | $6,100.00 | GEMWORLD | 8/15/2017 | $6,100.00 |
| US | TO | F1 | 508130002 | Tourmaline | | 6.96 | cts | 14.28 | 8.36 | 8.47 | mm | USA | GEMWORLD | 7/18/16 | $4,700.00 | GEMWORLD | 8/15/2017 | $4,700.00 |
| MZ | TP | F1 | 1007130001 | Tourmaline - Paraiba Type | | 29.13 | cts | 23.42 | 17.24 | 11.57 | mm | Mozambique | ZIGRAS | 6/14/16 | $1,165,200.00 | GEMWORLD | 8/15/2017 | $189,280.00 |
| MZ | TP | F1 | 1007130002 | Tourmaline - Paraiba Type | | 34.40 | cts | 23.97 | 17.39 | 12.27 | mm | Mozambique | ZIGRAS | 6/14/16 | $1,720,000.00 | GEMWORLD | 8/15/2017 | $201,240.00 |
| MZ | TP | F1 | 1007130003 | Tourmaline - Paraiba Type | | 44.59 | cts | 25.11 | 21.09 | 13.95 | mm | Mozambique | ZIGRAS | 6/14/16 | $891,800.00 | GEMWORLD | 8/15/2017 | $231,816.00 |
| MZ | TP | F1 | 1007130004 | Tourmaline - Paraiba Type | | 83.37 | cts | 28.45 | 25.84 | 17.80 | mm | Mozambique | ZIGRAS | 6/14/16 | $1,667,600.00 | GEMWORLD | 8/15/2017 | $430,420.00 |
| MZ | TP | F1 | 1007130005 | Tourmaline - Paraiba Type | | 108.46 | cts | 32.96 | 27.34 | 17.92 | mm | Mozambique | ZIGRAS | 6/14/16 | $2,711,500.00 | GEMWORLD | 8/15/2017 | $493,495.00 |
| AU | OP | F1 | 203140001 | Pair Black Boulder Opal Freefo | | 16.05 | cts. | 18.50 | 10.50 | 4.50 | mm | Australia | ZIGRAS | 6/14/16 | $25,000.00 | GEMWORLD | 8/15/2017 | |
| AU | OP | F1 | 203140002 | Cut Black Boulder Opal Tongu | | 32.15 | cts. | 30.00 | 20.00 | 6.00 | mm | Australia | ZIGRAS | 6/14/16 | $38,000.00 | GEMWORLD | 8/15/2017 | |
| AU | OP | F1 | 203140003 | Opalized Pleisiosaur Jawbone | | 304.50 | cts. | 6.40 | 4.50 | 2.00 | cm | Australia | ZIGRAS | 6/14/16 | $350,000.00 | GEMWORLD | 8/15/2017 | |
| AU | OP | F1 | 227140001 | Harlequin All Color Black Opal | | 47.15 | cts. | 36.00 | 22.50 | 8.00 | mm | Australia | ZIGRAS | 6/14/16 | $40,000.00 | GEMWORLD | 8/15/2017 | |

17

Exhibit 20.

83.     Because no rational explanation was provided to Hallick for these reductions, it became clear to him that contrary to the representations of Hull and Nohl, the original appraisals were indeed wildly inflated as the FBI alleged, and that GTIF and its managers were perpetrating a fraud upon Hallick and other investors.

84.     Based on disclosures by GTIF, it appears that the managers paid themselves $1,627,957 for management fees in 2016. Ex. 21.  Added to the totals from the FBI investigation, it would appear that the GTIF managers paid themselves a total of $3,087,957 in management fees since the Fund's inception in 2014. Ex. 16, at 13; Ex. 21. Hallick and other investors do not have any way to verify the amount of management fees paid, or other distributions taken by the managers of GTIF, nor do they have a way to accurately determine how the exorbitant fees were arrived at.

85.     Based on disclosures by GFAF, it would appear that the GFAF managing members have paid themselves hundreds of thousands of dollars since the inception of the fund for management fees. Exs. 22–25. The managing members also maintain a high ownership percentage, which amounts to paying themselves a significant portion of the funds profits, based on unrealized gains. Ex. 5, at 8. Hallick and other GFAF investors have no way to verify the accuracy of the GFAF disclosures, or determine how much the managing members have actually paid themselves. In addition, Nohl (through his company Chrysalis) was paid a commission of $580,000 for the acquisition of the sole painting owned by the fund and, on information and belief, Nohl will receive an additional 20% commission on the sale price of the painting, with 40% of the net profits to be shared with the former owners of the painting.  The relevant pages of the purchase agreement are attached hereto as Exhibit 26.

Case 19-29613-gmh    Doc 17-7    Filed 10/11/19    Page 18 of 22

86.     In an attempt to assuage Hallick and avoid litigation, Michael Hull and Christopher Nohl represented to Hallick that GFAF had received a $9 million offer for the painting (which was acquired with Hallick's funds). Despite representing gains of millions of dollars on the $3.7 million "Fair Value" of the painting in recent GFAF financial statements and nearly 100% greater than a $4.6M insurance appraisal on the painting, GFAF turned the purported offer down. When asked why the offer was turned down, Hull represented to Hallick that he believed the painting could be sold for as much as $30 million. Hallick requested proof that the $9 million offer was made and Hull and Nohl were unable to provide any proof.

87.     On July 19, 2017, Hallick received audits of GREDF financial statements for 2014 and 2015 from the fund's accountants. Exhibit 27.

88.     In a cover letter to investors summarizing the audits, the accountants warned that the GREDF "accounting records were not accurately maintained during the entire period under audit."  *Id.*

89.     The GREDF accountants also identified other "deficiencies" and "material weaknesses" stating: "Numerous year end adjustments were required, [sic] which suggests investor statements do not match the final 2015 and 2014 audited financial statements." *Id.*

90.     In addition, the GREDF audit resulted in a reduction of over 50% of the investment "gains" of the funds. Hallick was informed that this was because the funds valued the properties they had accumulated by selecting one appraised property as an exemplar, which they utilized to value other properties in the portfolio, an improper methodology that was used to artificially increase the values of the other properties and management fees.

91.     In light of these significant accounting irregularities, Hallick and the other GREDF investors have no way to verify the accuracy of their account statements, the veracity of

the purported assets of the fund, or determine how much the managing members have paid themselves.

92.     Based on disclosures by GGMF, it would appear that the GGMF managers have also paid themselves hundreds of thousands of dollars since the inception of the fund for management fees. Exs. 28–30. The managing members also maintain a high ownership percentage, which amounts to paying themselves a significant portion of the funds profits, based on unrealized gains. Ex. 12, at 9. Hallick and other GGMF investors have no way to verify the accuracy of the GGMF disclosures, or determine how much the managing members have actually paid themselves.

93.     On information and belief, through Bluepoint, the Hulls paid themselves additional investment advisory fees of 1% of Hallick's assets under management, including in the Greenpoint Funds, providing further incentive for them to artificially inflate the investment value of the Greenpoint Funds from which they were already directly benefitting.

94.      On information and belief, the SEC, FBI, and Internal Revenue Service Criminal Investigative Unit are also investigating GFAF, GREDF, GGMF, Bluepoint, the Hulls, and Nohl for investment fraud schemes similar to GTIF.

**CLAIM FOR RELIEF**

**Appointment of Receiver and Judicial Dissolution**
**Under Wis. Stats. §§ 813.16, 183.0902, and 183.0903, *et seq.***

95.     Plaintiff hereby re-alleges the foregoing allegations in this Complaint as if set forth fully herein.

96.     As described in detail in the paragraphs above, one or more of the managers of GTIF, GFAF, GREDF, and GGMF are acting or will act in a manner that is illegal, oppressive, and/or fraudulent with respect to Hallick and other investors.

20

97.     As described in detail in the paragraphs above, the assets of GTIF, GFAF, GREDF, and GGMF are being misapplied and/or wasted.

98.     As described in detail in the paragraphs above, GTIF, GFAF, GREDF, and GGMF are not acting in conformity with their operating agreements, and, under the circumstances, it is not reasonably practicable to continue to carry on the business of these funds.

99.     The operating agreements of GTIF, GFAF, GREDF, and GGMF each provide that they shall be dissolved upon the entry of a decree of judicial dissolution pursuant to Wis. Stat. § 183.0902. Exs. 2, at 14; 6, at 16–17; 10, at 16; 13, at 14.[3]

100.    The operating agreements of GTIF, GFAF, GREDF, and GGMF also contain a fee-shifting provision, entitling the prevailing party to costs and reasonable attorneys' fees from the other party. Exs. 2, at 17; 6, at 20; 10, at 19; 13, at 17.

101.    As an investor in and member of GTIF, GFAF, GREDF, and GGMF, Hallick has an interest in the property and assets of GTIF, GFAF, GREDF, and GGMF, and as described in detail in the paragraphs above, the property and assets are in danger of being lost, wasted, or materially impaired.

102.    Accordingly, pursuant to Wis. Stat. § 813.16, the Court should immediately appoint a receiver to assume plenary control of GTIF, GFAF, GREDF, and GGMF.

103.    The Court should further enter an order decreeing the dissolution of GTIF, GFAF, GREDF, and GGMF, and order the receiver to wind up the Greenpoint Funds, marshal, account for, liquidate, and distribute their assets according to law, and take any and all other actions appropriate to protect Hallick and the other investors' interests in the funds pursuant to Wis.

---

[3] In the event it is determined that the Second Amended and Restated Operating Agreement of Greenpoint Tactical Income Fund LLC is the operative agreement, § 9.2 of that document also provides for dissolution by judicial decree under Wis. Stat. § 183.0902.

Stats. §§ 183.0902, 183.0903, *et seq.*, including but not limited to seeking the return of any funds received by the managing members of the Greenpoint Funds, or any other person, by virtue of any improper or wrongful conduct.

WHEREFORE, plaintiff requests that the Court order and enter judgment as follows:

(1) Appointing a receiver to immediately assume plenary control over GTIF, GFAF, GREDF, and GGMF;

(2) Issuing a temporary restraining order or preliminary injunction to preserve the assets of GTIF, GFAF, GREDF, and GGMF for administration, prevent the precipitous withdrawal of funds, and to preserve the status quo;

(3) Decreeing the dissolution of GTIF, GFAF, GREDF, and GGMF;

(4) Directing the receiver to wind up GTIF, GFAF, GREDF, and GGMF marshal, account for, liquidate, and distribute their assets according to law, and seek the return of any funds received by their managing members, or other persons, by virtue of any improper or wrongful conduct;

(5) Awarding Hallick his costs and reasonable attorneys' fees under the terms of the GTIF, GFAF, GREDF, and GGMF operating agreements, or otherwise; and

(6) Awarding Hallick his costs and disbursements according to law and granting such additional relief as the Court deems just and equitable.

Dated this 16th day of November, 2017.      **HANSEN REYNOLDS LLC**

By: /s/ Paul R. Jacquart
    Timothy M. Hansen (1044430)
    Paul R. Jacquart (1035971)
    John A. Busch (1016970)
    Danielle M. Nardick (1097696)
    316 North Milwaukee Street, Suite 200
    Milwaukee, Wisconsin 53202
    T. (414) 455-7676 Phone
    F. (414) 273-8476 Facsimile
    E-mail: pjacquart@hansenreynolds.com
    E-Mail: thansen@hansenreynolds.com
    E-Mail: jbusch@hansenreynolds.com
    E-Mail: dnardick@hansenreynolds.com

    *Attorneys for Plaintiff Erick J. Hallick*