# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

| | |
|---|---|
| Greenpoint Tactical Income Fund LLC, | Case No. 19-29613-gmh |
| Debtor. | Chapter 11 |

| | |
|---|---|
| GP Rare Earth Trading Account LLC | Case No. 19-29617-gmh |
| Debtor. | Chapter 11 |

**Report of Debtors for October 17, 2019 Hearing**

Now comes, Debtors, Greenpoint Tactical Income Fund LLC and GP Rare Earth Trading Account LLC, by their attorneys, Steinhilber Swanson LLP by Attorneys Michael P. Richman and Claire Ann Richman, and pursuant to the Court Minutes/Order [Docket 19 in Case No. 19-29613 and Docket 20 in Case No. 19-29617] reports as follows.

## COMMENCEMENT OF CASES

1.   On October 4, 2019 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing the above-captioned cases.

2.   The Debtors remain in possession of their property and are operating their business as debtors in possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.   On October 11, 2019, the Securities and Exchange Commission ("SEC") filed a motion for the appointment of a Chapter 11 trustee and in the alternative to convert these cases to chapter 7 (the "SEC Trustee Motion"). By Minute Entry on the Docket entered October 12, 2019, the Court denied (without prejudice) the portion of the SEC Trustee Motion that sought in the

alternative to convert the cases to chapter 7, for failure to comply with local rules. No other motion for the appointment of a trustee or examiner has been made, and, as of the date of this Motion, no official committee has been appointed. An organizational meeting of creditors under § 341 of the Bankruptcy Code is scheduled to be held on November 4, 2019.

## THE DEBTORS' BUSINESS

4.  GPTIF is a Wisconsin limited liability company with its principal place of business in Milwaukee, Wisconsin. GPTIF is a company managed by 1) Greenpoint Management II LLC ("GP Management"), a Wisconsin limited liability company, by Michael Hull ("Hull"), the President and CEO of GP Management; and 2) Chrysalis Financial LLC ("Chrysalis), a Wisconsin limited liability company located in Milwaukee, Wisconsin, by Christopher Nohl ("Nohl"), the authorized Managing Member of Chrysalis. GPTIF's principal business is investing in gems and minerals (together "gemstones"). It does so through its wholly-owned subsidiary, GP Rare Earth Trading Account, LLC ("GPRE"), also a Wisconsin limited liability company with its principal place of business in Milwaukee, Wisconsin. Since their founding in late 2013, through purchases and sales of gemstones, and other investments, the Debtors have amassed a portfolio of gemstones (owned by GPRE) which Debtors believe has a fair market value of approximately $75 million. Greenpoint Tactical Income Fund, LLC ("GPTIF") also has more passive investments in other businesses which it believes have a fair market value of about $30 million.

5.  There are 142 investors in GPTIF, known as Members under the Second Amended and Restated Operating Agreement of Greenpoint Tactical Income Fund LLC, dated January 1, 2016 ("GPTIF OA"). GPTIF owns 100% of GPRE, the title holder of the portfolio of gemstones. The Members of GPTIF include the Managing Members (defined as Greenpoint Management and

Chrysalis). As noted above, Nohl is authorized to act for Chrysalis and Hull is authorized to act for Greenpoint Management.

6. A detailed inventory of the Debtors' gemstone holdings will be attached to Schedule B filed by GPRE (the "Gemstone Inventory"). The Debtors have used independent appraisers to determine the fair market values of all their gemstones. The individual values are not included on the Gemstone Inventory because the Debtors intend to use their chapter 11 cases to sell enough gemstones under Bankruptcy Code § 363 to generate cash proceeds that will be used to pay administrative expenses and allowed claims in full, and otherwise to emerge from chapter 11 upon a sound financial basis going forward. Because of the relatively unique manner that purchases and sales of gemstones are negotiated and transacted, any public disclosure of the Debtors' determination of gemstone values could seriously damage the Debtors' ability to negotiate and achieve the highest and best values for the gemstones.

7. The Debtors have ownership of and investment in a variety of affiliates and other business entities, that in the aggregate they believe to have a value of approximately $30 million. Should the opportunity arise during these chapter 11 cases, it is also possible that the Debtors would propose for sale under Bankruptcy Code § 363 one or more of such interests in order to have an alternative source for funding the payment of administrative claims and allowed claims.

### REASONS FOR URGENT FILING: HALLICK ARBITRATION

8. As the Court is aware, the Debtors made a "short-form" filing of their petitions on an urgent basis on October 4, 2019.

9. The need for and urgency of the bankruptcy filings was precipitated by an impending hearing in an arbitration proceeding (the "Hallick Arbitration," described more fully below) which could have resulted in an order requiring the Debtors to relinquish $45 million of

gemstones (in the Debtors' valuation, and constituting more than half their portfolio) to satisfy a $15 million claim asserted by one of the Members. As a practical matter, compliance with such an order would have destroyed their businesses and irreparably damaged the investments of the other Members.

10. The Hallick Arbitration arose from a settlement agreement dated April 13, 2019 among Erik J. Hallick ("Hallick") as claimant, and as respondents, the Debtors GPTIF and GPRE, as well as affiliates of the Debtors: Greenpoint Fine Art Fund LLC, Greenpoint Real Estate Development Fund LLC, Greenpoint Global Mittelstand Fund I LLC, Greenpoint Asset Management LLC, Greenpoint Asset Management II LLC, Greenpoint Asset Management IV LLC, Greenpoint Asset Management V LLC, Chrysalis Financial LLC, Jennifer Weisbach Art Advisory LLC, Bluepoint Investment Counsel LLC, Michael G. Hull, Patrick F. Hull, Christopher Nohl and Jennifer Weisbach (the "Hallick Settlement Agreement").

11. The Hallick Settlement Agreement settled all claims that had been or could have been asserted in a prior arbitration before the Honorable John W. Markson (the "Arbitrator"), captioned *Erick Hallick v. Greenpoint Tactical Income Fund LLC, et al*, and in a Dane County Circuit Court action known as *Erick Hallick v. Greenpoint Tactical Income Fund LLC* (case no. 17 CV2826) ("Hallick Civil Action"). The Hallick Settlement Agreement provided for two cash payments to be made to Hallick, one on the later of April 21, 2019 or 20 days after execution of the Settlement Agreement ($375,000) and a second payment of $13,625,000 on July 21, 2019. *Hallick Settlement Agreement,* §§ 1, 2, pp. 1-2.

12. The first cash payment was made to the Claimant, but the second payment was not made as required by July 21, 2019.

13. The parties to the Hallick Settlement Agreement agreed that if there was a payment default, an appraiser would be selected to value the Debtors' gemstones at fair market value in order to facilitate an "in-kind" distribution (the "In-Kind Distribution") pursuant to which a quantum of physical gemstones appraised at the agreed claim amount of $15 million (increased by $1 million as a penalty for the second payment default, less prior distributions) would be turned over to Hallick. *April 2019 Settlement Agreement,* §§ 3 and 4. The parties also agreed the enforcement of the Hallick Settlement Agreement would be overseen by the Arbitrator. *Id.*, § 19.

14. The appraisal was conducted, but at prices that the Debtors believe were at liquidation value rather than fair market value. What the appraiser determined should be given to Hallick as an In-Kind Distribution for a $15 million claim was a quantum of gemstones that the Debtors believed to be worth $45 million. In the Arbitration Proceeding, the Debtors challenged the validity of the appraisal. The chapter 11 cases were commenced before that issue could be determined, and before an In-Kind Distribution could be ordered.

15. On October 11, 2019, the Arbitrator held a status conference (in which the Debtors participated) and directed that the Hallick Arbitration be stayed due to the pendency of these chapter 11 cases and the applicability of the automatic stay under 11 U.S.C. §§ 362(a)(1) and (3).

16. The Debtors will likely utilize § 365 of the Bankruptcy Code to move to reject the Settlement Agreement. If such a motion is granted, Hallick will revert to his pre-settlement claims position and will be free to make such claims in these chapter 11 cases. To the extent those claims are allowed, and if the Debtors' plan to sell gemstones at fair market value under Bankruptcy Code § 363 is approved, Hallick's allowed claim will be paid through a Plan of Reorganization.

17. The Debtors believe that selling gemstones at arm's length in the market assures the highest values and is the only appropriate way to satisfy all allowed claims and preserve

5

Case 19-29613-gmh    Doc 21    Filed 10/16/19    Page 5 of 10

Debtors' businesses. Their intention is to propose and request that this Bankruptcy Court approve such a process. While they previously agreed in the Settlement Agreement that the satisfaction of certain claims could be accomplished pursuant to an appraisal, they did not anticipate that the appraiser would (in Debtors' opinion) fail to appraise at fair market value. There is no guesswork or unnecessary litigation over appraisal methodologies where actual sales can be achieved.

18. Considering the Debtors' objective to obtain the highest value for the gemstones, it was important that the appraisal which they believe was conducted at liquidation value not be confirmed or otherwise approved in the Hallick Arbitration. The appraisal is subject to a confidentiality agreement, and it is important that it remain confidential. The approval or disclosure of any such appraisal could seriously damage the Debtors' negotiation leverage in seeking fair market value sales in the market. Potential buyers could be confused by the values of the appraisal, and in the very least could use those values to negotiate for lower sales prices than might otherwise be the case in an arm's length transaction.

## ANTICIPATED SALES PROCESS

19. Debtors' gemstones are purchased and sold in a manner similar to fine artwork. The highest and best prices are achieved through a combination of (a) retail sales at stated prices for lower-valued items, (b) consignments to recognized dealers that contain price parameters designed to maximize value and prohibit sales at prices deemed too low, and (c) marketing to appropriate prospective purchasers. Some gemstone sales are privately negotiated with interested purchasers. Many gemstones are unique, and therefore attempting to price or value them based upon their mineral content or comparable sales is insufficient to capture the value that a particular purchaser might place on them.

20.     The Debtors own many precious gemstones, but one in particular is a good demonstration of this point. The Debtors own the Emperor Emerald. One expert has called the Emperor Emerald the "finest emerald specimen ever found." Discovered in Colombia, it is estimated to be 35 million years old. A recent brochure accompanying its exhibit it is described as "the very finest crystal on matrix" of "all the intact emerald crystals ever found in 300 years."

21.     The Debtors will shortly move for approval of a sales process of this type (including retail, consignment, and private sales) in a motion pursuant to Bankruptcy Code § 363. The Debtors submit that they, by their Managing Members, Greenpoint Management and Chrysalis, and in particular Hull and Nohl, are highly knowledgeable and experienced with the leading consignees and dealers, and that Hull and Nohl are in the best position to determine valuation and pricing for sale purposes, as well as manage the overall sales process (as they have been doing successfully for the Debtors for nearly four years) and identifying prospective purchasers.

## PRIOR AND COLLATERAL LITIGATION AGAINST DEBTORS

22.     Since 2015, the Debtors and their managers have been under multiple investigations by the Securities Exchange Commission ("SEC"). In 2017, the Debtors were involved in an investigation by the Federal Bureau of Investigation ("FBI"). The Debtors' Managing Members (including Hull and Nohl) are defendants in a lawsuit that was commenced by the SEC on September 30, 2019. The SEC lawsuit does not name the Debtors as defendants.

23.     On March 23, 2017 2017 the FBI executed on a search warrant that appears to have been based upon the information generated in the SEC's initial investigation and the complaint of a former employee of the Managing Members. The principal allegation of wrongdoing on which the FBI appears to have been acting is that Hull and Nohl were defrauding investors by ascribing false and artificially inflated values to the gemstones. The FBI seized numerous papers and files

(including computers from Mr. Nohl's home), and (with Debtors' cooperation) were given the access codes to take custody and control of the secure vault that holds the gemstones. (The vault is located in Milwaukee.) The gemstone valuations are of course important for the Debtors to be able to manage their own investment process. But they are also important under the Greenpoint OA, pursuant to which Member distributions (and the fees of the Managing Members) are paid based upon the value of assets under management.

24. The Debtors believe that after acquiring access to the vault, the FBI conducted its own appraisal of the gemstones to determine if there was any improper valuation procured by Debtors from the Debtors' independent appraisers. After approximately two months the FBI surrendered custody of the vault and gemstones by returning the access codes. Additional information requests were made by FBI, but none have been made since early 2018, and no prosecution has been initiated. While the Debtors did not receive an official letter of declination, they believe that had the FBI discovered evidence of criminal wrongdoing that actions would have long ago been commenced, and that gem and mineral assets would not have been returned

25. Hallick commenced his original arbitration as well as the Hallick Civil Action in 2017 after the FBI returned assets. While the Debtors do not at this time know the extent to which Hallick was (or was in privity with) the former employee who first complained to SEC, or was working in any manner with the FBI, the allegations in his arbitration and the Hallick Civil Action appear to be closely related to the allegations which the FBI was investigating. After the application to obtain the FBI search warrant was improperly leaked to the media in 2017, Hallick used the unsupported allegations in that application to further his arbitration and civil action complaints.

8

26. The SEC complaint is captioned *United States Securities and Exchange Commission v. Bluepoint Investment Counsel, LLC, Michael G. Hull, Christopher J. Nohl, Chrysalis Financial LLC, and Greenpoint Asset Management II LLC*, case no. 19-cv-809 (United States District Court, Western District of Wisconsin) ("SEC Civil Action"). The SEC Civil Action does not name the Debtors as parties and would not otherwise be covered by the automatic stay as a consequence of the exception to the stay set forth in § 362(b)(25). However, the SEC Civil Action names the Debtors' Managing Members and their principals Hull and Nohl, and alleges, as did the application for the FBI search warrant and the Hallick arbitration and Civil Action complaints, that the Managing Members, Hull and Nohl, artificially inflated the valuation of the Debtors' gemstones in order to falsely inflate the portfolio value in order to pay distributions and fees to Members (including themselves). The time for the Managing Members, Hull and Nohl to respond to the SEC Civil Action is November 29, 2019.

27. The Debtors' Managing Members and their principals are being represented in the SEC Civil Action by Patrick Coffey of Husch Blackwell. The SEC Civil Action complaint does not seek or state grounds for the appointment of a receiver, and no such relief has been sought by motion. Attorney Coffey has advised that the SEC informally requested consent to the appointment of a receiver, but Attorney Coffey refused the request.

28. Over the preceding two and a half years since the FBI executed its search warrant, no allegation of wrongdoing by Debtors or their Managing Members and principals has ever been proved. The SEC Trustee Motion puts the same unproved allegations before this Court in an effort to displace the Managing Members and their principals with a trustee who would likely have no knowledge or relevant experience in gemstone sales, the necessary relationships needed to obtain such sales at the highest and best values, or the knowledge of the business required to reorganize

successfully. That would be true even if there were grounds for the appointment of a trustee, but the SEC Trustee Motion has nothing more than the same unproved allegations that have clouded the Debtors' businesses since the FBI search warrant was executed more than two years ago.

29. The SEC Trustee Motion repeats many of these unproved allegations as grounds for the appointment of a trustee. Debtors are opposed to the SEC Motion to Appoint a Trustee and will contest it vigorously.

Dated this 16th day of October 2019.

**STEINHILBER SWANSON LLP**

By: *Electronically signed by Michael P. Richman*
Michael P. Richman
Claire Ann Richman
122 W Washington Ave, Suite 850
Madison, WI 53703
TEL: (608) 630-8990/FAX: (608) 630-8991

*Proposed Attorneys for the Debtors*