UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

| | |
|---|---|
| Greenpoint Tactical Income Fund LLC and | Case No. 19-29613-gmh |
| GP Rare Earth Trading Account LLC, | Case No. 19-29617-gmh |
| Jointly Administered Debtors. | Chapter 11<br>(Jointly Administered<br>Under Case No. 19-29613) |

**ORDER RESTRICTING SEC'S DISSEMINATION OF CONFIDENTIAL INFORMATION LIKELY TO ADVERSELY AFFECT PROPOSED ASSET SALES**

This court is jointly administering the chapter 11 bankruptcy cases of debtors Greenpoint Tactical Income Fund LLC and GP Rare Earth Trading Account LLC. The debtors are related: GP Rare Earth owns an inventory of precious gems and minerals and Greenpoint Tactical owns GP Rare Earth. The debtors have reported that GP Rare Earth owns a portfolio of gems and minerals that they believe has a fair market value of about $75 million and that Greenpoint Tactical has investments that it believes have a fair market value of around $30 million. ECF No. 21, at 2. The debtors' property is now property of the estate, and by operation of section 1115(b) of the Bankruptcy Code, the debtors remain in possession of their property. See 11 U.S.C. §§541(a), 1107(a), & 1115. As "debtors in possession" the debtors control the estate property; they are entitled to exercise most of the powers of a bankruptcy trustee, subject to this court's oversight; and they are duty bound to reorganize the debtors in a way that best serves the interests of the estates. See 11 U.S.C. §1107(a), *Lange v. Schropp (In re Brook Valley IV, Joint*

*Venture)*, 347 B.R. 662, 673 (B.A.P. 8th Cir. 2006), aff'd sub nom., *Lange v. Schropp* (*In re Brook Valley VII, Joint Venture*), 496 F.3d 892 (8th Cir. 2007).

I

A

The debtors commenced these bankruptcy cases to stop an arbitration proceeding that could have requiring them to transfer gems that they believed had a fair-market value of $45 million to satisfy the claim of one of their investors, Erick Hallick, for $15 million. ECF No. 21, at 5. The Hallick litigation followed investigations of the debtors, their managing members, and some affiliates by the U.S. Securities and Exchange Commission and the Federal Bureau of Investigation, including, according to the debtors, the execution of an FBI search warrant in March 2017 that afforded the Bureau custody of the debtors' gems and minerals for about two months. *Id.* at 7–8.

On September 30, 2019, the SEC commenced a civil action against the debtors' managing members, among others, in the U.S. District Court for the Western District of Wisconsin alleging violations of section 17(a) of the Securities Act, 15 U.S.C. §77q(a); section 10(b) of the Securities Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5; and section 206 of the Investment Advisers Act, 15 U.S.C. §80b-6(1), and Rule 206(4)-8, 17 C.F.R. §275.206(4)-8. While not naming the debtors as defendants, the SEC alleged in its complaint that the debtors and their managers misled investors about how they operated Greenpoint Tactical Income Fund and about the value of assets. Compl. at 4, *SEC v. Bluepoint Investment Counsel, LLC*, Case No. 19-CV-809 (W.D. Wis.), ECF No. 1 ("District Court Case"). The defendants in the District Court Case filed a motion for a protective order on January 14, 2020, and that matter appears to be fully briefed and under advisement. See Case No. 19-CV-809 (W.D. Wis.), ECF Nos. 21, 22, 24 & 27. On February 7, 2020, the SEC filed an amended complaint in the District Court naming the debtors as defendants. First Am. Compl., Case No. 19-CV-809 (W.D. Wis.), ECF No. 33.

The SEC repeated the allegations from the District Court Case in an adversary complaint filed in this court on January 2, 2020, requesting a determination that its "claims for disgorgement of ill-gotten gains, prejudgment interest, and civil penalties is not dischargeable pursuant to 11 U.S.C. §1141(d)(6)". Compl. at 6, *SEC v. Greenpoint Tactical Income Fund LLC*, Adv. Proc. No. 20-2005 (Bankr. E.D. Wis.), ECF No. 1. The debtors and the SEC later agreed that the SEC's adversary proceeding is stayed in deference to the District Court Case. Adv. Proc. No. 20-2005, ECF No. 13.

B

The debtors intend to file a single plan of reorganization to pay in full all administrative expenses and unsecured claims and provide some type of redemption rights for equity holders. ECF No. 356, at 1. The debtors contemplate raising the capital necessary to fund the plan by selling the bankruptcy estate's gems and minerals.

The debtors have asserted repeatedly since the outset of these cases that to maximize the value of these assets information about acquisition costs, offering prices, and appraisals of the gems and minerals must be kept confidential. Following a hearing on November 13, 2019, the court entered an order on November 14, 2019, that, among other things, prohibits public dissemination of "information . . . from any source that contains (a) the identities of consignees, brokers, other intermediaries and actual and prospective purchasers of debtors' precious gems and minerals, or (b) specifically identifiable prices or values attributed to any gems and minerals owned by debtors including the terms of any sales (whether individually, or in the aggregate, or in any parts thereof; and whether current or in the past)". ECF No. 82, at 2–4.

On January 24, 2020, the debtors filed a motion to enforce the November 14 order and requested that the court sanction the SEC in connection with the SEC's pursuit of discovery in the District Court Case about, among other things, appraisals and valuations of the debtors' assets from persons not parties to the District Court Case. ECF No. 240. The debtors contend that the SEC's subpoenas were transparent attempts

to avoid this court's limitations on discovery and the confidentiality protections that protect against devaluation of the assets of the bankruptcy estates. On January 24, the court directed the SEC to respond and ordered that "[n]o discovery, document, material, testimony, or information that is from a source other than the offering party (or its agents) that was obtained through process or procedure other than those stated in and subject to the court's November 14, 2019 order will be admitted as evidence in this case or any related adversary proceeding in the absence of an agreement of the parties or subsequent leave of court obtained after notice and hearing." ECF No. 242 (citation omitted) (citing ECF No. 82). The parties' dispute persisted.

The debtors and the SEC reportedly attempted to resolve their disagreements. The parties were unsuccessful in reaching an agreement on whether the SEC could make unfettered use of price, cost, and appraisal information about the debtors' gems and minerals obtained through discovery in the District Court Case before the District Court ruled on the pending request for a protective order in that case.

On March 5, 2020, the court heard the debtors' requests for enforcement of the November 14 order and for contempt sanctions. ECF No. 320, at 3–4; ECF No. 325, at 70–101. At the hearing, debtors' counsel clarified that the remaining disagreement involved whether this court's protective order constrained the SEC from publicly disseminating confidential information about the debtors' gems and minerals if the SEC obtained the information through discovery in the District Court Case. In effect, the debtors sought an expansion of the November 14 order to cover information the SEC obtained in the District Court Case. The SEC's counsel explained that she was not authorized to agree to an interim preservation of confidentiality and that the debtors' motion had not requested expansion of the November 14 order's protections. ECF No. 325, at 93–95.

Following the parties' lead as conceiving of the debtors' request as one to expand the scope of the November 14 order's confidentiality protection, the court required the

debtors to file an expedited request for that relief, affording the SEC an opportunity to respond; imposed a temporary restraint on the SEC's public disclosure of confidential information relating to the gems and minerals, ECF No. 321; and scheduled an evidentiary hearing for March 13, 2020, ECF No. 320, at 3–4.

Before the March 13 evidentiary hearing, the court entered an order that construed the debtors' request to extend the limitations on use of confidential information as being based on the debtors' "contention that the dissemination of certain information about their high-value gems and minerals will negatively impact their ability to maximize the sale values of those assets, and, thus, will endanger the success of their chapter 11 case." ECF No. 342. The order observed that §105(a) of the Bankruptcy Code "permits the bankruptcy court to enjoin conduct (even the continuation of federal court litigation) if the injunction 'is likely to enhance the prospects for a successful resolution of disputes attending [the debtor's] bankruptcy.'" *Id.* (alteration in original) (quoting *Caesars Entm't Operating Co., Inc. v. BOKF, N.A. (In re Caesars Entm't Operating Co., Inc.)*, 808 F.3d 1186, 1188 (7th Cir. 2015)).

At the March 13 hearing debtors presented the testimony of Michael Hull and Christopher Nohl. Hull controls Greenpoint Asset Management II, LLC and Nohl is the President and Chief Operating Officer of Chrysalis Financial, LLC. ECF No. 357, at 28–29 & 81; see also ECF No. 3, at 2. Chrysalis and Greenpoint Asset Management II are the managing members of debtor Greenpoint Tactical, and Greenpoint Tactical is the sole member of debtor GP Rare Earth. ECF No. 3, at 2, see also *In re GP Rare Earth Trading Account LLC*, Case No. 16-29617 (Bankr. E.D. Wis.), ECF No. 3. Both witnesses testified that they have many years' experience in gem and mineral transactions and have been involved in hundreds of transactions. ECF No. 357, at 32–33 & 82–83. They further testified that in selling precious gems and minerals the seller's ability to control information about the acquisition cost, appraisals, and other information about an asset is critical to obtaining the highest price the market will bear. Typically, if a potential

buyer knows how much the seller paid for the item or what value the seller attributes to an item, the buyer is unlikely to pay in excess of those amounts. *Id.* at 33–35 & 88–95. A sophisticated seller of precious gems and minerals will not disclose this information unless the seller concludes that doing so is in its benefit. *Id.* at 88–89.

Hull testified that the debtors' objective in this reorganization case is to sell their gem and mineral inventory "for the absolute highest price" and that they do not believe they will be able to do that if potential buyers are able to obtain information from other sources about the debtors' acquisition cost, valuations, or pricing. *Id.* at 37–38. Hull testified that, if a potential buyer can obtain that information, the buyer will seek to "minimize [the debtors'] profit as much as possible" by buying "it as close to the cost as possible or . . . as close to the appraised value as possible." *Id.* at 38.

Nohl testified that, as a managing member of the debtors, he has been personally involved in the purchase and sale of 5,000 individual gem or mineral pieces, which he estimated involved a couple hundred individual purchase and sale transactions. *Id.* at 82–83. Nohl testified that in evaluating potential sale prices, the debtors take account of opinions offered by their valuation experts, as well as the circumstances of the market at the time the actual sale discussion is occurring, along with the nature, origin, and history of the piece and related dynamic demand factors. *Id.* at 86–88. In selling precious gems and minerals the debtors only "very rarely" disclose their internal appraisals or valuations and then only when doing so provides a strategic benefit, such as disclosing the appraised value of a comparable specimen of inferior quality to one being sold as a means of justifying a higher price. *Id.* at 88–90. Disclosure of an appraisal, Nohl testified, can give a false impression of the item's value, providing "ammunition [to the buyer] to argue a lower price point than [the item's] current value". *Id.* at 90. When employing a broker to make the sale, as is typical with higher value gems and minerals, the disclosure of internal valuations can make the broker's ability to maximize price more difficult by "creat[ing] a situation where [the broker] would literally have to fight just to

substantiate their commission on top of an old value." *Id.* at 91. If the purchaser knows the appraised value, they will "try[] to push the [sale] value towards whatever that appraisal said if it is in their favor." *Id.* at 92. And, "most of the time", Nohl testified, "the top collector is going to be very shrewd"; if they know the seller's acquisition price, "they'll use that information against you to try to negotiate to the lowest point possible." *Id.* at 93. Nohl illustrated this point with an anecdote about an acquisition he made in which knowledge about the seller's acquisition cost allowed him to buy it for more than $300 thousand less than the asking price. *Id.* at 94–95.

Nohl further testified that the debtors intend to employ a consignee to maximize the sale value of their gem and mineral assets. Disclosure of the debtors' "unified eval" number, which the debtors base on either their acquisition cost plus adjustments to cost basis, or the most recent internal appraisals, would undermine the consignee's success by setting "a ceiling for what th[e] sale price is that can be achieved, because the [buyer's] impression will be that anything above that number is commission for the broker." *Id.* at 99–101.

II

A

Based on the evidence presented, I find that the debtors' non-public information about the cost and appraised values of specific gems and minerals (including the "unified eval" information) has substantial economic value to the debtors. The debtors' ability to control the dissemination of this information as sale circumstances warrant is necessary to enable them to obtain maximum sale value of their gem and mineral assets. Conversely, dissemination of that information by non-debtors or making the information publicly available will have a significant negative effect on the debtors' ability to maximize the sale value of the bankruptcy estate's precious gems and minerals. As a result, disclosure of that information by persons other than the debtors is

likely to have a material negative effect on the debtors' ability to reorganize and will detrimentally affect the interests of creditors or holders of equity interests, or both.

I conclude, therefore, that the debtors' non-public information about the acquisition cost and appraised values of their precious gems and minerals constitutes confidential commercial information that is entitled to protection from being revealed publicly in the absence of a necessary and overwhelming countervailing public interest. See, e.g., *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 547 (7th Cir. 2002) (stating that competitive business information is "a trade secret or something comparable" if its "economic value depends on its secrecy"); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995) (holding that information regarding pricing, distribution, and marketing constituted trade secret material); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1345–46 (7th Cir. 1986) (finding data related to bids and evaluating bids were "unquestionably sensitive trade secrets" and warranted protection from unnecessary disclosure, as counterparties "could use it to advantage in the next round of negotiations"); see also *Mosaid Techs. Inc. v. LSI Corp.*, 878 F. Supp. 2d 503, 510 (D. Del. 2012); *Inter-Med Inc. v. ASI Med. Inc.*, No. 09-CV-383, 2010 WL 2679992, at *2 (E.D. Wis. July 1, 2010). The SEC has not shown that the public interest justifies authorizing it to reveal the debtors' gem- and mineral-specific cost, appraisal, and "unified eval" information in connection with this bankruptcy case, the related adversary proceeding, or the District Court Case.

B

1

The debtors request that I restrain the SEC from disclosing this information even if the SEC obtained the information other than through discovery in this court. That request, in effect, is a request for an order under §105(a) of the Bankruptcy Code, which provides, "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). "Though section

105(a) does not give the bankruptcy court carte blanche—the court cannot, for example, take an action prohibited by another provision of the Bankruptcy Code—it grants the extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties." *Caesars Entm't*, 808 F.3d at 1188 (citations omitted) (first citing *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014); and then citing *In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004)). This equitable authority to issue orders "appropriate to carry out the provisions" of the Bankruptcy Code includes the authority to enjoin conduct that would devalue the bankruptcy estate's assets or interfere with the debtors' ability to fund a reorganization plan by selling those assets. See *id.* (quoting §105(a)). In exercising its authority under §105(a), a bankruptcy court can enjoin conduct that would "defeat or impair its jurisdiction over the case before it"—including, it is reasonable to conclude, its oversight of the debtors' reorganization efforts and sales of estate assets—when the debtor shows a likelihood of success on the merits and lack of public harm, even in the absence "an inadequate remedy at law or irreparable harm." *In re L & S Industries, Inc.*, 989 F.2d 929, 932 (7th Cir. 1993); *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998).

2

The SEC has not challenged the debtors' likelihood of reorganizing in connection with opposing the debtors' request to restrain distribution of confidential asset information. As Hull testified, the debtors' objective in these chapter 11 cases is "[t]o sell [the estates' gems and minerals] for the absolute highest price [they] can get." ECF No. 357, at 37. And the debtors filed an application to employ a broker and a motion to sell minerals and compensate the broker, consistent with Nohl's testimony about the debtors' plan to market those assets. *Id.* at 91; ECF Nos. 346 & 348.

I find that the debtors have shown at least some likelihood of success in achieving their plan to pay creditors by liquidating their gem and mineral assets and that the disclosure by non-debtors of confidential information about those assets is

likely to interfere irreparably with their ability to maximize the sale values of those assets. The public interest favors the debtors' ability to reorganize or otherwise liquidate estate assets so that, as stewards of the bankruptcy estates, they can pay the debtors' creditors and maximize any remaining value for the benefit of the holders of equity interests.

If an order protecting the debtors' confidential information interfered unduly with proceedings in the District Court Case, the balance of considerations might caution against its issuance. But the SEC has not shown that restricting the dissemination of confidential information about the debtors' assets until the District Court adjudicates a pending motion for a protective order interferes in any meaningful way with the continuation of the District Court Case. And the interference the SEC warns against in its briefing is both unsupported by evidence and outweighed by the likelihood of disclosure having a detrimental effect on the bankruptcy estates.

III

The SEC contends that §362(b)(4) of the Bankruptcy Code deprives this court of authority to restrain its use of the debtors' information. Section 362(b)(4), as relevant here, exempts from the "automatic stay" of certain proceedings against a debtor the "commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power".

Section 362(b)(4) does not by its terms limit the bankruptcy court's authority under §105(a) to "issue any order . . . necessary or appropriate to carry out the provisions of" the Bankruptcy Code. And, even if §362(b)(4) could be understood to limit §105(a), that limitation applied here would only prohibit a §105(a) injunction against the commencement or continuation of the District Court Case.

The restraint on disclosure of confidential information the debtors seek is, as it might affect proceedings in the District Court Case, a temporary measure designed to ensure that the SEC's use of confidential information in that proceeding does not

devalue bankruptcy-estate assets by including that information in the public record or disclosing it to third parties for no compelling reason and before the District Court considers whether any need for disclosure in that case warrants the likely adverse effect on the bankruptcy estates. Important for present purposes, the debtors are content to leave to the District Court's judgment whether (or under what circumstances) the adjudicative need for public or third-party disclosure of confidential information in that case outweighs the adverse effects on the estates. The requested restraint simply preserves the confidentiality of the information, and thereby protects the value of bankruptcy estates' assets, until the District Court has an opportunity to consider these matters in adjudicating the motion for a protective order that it now has under advisement.

IV

For these reasons, IT IS ORDERED that subject to and understood by reference to the capitalized terms defined below:

The SEC is restrained from disseminating Confidential Information, except it may disseminate such information (1) in accordance with this court's November 14 order; (2) in accordance with an order entered by the District Court that governs the use of Confidential Information in the District Court Case; or (3) as specifically authorized by an order of this court or of the District Court.

This court will hear and adjudicate disputes about whether information is Confidential Information within the terms of this order, without exclusion of the District Court adjudicating any such dispute involving information that the SEC (a) obtains or seeks to obtain through discovery in the District Court Case or (b) seeks to use in litigating the District Court Case.

This order is not intended to, does not purport to, and does not stay, limit, or restrict the District Court's adjudication of the District Court Case or the continuation of the District Court Case. Specifically, nothing in this order should be understood to

constrain the District Court's issuance of orders (1) governing the use of Confidential Information in the District Court Case or (2) superseding the effect of this order to the extent this order applies to the collection or use of Confidential Information in the District Court Case.

As used in this order:

"Confidential Information" means sale price, acquisition cost, or appraisal information about specific gems or minerals (i.e., disaggregated) that are bankruptcy-estate property, except "Confidential Information" does not include such information if the information is (a) obtained from a public source, (b) has been made publicly available by the debtors, or (c) is included in the pleadings or elsewhere in the public record in the District Court Case when this order is entered.

"District Court" is the United States District Court for the Western District of Wisconsin.

"District Court Case" is *SEC v. Bluepoint Investment Counsel, LLC*, Case No. 19-CV-809 (W.D. Wis. filed Sept. 30, 2019).

March 20, 2020

_____
G. Michael Halfenger
Chief United States Bankruptcy Judge