So Ordered.

Dated: October 27, 2022



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

| | |
|---|---|
| Greenpoint Tactical Income Fund LLC and GP Rare Earth Trading Account LLC, | Case No. 19-29613-gmh<br>Case No. 19-29617-gmh |
| Jointly Administered Debtors. | Chapter 11<br>(Jointly Administered<br>Under Case No. 19-29613) |

### DECISION AND ORDER

Freeborn & Peters LLP served as counsel for the Official Committee of Equity Security Holders of Greenpoint Tactical Income Fund LLC (the "Committee") from December 9, 2019, through May 19, 2022. Freeborn filed a final application for compensation, requesting approval of $1,143,443.68 in compensation and $15,632.68 in expenses. ECF No. 1486. The reorganized debtors filed a limited objection, requesting

that the court disapprove a total of $80,620.64 in fees and costs incurred in connection with two of the Committee's pursuits: (1) a motion for derivative standing to which $58,723 in fees is attributed and (2) an objection to Duff & Phelps LLC's unsecured claim to which $21,897.64 in fees and costs is attributed. ECF No. 1491. The parties have agreed that the court can adjudicate Freeborn's application, including adjudging whether the requested compensation and expenses are reasonable, without an evidentiary hearing. ECF No. 1589, at 1.

I

The Committee engaged Freeborn as its counsel, with court approval, under 11 U.S.C. §1103(a). See ECF No. 177. Freeborn's request for an award of fees and costs is therefore governed by §330(a), which provides ". . . the court may award to . . . a professional person employed under section . . . 1103–(A) reasonable compensation for actual, necessary services . . . and (B) reimbursement for actual, necessary expenses." Section 330(a)(4)(A) imposes a limitation: "the court shall not allow compensation for—(i) unnecessary duplication of services; or (ii) services that were not—(I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case".

The court applies these principles with an ex ante eye. As the Fifth Circuit has explained, "In awarding fees, hindsight is irrelevant; retrospect is irrelevant; 'material benefit to the bankruptcy estate' is irrelevant. '**What matters is that, prospectively, the choice to pursue a course of action was reasonable**.'" *Edwards Fam. P'ship, L.P. v. Johnson* (*In re Cmty. Home Fin. Servs., Inc.*), 990 F.3d 422, 427 (5th Cir. 2021) (emphasis added) (citations omitted) (quoting *Barron & Newburger, P.C. v. Texas Skyline, Ltd.* (*In re Woerner*), 783 F.3d 266, 273–74 (5th Cir. 2015)).

The debtors contend that the Committee should have known that the derivative standing motion and objection to Duff & Phelps's claim were not reasonably likely to benefit Greenpoint's estate at the time they were filed and "were not otherwise necessary for the administration of the estate[]." ECF No. 1491, at 1–2. We turn first to

the relevant facts, all of which are by now beyond contention or established by judicial notice of previous proceedings.

II

Debtor Greenpoint Tactical Income Fund LLC ("Greenpoint" or the "Fund") is an investment fund that holds and manages a portfolio of financial interests, including a 100% ownership interest in debtor GP Rare Earth Trading Account LLC ("GPRE"), which buys, sells, and holds gems and fine minerals for investment purposes. Greenpoint is owned by its managing members, Chrysalis Financial, LLC, and Greenpoint Asset Management II, LLC, and 140 others who invested in it. ECF No. 1401, at 3. Christopher Nohl is the president of Chrysalis Financial, LLC, and Greenpoint Asset Management II, LLC, is ultimately managed by Michael Hull.

The debtors filed these cases under chapter 11 of the Bankruptcy Code in October 2019. Greenpoint initially filed a chapter 11 plan in July 2020 proposing to pay all unsecured claims in full and allowing investors to either remain in the Fund or exercise certain redemption rights. ECF No. 529. Greenpoint's initial plan proposed to "make all payments required to be made as of the Effective Date from a combination of (a) proceeds of gem and mineral sales distributed by GPRE, (b) proceeds from transactions involving subsidiaries and their investments, and (c) amounts borrowed pursuant to a Debtor-in-Possession or Exit Financing facility." *Id*. at 12. Although Greenpoint proposed to make plan payments from sales of assets, its assets were largely illiquid, and it did not make any significant asset sales in 2019 or 2020. In fact, it did not sell anything of significance until late 2021, when it sold its equity interests in Archangel Device, LLC.

The Committee opposed confirmation of the initial chapter 11 plan. Plan-confirmation litigation continued during the winter of 2020–2021, but during this time the debtors and the Committee also began an effort to achieve mutually acceptable plan

terms. The effort was time consuming, resulting in multiple adjournments of the confirmation hearing, which was originally scheduled for February 2021.

While the debtors were pursuing plan confirmation, they were also defending against securities-fraud litigation in the Western District of Wisconsin. The U.S. Securities and Exchange Commission had commenced a civil lawsuit against the debtors, Greenpoint's managers, and others in which the SEC sought, among other things, disgorgement and penalties for alleged frauds perpetrated on Greenpoint's investors. The SEC alleged that Greenpoint's managers and other entities had made "false and misleading statements to the investors" "[i]n . . . offering materials"; had "misled the investors as to how they . . . operat[ed] the Fund and valu[ed] its assets"; had "used their misleading and improperly determined valuations to charge the Fund excessive management and other fees and payments"; had "unlawfully enriched themselves at the expense of investors by engaging in undisclosed self-dealing and related party transactions"; and had "interfered in the appraisals of the gems and minerals owned by the Fund in order to obtain and report higher values and thereby obtain higher management fees." ECF No. 284-11, at 3–5. There is little doubt that by the time Greenpoint sought bankruptcy protection its relationship with many of its investors had soured, and while some investors remained committed to the Fund, others were in search of an exit strategy.

III

*The Committee's derivative standing motion.* About nine months after the debtors commenced this case and a few weeks before Greenpoint filed its initial chapter 11 plan, the Committee requested "derivative standing to assert certain causes of action that it allege[d] belong[ed] to the bankruptcy estate of Greenpoint . . . ." ECF No. 1004, at 1; see also ECF No. 491. The Committee's motion for derivative standing requested permission to commence on Greenpoint's behalf damages claims against its managers and insiders Nohl, Hull, and Christopher Houden, Sr. "Many of the allegations of mismanagement, misrepresentations, and self-dealing appear[ed] to overlap with allegations made by the SEC in its action pending in the Western District of Wisconsin." ECF No. 1004, at 4. If successful, the derivative claims might have proved a source of funds to be distributed to investors through a plan of reorganization.

Greenpoint and Christopher Houden, Sr., objected. On March 31, 2021, while the debtors and the Committee were negotiating plan terms, the court denied the Committee's derivative-standing motion without prejudice. ECF No. 1004. The court concluded that the Committee had not shown that pursuit of the derivative claims was cost-justified:

> The costs of proceeding with the Committee's litigation must, of course, be weighed against its expected benefits. But the extent to which it holds expected benefits is at best unclear. As noted above, the Committee says it will seek to recover more than $7 million, but its motion does not at all address the likelihood that it will be successful in that undertaking. Nor does it address the likelihood of being able to collect any awarded damages from the proposed defendants or how long all of this is likely to take.

> Greenpoint, in contrast, has proposed a plan of reorganization that pays all creditors in full and provides some avenues of recovery to equity holders. Creditors have voted on it. Greenpoint is currently negotiating with the Committee about amending the plan or proposing a new one that would satisfy the Committee's objections to it. Allowing the Committee to pursue its lawsuit now risks derailing this potentially beneficial plan-confirmation process.

> Taking all circumstances into account, the Committee has failed to meet its burden to show that Greenpoint's presumed refusal to pursue the claims is unjustified. Obviously, however, the cost-benefit analysis might yield a different outcome if the plan-confirmation process currently underway fails to bear fruit.

*Id*. at 5–6.

Notably in considering the Committee's request for derivative standing the court did not conclude that the claims the Committee sought to advance lacked merit or that the Committee was not an appropriate party to champion those claims. In denying the Committee's motion without prejudice the court made a discretionary choice between two options: (1) staying resolution of the motion to allow the Committee to pursue discovery into the strength and ultimate collectability of the derivative claims—an undertaking that would likely have burdened the estate with the related litigation expenses of both the Committee and Greenpoint—and (2) denying the motion without prejudice while Greenpoint and the Committee attempted to negotiate a consensual plan of reorganization. The court chose option 2.

The debtors argue that the Committee should have known before pursuing the motion that it would not benefit the estate, particularly given that Greenpoint had proposed a plan that paid creditors in full and preserved equity. The debtors further argue that the derivative standing motion was never going to benefit the estate because (1) the claims against Houden were small and not worth pursuing, given the administrative costs involved, (2) Greenpoint was required to "indemnify their Managing Members from actions against them that arise from the performance of their duties" and such indemnity "would have been applicable to most of the claims sought to be brought by the Committee, thereby rendering [the] derivative actions . . . an 'expensive futility'", and (3) the Committee did not consider the benefit to the estate before filing its motion because it did not address the likelihood of collection, or the time it would take to collect, any damages awarded. ECF No. 1491, at 12.

None of this shows that the motion was unreasonable ex ante. Greenpoint's proposal of a plan paying all creditor claims in full and preserving the investors' (limited) rights to Greenpoint's remaining equity is no derivative-standing showstopper. Greenpoint's ability to perform that plan was far from clear. Greenpoint's estate was incurring significant administrative expenses, yet neither Greenpoint nor GPRE had liquid assets or had conducted any significant asset sales during the bankruptcy case. Greenpoint's only other stated means of paying claims under the plan was the possibility of exit financing, which would have required encumbering Greenpoint's (or GPRE's) assets. The Committee, acting on the investors' behalf, was understandably opposed to that course because it risked further devaluation of their interests. The Committee's derivative standing motion, which sought to maximize equity's interest in the estate by liquidating the estate's claims against Greenpoint's managers and other non-debtors, might have been a reasonable litigation strategy if the Committee could have expected a substantial net recovery.

The court denied the motion without prejudice, moreover, in recognition that future developments might justify the Committee's pursuit of the derivative claims. As the court observed in denying the motion, "the cost-benefit analysis might yield a different outcome if the plan-confirmation process currently underway fails to bear fruit." ECF No. 1004, at 6. If the plan-confirmation process had gone differently—had subsequent efforts to achieve a consensual plan failed, for example—the Committee may have convinced the court to reconsider its denial of the motion or to grant a second request for derivative standing. In all events, the motion, when filed—months before the debtors and Committee embarked on efforts to compromise on a plan of reorganization—was reasonably conceived as a potential means of maximizing estate value.

This conclusion is unaffected by the debtors' remaining arguments. The debtors contend that Greenpoint should not have pursued the claims against Houden because

the expected recovery could not outweigh the costs. But, even if the court agreed with the debtors' argument, the debtors do not identify specific time entries that relate solely to the Committee's pursuit of derivative claims against Houden. They thus provide no means of reducing the requested fee award, which leaves their objection on that ground insufficiently developed. It is therefore waived. *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.") (citing *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006)).

The debtors also contend that the Committee's derivative-standing motion was an unreasonable undertaking because Greenpoint would have incurred litigation expenses in pursuit of claims that could have yielded nothing more than judgments for which the estate would owe offsetting indemnification obligations, including for defense costs. The record, however, does not establish that those obligations necessarily made pursuit of the claims uneconomical. The debtors rely on a provision of Greenpoint's former operating agreement that required it to indemnify its "Managing Members and Members". ECF No. 1444-2, at §6.2 ("The Managing Members shall be Chrysalis and Greenpoint [Asset Management II LLC].") & §6.10 (discussing "[i]ndemnification of Managing Members and Members"). Hull and Nohl—two targets of the claims the Committee sought to pursue—are not managing members or members and thus appear not to be covered by the operating agreement's indemnity obligations. More important, Greenpoint's indemnification obligations covered conduct undertaken with the good faith belief that it was in—or at least not opposed to—the Fund's best interests. See ECF No. 1444-2, at §6.10(a) ("No Managing Member or Member shall be liable to the [Fund] for any loss of damage suffered by the [Fund] on account of any action taken or omitted to be taken by the Managing Member or Member, that the Managing Member or Member **in good faith believed to be in or not opposed to the [Fund's] best interests** . . . ." (Emphasis added.)). The Committee's proposed derivative

claims alleged intentional mismanagement of the Fund and misrepresentations about the Fund and its assets—conduct that, if proved, likely could have been shown not have been pursued with a good faith belief that it was in (or not opposed to) the Fund's best interests. Consequently, indemnification for the claims that the Committee sought to litigate was far from assured, even for members like Houden.

Finally, the Committee's failure to address the difficulty of collecting from the derivative-claim targets did not make its motion a nonstarter, even though this failure was one of the reasons the court denied the motion. As explained above, the court's decision to deny the motion on the grounds that the Committee had not shown that the derivative claims would benefit the estate was context dependent. Under different circumstances than those existing when the court adjudicated the motion—several months after the Committee filed it—the court might have afforded the Committee an opportunity to supplement the motion after taking discovery or granted it notwithstanding the risk that allowing the Committee to pursue litigation might ultimately prove detrimental to the estate. Suffice to say that the court denied the motion because it wasn't then persuaded that the expected gain justified the potential expense and possible negative effect on the plan-negotiation process, not because it viewed the motion as ill-conceived or senseless at the outset. Though the case ultimately proceeded to a negotiated resolution that resulted in confirmation of a debtor-proposed plan acceptable to the Committee, the Committee's filing of the motion was a reasonable ex ante effort to maximize the value of the estate.

IV

*The Committee's objection to Duff & Phelps's claim.* The debtors also ask the court not to approve the fees and expenses incurred by the Committee in connection with the Committee's objection to Duff & Phelps's claim.

Duff & Phelps's claim arose from litigation services provided to defend Greenpoint and others against an arbitration commenced by Erick Hallick. Before the debtors filed for bankruptcy protection, Hallick, who had made substantial investments in Greenpoint, had commenced a civil action in state court that led to an arbitration against Greenpoint, GPRE, Greenpoint's managing members, and other related individuals and entities (collectively "respondents"). Greenpoint, through Patrick Coffey, a partner in the law firm Husch Blackwell LLP, engaged Duff & Phelps, a financial consulting firm, to assist in defending against Hallick's claims and potentially to provide expert testimony in the arbitration. Greenpoint listed Duff & Phelps in its bankruptcy schedules, specifically in part 2, line 3.4 of schedule E/F, as a creditor holding an unsecured claim in the amount of $520,456.22 and indicated that Duff & Phelps's claim was not disputed, contingent, or unliquidated. ECF No. 25, at 12.

In objecting to Duff & Phelps's claim, the Committee contended that the scheduled claim amount reflected services that Duff & Phelps performed on behalf of other arbitration respondents, not just Greenpoint. Duff & Phelps, the Committee argued, had no right under nonbankruptcy law to charge Greenpoint for work done on behalf of others, so the claim must be disallowed to that extent. See 11 U.S.C. §502(b)(1).

Duff & Phelps moved for summary judgment contending that because its only agreement was with Greenpoint, Greenpoint was responsible for its fees, even for services that benefitted other respondents. After affording the Committee an opportunity to pursue discovery relating to the scope of the Duff & Phelps–Greenpoint agreement, the court granted summary judgment, ruling that no reasonable factfinder could conclude that any of Duff & Phelps's services were outside the scope of the agreement.

In opposing the Committee's fees for contesting Duff & Phelps's claim, the debtors argue that the Committee should have known that its objection was baseless. According to the debtors, the objection was not reasonably likely to benefit the estate

because Greenpoint's obligation to Duff & Phelps was based on an engagement letter that made payment Greenpoint's sole responsibility and the Committee's position that Greenpoint was not liable for fees benefitting other respondents was unsupported.

But, again, ex post failure does not entail ex ante unreasonableness. While the court ultimately ruled that no reasonable finder of fact could conclude that Duff & Phelps requested payment for services that exceeded the scope of its engagement, the engagement letter's terms considered in the context of Duff & Phelps's work product—in which Duff & Phelps's principals identified themselves as presenting expert testimony on behalf of several other respondents in addition to Greenpoint—left open the question whether Greenpoint was liable for the full cost of Duff & Phelps's services. Indeed, the court ordered discovery relating to that question because it could not be answered based solely on the terms of the parties' agreement. If discovery had revealed a basis for inferring that Duff & Phelps had a contractual relationship with other respondents, the Committee might have succeeded in reducing Duff & Phelps's half-million-dollar claim by showing that it was based in part on services for which non-debtors were responsible. The Committee's pursuit of the claim objection was reasonable.

Finally, Greenpoint objects to the claim-objection fees "on the grounds that in many instances, Freeborn lumped together its fees related to filing objections to the proofs of claim of Duff & Phelps and other creditors of the Debtors." ECF No. 1491, at 9. Greenpoint does not expand on this point and does not point to specific time entries that it finds objectionable. This undeveloped argument is waived. See *M.G. Skinner & Assocs.*, 845 F.3d at 321.

V

For these reasons IT IS HEREBY ORDERED:

1. The debtors' objection to the Fourth and Final Fee Application of Freeborn & Peters LLP is OVERRULED.

2. Freeborn & Peters LLP is awarded final compensation of $1,143,443.68 for services rendered and $15,632.68 for reimbursement of expenses incurred for the period of December 9, 2019, through May 19, 2022, pursuant to 11 U.S.C. §330(a) and that award is allowed as an administrative expense under 11 U.S.C. §503(b)(2).

# # # # #