So Ordered.

Dated: December 22, 2023



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

| | |
|---|---|
| Greenpoint Tactical Income Fund LLC n/k/a Alluvium Fund LLC, and | Case No. 19-29613-gmh |
| GP Rare Earth Trading Account LLC, | Case No. 19-29617-gmh |
| | Chapter 11 |
| Jointly Administered Debtors. | (Jointly Administered Under Case No. 19-29613) |

OPINION AND ORDER ON

H INFORMATICS LLC'S APPLICATION FOR ALLOWANCE
OF ADMINISTRATIVE CLAIM PURSUANT TO 11 U.S.C. 503(b);

DEBTOR GREENPOINT TACTICAL INCOME FUND LLC N/K/A ALLUVIUM
FUND LLC'S MOTION FOR APPROVAL OF COMPROMISE
PURSUANT TO FED. R. BANKR. P. 9019; AND

H INFORMATICS' MOTION IN LIMINE AND FOR SUMMARY JUDGMENT

H Informatics LLC filed a timely application for allowance of administrative

expenses alleging that it is entitled to compensation for administrative services it

provided to Greenpoint Tactical Income Fund, LLC, now known as Alluvium Fund LLC, (the Fund) during the Fund's bankruptcy case. H Informatics' application was filed as one part of a bundled motion. The other part of the bundle is the Fund's motion for approval under Federal Rule of Bankruptcy Procedure 9019 of the Fund's compromise of H Informatics' administrative expense claim. The United States trustee and creditor U.S. Securities and Exchange Committee object to both.

I

A

The Fund was managed by Greenpoint Asset Management II (GAM II), an entity Michael Hull controls, and Chrysalis Financial, LLC (Chrysalis), an entity Christopher Nohl controls, from its inception until July 2023. The Fund and its wholly owned entity GP Rare Earth Trading Account LLC (Rare Earth) filed chapter 11 bankruptcy petitions in October 2019 after they were unable to make payments required by a settlement agreement reached with disgruntled investor Eric Hallick, creating a risk that the presiding arbitrator would order them to surrender gem and mineral assets to Hallick.

After the Fund and Rare Earth filed for bankruptcy, the SEC impleaded them into a civil action it had commenced in the Western District of Wisconsin against Hull, Nohl, GAM II, Chrysalis, and Bluepoint Investment Counsel LLC, another entity 50% owned by Hull, for violations of federal securities laws. The SEC generally alleged that GAM II, Chrysalis, Hull, and Nohl misrepresented the nature of the Fund and the values of its (and Rare Earth's) assets to investors and unlawfully benefited from the Fund in a variety of ways including by receiving inflated management and administrative fees.

In the Fund's bankruptcy case (which was jointly administered with the Rare Earth case) the United States trustee appointed an Official Committee of Equity Security Holders (Equity Committee) to represent the Fund's non-insider investors. After protracted negotiations and mediation, the Equity Committee and the Fund agreed on a

framework for confirmation of a plan of reorganization and an amendment of the Fund's operating agreement. The crux of the deal was that the plan would allow investors the opportunity to exit the Fund by electing to have their interests redeemed over a period of years and that the Fund would propose ratification of an amended operating agreement under which the non-management-related investors would have greater oversight and control through the creation of an independent oversight board, as well as providing for automatic termination of the managers should the Fund fail to make required redemption payments to the exiting investors.

As part of this larger deal, the Fund agreed that the Committee could opt to have the Fund replace H Informatics with a successor administrative service provider. The parties agreed that if the Committee exercised this option, H Informatics would be entitled to an administrative claim for its work during the bankruptcy based on the rate stated in its pre-bankruptcy services contract with the Fund.[1] ECF No. 1504, at 7; ECF No. 1634-2, at 20-22. In February 2022 the court approved the Fund's rejection of its pre-petition contract with H Informatics and approved the Fund's employment of Nav Consulting, Inc., under 11 U.S.C. §327, to serve as its fund administrator, subject to the compensation limitations imposed by §328. ECF Nos. 1240 & 1285.

The Fund's investors overwhelming voted in favor of amending the operating agreement and accepting the proposed plan of reorganization. Before evidentiary hearings on plan confirmation commenced, Hallick, the original investor-protagonist, withdrew his objections and agreed to accept the plan of reorganization, leaving no

---

[1] H Informatics did not sign the term sheet that embodied the principal terms of the parties' agreement. ECF No. 1634-2, at 2 & 23. But Hull (who controls H Informatics) signed the term sheet both individually and on behalf of GAM II, and, more important, H Informatics has represented in connection with this matter that it also agreed to the parties' terms. *Id.*; ECF No. 1504-1, at 4-5 ("H Informatics agreed to treatment of its claim under a mediated consolidated term sheet . . . . Under the Term Sheet, H Informatics agreed to . . . accept its full administrative claim and not oppose rejection of the Agreement by [the Fund]."); ECF No. 1504, at 13-15; and ECF No. 1582, at 2. As a result, for purposes of adjudicating the combined motion relating to the allowance of H Informatics' administrative expense claim, the court treats H Informatics as having agreed to the term sheet provisions that relate to that claim.

investor or creditor, other than the SEC, objecting to confirmation. ECF Nos. 1425 & 1453. At the confirmation hearings Hull and Nohl presented essentially uncontested testimony about the Fund's ability to finance the plan through anticipated asset sales. Based on that testimony the court confirmed the plan on May 18, 2022, overruling objections of the United States trustee and the SEC. ECF No. 1470.

B

After the court confirmed the plan, H Informatics timely requested allowance of administrative expenses under section 503(b)(1)(A) of the Bankruptcy Code. ECF No. 1504. The Fund joined that filing to request, under Rule 9019, that the court approve its pre-confirmation agreement to compensate H Informatics for services provided during the bankruptcy case based on the parties' pre-bankruptcy services contract.

The Fund's pre-bankruptcy contract with H Informatics was executed on January 1, 2018, about 21 months before the Fund filed its bankruptcy petition. ECF No. 1504-1, at 36. That contract provides that H Informatics agrees "to perform certain" "general administrative, bookkeeping, banking management and other administrative functions necessary for" the Fund's "raising invested capital through the sale of Units and to acquire various alternative investment assets". *Id*. As for compensation, the 2018 service agreement states, "H Informatics shall be paid an annual fee of eighty-five basis points (.85%) of the 'Assets under Service.' Assets under Service considers the investors benefitting from the services H Informatics provides[ ] and is an aggregate of the value of their accounts." *Id.* at 36 & 40. The agreement has a one-year term, but it further states that it "shall automatically renew for successive one (1) year terms following the initial term unless either party delivers to the other a written notice of termination thirty (30) days . . . before the end of the then[-]current term". *Id.* at 36-37. It also allows H Informatics to terminate the agreement without cause on 30-days' notice and for either party to terminate it for cause or upon "the bankruptcy of either party". *Id.* at 37.

H Informatics contends that, employing the contract terms in the manner agreed before plan confirmation, it is entitled to an allowed administrative claim "in the amount of $1,350,871.08 for post-petition administrative services provided to [the Fund]" from the commencement of the bankruptcy case until the court approved the Fund's rejection of the H Informatics contract on February 11, 2022. ECF No. 1504, at 1 & 10.

C

Events that occurred after confirmation of the Fund's chapter 11 plan presented challenges for the Fund and its managing members. First, on August 2, 2022, shortly after the SEC and the United States trustee objected to H Informatics' application for administrative expenses, a jury in the SEC's civil action found that all the defendants in that case, including Hull, Nohl, the Fund, GAM II, and Chrysalis, had violated federal securities laws. *SEC v. Bluepoint Inv. Counsel, LLC*, Case No. 19-cv-809, ECF No. 370 (W.D. Wis. Aug. 2, 2022). Following the verdict, the district court received briefs and held hearings to consider an award of remedies to the SEC, a matter that remains pending.

Second, the Fund's ability to sell assets as needed to finance the plan failed to match the managers' predictions. About a year after plan confirmation, the Fund's payments to investors who elected the early redemption option were past due, and the Fund was unable to make either those payments or full payment of all allowed administrative expenses, including those of its lawyers and managing members. As provided in section 6.12(a) of the Fund's third amended and restated operating agreement, and section 3.3.2.II.c of the Fund's confirmed plan, the Fund's failure to pay investors who elected the early redemption option triggered the automatic termination of the Fund's managing members, GAM II and Chrysalis. ECF No. 1470, at 15 & 54.

In July 2023 the Fund's oversight board appointed a new managing member, Annette Kaja, a former co-chair of the Fund's oversight board and former member of

the Equity Committee. ECF No. 1634, at 7. New management hired new counsel for the Fund, selecting the lawyers who had represented the Equity Committee. On August 14, 2023, the Fund, acting through its new counsel, filed correspondence with the district court that related these developments and requested that the court consider "when deciding its remedy" that the Fund continues to hold its members' investments and was not previously represented apart from its former managing members, who were the focus of the wrongdoing. *SEC v. Bluepoint Investment Counsel, LLC*, 19-cv-809, ECF No. 435, at 2-3 (W.D.Wis. Aug. 14, 2023). The Fund also initially asked the district court to consider "in ordering remedies" "[c]anceling all debt[s] or liabilities that the Fund owes to Chrysalis, GAM II, Christopher Nohl, Michael Hull and H Informatics LLC . . . ." *Id*. at 3. The Fund withdrew that request after GAM II and Hull objected and filed a motion in their pending jointly-administered chapter 11 case alleging that the Fund's request violated 11 U.S.C. §362(a)'s automatic stay provisions.[2] See *Id.*, ECF No. 438.

II

The SEC and the United States trustee urge the court to disallow the Fund's compromise and H Informatics' administrative expense claim. They argue generally that any compromise to pay H Informatics more than $1.3 million for services during the bankruptcy case cannot be shown to be in the best interest of the bankruptcy estate nor can H Informatics prove that the amount represents reasonable compensation for its services. They also argue that H Informatics is a professional within the meaning of section 327 of the Bankruptcy Code; thus, controlling precedent precludes allowance of its administrative expense claim because the court never approved the Fund's employment of H Informatics. See *In re Singson*, 41 F.3d 316, 319-20 (7th Cir. 1994)

---

[2] The Fund disputes GAM II and Hull's allegations that it violated the §362(a) stay. The court has that matter under advisement.

(Compensation for professional services generally may be allowed only for services provided following court approval of employment.).

Following the jury verdict in the SEC's civil action, the United States trustee and the SEC supplemented their objections to the combined motion seeking allowance of H Informatics' administrative expense claim. The United States trustee's supplemental filing emphasizes in part that H Informatics' services cannot reasonably be calculated using the Fund's previously reported asset values because the evidence in the civil action demonstrates "that [the Fund's] and GPRE's valuations were materially overstated". ECF No. 1688, at 5. The SEC's supplemental filing adds that in the civil action the defendants, including the Fund, its former managers, and the individuals who control them, "acknowledged that H Informatics received ill-gotten gains and those fees are subject to disgorgement." ECF No. 1583, at 2. The defendants' district court submission on disgorgement and penalties, which the SEC filed as an exhibit to its supplement, concedes that almost $300 thousand of H Informatics' fees for *pre-bankruptcy* services (from the first quarter of 2018 through September 2019) are subject to disgorgement, because they were based on an "overstatement of asset values." ECF No. 1583-1, at 5.

A

*The motion to compromise.* Rule 9019(a) affords bankruptcy courts discretion to approve certain compromises. It states (with added emphasis), "On motion by the trustee and after notice and a hearing, the court *may* approve a compromise or settlement." As the parties observe, precedent guides the exercise of this discretion, at least in the context of trustees' compromises of claims held by the bankruptcy estate: "Bankruptcy courts may approve adversary litigation settlements that are in the best interests of the estate. The linchpin of the 'best interests of the estate' test is a comparison of the value of the settlement with the probable costs and benefits of litigating." *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007) (first

citing *In re Energy Co-op., Inc.*, 886 F.2d 921, 927-29 (7th Cir. 1989), then citing *LaSalle Nat'l Bank v. Holland* (*In re Am. Reserve Corp.*), 841 F.2d 159, 161 (7th Cir. 1987)); see also *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994). In that context, "the value of the settlement must be reasonably equivalent to the value of the claims surrendered", and the "reasonable equivalence standard is met if the settlement falls within the reasonable range of possible litigation outcomes." *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d at 426. "Because litigation outcomes cannot be predicted with mathematical precision," the governing precedent instructs that a trustee's settlement of an estate's claim, "will [ ] fail the reasonable equivalence standard" "only if [the] settlement falls below the low end of possible litigation outcomes".[3] *Id.*

H Informatics contends that the compromise amount—more than $1.3 million—is in the reasonable range of possible outcomes, because it could have requested a greater payment. In support of this contention, it asserts that it has not charged the Fund "any fees for the accounts of managing members", has not accounted for any "likely appreciation in asset value occurring during [the Fund's] bankruptcy case", and has agreed not to seek damages for the rejection of its contract in February 2022. ECF Nos. 1504, at 13-15 and 1504-1, at 4-5 & 7. Because none of that is contested, H Informatics reasons that the reasonable equivalence standard is satisfied, and the court should approve the compromise under Rule 9019 without further ado. ECF No. 1504, at 14-15.

But before exercising its discretion to approve a debtor's compromise under Rule 9019, the bankruptcy court must consider the potentially applicable factors and make an "'informed and independent judgment' about" the reasonableness of the compromise.

---

[3] H Informatics presumes that these same principles apply to the debtor's request for approval of its compromise of H Informatics' administrative expense claim—that is, to approval of a claim *against* the estate. Perhaps one might reasonably question that presumption, but no one does; so this opinion does not explore the issue further.

*In re Am. Reserve Corp.*, 841 F.2d at 162 (quoting *Protective Comm. for Indep. S'holders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424 (1968)); see also *In re Energy Co-op., Inc.*, 886 F.2d at 924–25. The court "may not simply accept the trustee's [or debtor in possession's] word that the settlement is reasonable, nor may [the court] merely 'rubber-stamp' the trustee's [or debtor in possession's] proposal." *In re Am. Reserve Corp.*, 841 F.2d at 162. Still, because compromise typical minimizes administrative expenses and maximizes payments to parties with an interest in the bankruptcy estate, courts ordinarily defer to the trustee's (or debtor in possession's) "judgment so long as there is a legitimate business justification" for approving the compromise. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)).

Ordinarily, however, is not always. And, in considering whether to approve a compromise, the bankruptcy court must decide whether it is reasonable under the current circumstances, rather than the circumstances that existed at the time of the compromise or when approval of the compromise was first sought. See *Martin*, 91 F.3d at 393–96; *Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002) ("Because the situation has changed drastically since [the trustee] first negotiated the Settlement, the bankruptcy court should examine the *Martin* factors in light of the present circumstances."). After the Fund compromised H Informatics' administrative expense claim, the jury in the SEC case found the Fund's former managing members, GAM II and Chrysalis, the individuals who controlled those members, Hull and Nohl, and the Fund had violated securities laws. In its closing instructions to the jury, the district court "[b]roadly" described the SEC's claims as follows: "the SEC claims under each count that defendants defrauded investors by reporting misleading and unreasonable valuations of fund assets, misrepresented valuation procedures, and charged excessive management and other fees. The SEC further claims that defendants unlawfully enriched themselves at the expense of investors by engaging in

undisclosed[] self-dealing and related party transactions." *SEC v. Bluepoint Inv. Counsel, LLC* Case No. 19-cv-00809, ECF No. 374, at 5; ECF No. 387, at 237:19-25. And the SEC has requested that the district court order the defendants to disgorge "all payments [the Fund] made to Hull's companies, H Informatics and H Family Office", arguing that disgorgement of the entire amount is justified "'when the entire profit of a business or undertaking results from the wrongful activity.'" *SEC v. Bluepoint Inv. Counsel, LLC*, ECF No. 390, at 26 (quoting *Liu v. SEC*, 140 S. Ct. 1936, 1945 (2020)).

The defendants in the SEC civil action, including the Fund and its former managers, contest all of that, see *id.* at ECF No. 396, but following the district court's hearing on remedies, they acknowledged that $296,048 in fees paid to H Informatics pre-bankruptcy is subject to disgorgement. *Id.* at ECF No. 430, at 1 & 5. The civil action defendants have also acknowledged that the Fund's asset values H Informatics used to calculate compensation due pre-bankruptcy were overstated, explaining: "Defendants calculated the disgorgement amount on a quarter-by-quarter basis by calculating the specific fee attributable to the overstatement of asset values. The result of this calculation is $296,048 in disgorgement for H Informatics". *Id.* at 5. The defendants' post-verdict acknowledgment that the Fund's prepetition asset values were overstated strongly suggests that the compromise amount, which derives from multiplying a subset of post-petition asset values times the .85% contractual fee, cannot be accepted as reasonable.

The existing record, therefore, simply does not afford an adequate basis from which the court can determine that the compromise amount bears a reasonable relationship to the amount that H Informatics could be allowed under section 503(b)(1)(A). The jury verdict and subsequent filings in the district court offer significant reasons to doubt that the compromise amount reasonably reflects the actual value of services H Informatics provided to the Fund during the bankruptcy case, even if one presumes that a reasonable fee can be calculated using the terms of the pre-

petition services contract. Those developments also raise the possibility that the services contract on which the compromise is premised might be shown to be an unenforceable instrumentality of misconduct. And the deference typically afforded a debtor in possession when seeking compromise approval is undercut here both by the self-interest of the Fund's former management—Hull controls both H Informatics and GAM II—as well as the Fund's failure to champion the compromise now that it is under independent management.

For these reasons, the court concludes that, under the unusual circumstances this matter presents, the best course is to deny the request to approve the compromise, leaving H Informatics to establish that its administrative expense claim is allowed by section 503(b).

## B

### 1

*H Informatics' application for allowance of its administrative expense claim.* As mentioned above, the SEC and the United States trustee argue in part that the court may not allow H Informatics' administrative expense claim because H Informatics is a professional for purposes of section 327 and it failed to obtain the necessary court approval of its post-petition employment by the Fund.

Section 330(a) governs awards of compensation to "professional person[s] employed under section 327" by trustees and by debtors in possession exercising the rights and powers of a trustee pursuant to section 1107(a). 11 U.S.C. §§330(a) & 1107(a). Employment under section 327 requires court approval. See *Singson*, 41 F.3d at 320. And professional persons who fail to obtain that approval can neither be awarded and allowed compensation under sections 330(a) and 503(b)(2) nor allowed an administrative expense claim for that work under section 503(b)(1). *Id.*; see also *In re Milwaukee Engraving Co., Inc.*, 219 F.3d 635, 636 (7th Cir. 2000) ("By making express provision for employment under § 327, payment under § 330, and priority under

§ 503(b)(2), the Code logically forecloses the possibility of treating § 503(b)(1)(A) as authority to pay (and give priority to) claims that do not meet its substantive requirements.").

H Informatics neither sought nor obtained court approval to provide professional services to the Fund pursuant to section 327. What is unclear is whether H Informatics was required to obtain such approval. Section 327(a) provides that a debtor in possession, "with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other *professional persons* . . . to represent or assist the [debtor-in-possession] in carrying out [its] duties under this title". (Emphasis added.). Is H Informatics a "professional person" for purposes of section 327?

The Bankruptcy Code does not define "professional person." Terms not defined by the Code are typically afforded their "ordinary meaning[s]". *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 69 (2011). "Professional", as an adjective and in this context, most naturally means "of, relating to, or characteristic of a profession or calling"; "engaged in one of the learned professions or in an occupation requiring a high level of training and proficiency". *Webster's Third New International Dictionary*, at 1811 (2002). These would appear to be the most apt readings of "professional" as that term is used in §327. In this context, "profession" seems most naturally understood as having one of two definitions, either "a principal calling, vocation, or employment" or

> a calling requiring specialized knowledge and often long and intensive preparation including instruction in skills and methods as well as in the scientific, historical, or scholarly principles underlying such skills and methods, maintaining by force of organization or concerted opinion high standards of achievement and conduct, and committing its members to continued study and to a kind of work for which has for its prime purpose the rendering of a public service.

*Id.*

Reading section 327's use of "professional person" as limited to persons who engage in an occupation governed by specialized knowledge and prescribed technical or ethical standards does not allow the court to resolve on the existing record whether H Informatics is a professional person for section 327 purposes. The record shows that Lauren Kelly, the chief executive officer of H Informatics, "personally provided many of the services" H Informatics performed for the Fund. ECF No. 1504-2, at 2. Kelly states in a supporting declaration that she has been "involved in the financial services industry since 1999", she "spent thirteen years employed with brokerage firms, and [is] accordingly well versed in the calculation of fees based on assets under service/management", and she "left brokerage to work as a registered investment adviser with Bluepoint Investment Counsel" (another Hull-related entity and defendant in the SEC civil case). *Id.* at 1–2. Kelly also asserts that based on her "professional opinion, the[ ] services [H Informatics' provided to the Fund] benefited the Debtors and the estate and the amount sought by H Informatics reflects the reasonable value of the services." *Id.* at 4. Based on this, Kelly, thus H Informatics, might be a professional, in the sense of performing work requiring specialized knowledge or that is regulated or subjected to defining technical or ethical standards. And, if so, H Informatics might have been "a professional person" for purposes of section 327 in connection with its services to the Fund as debtor in possession.

What is more, several bankruptcy courts have read section 327's use of "professional person" functionally. This functional approach asks whether the person had an oversight role in the debtor's business, either before or during bankruptcy:

> A "professional" has been defined as an employee that performs non-repetitive tasks involving the "exercise of judgment and discretion" in order to "assure the company's future viability," such as "development of a business plan, . . . [a]ssistance and supervision of bookkeeping and financial functions relating to receivable collections, . . . lease negotiations, disposal of nonessential assets, and supervision of personnel."

*In re Renaissance Residential of Countryside, LLC*, 423 B.R. 848, 857 (Bankr. N.D. Ill. 2010) (quoting *In re Rusty Jones, Inc.*, 109 B.R. 838, 843-44 (Bankr. N.D. Ill. 1989)). The functional approach casts a broad net, the reach of which some opinions limit by requiring for professional status that the person is one "whose occupation plays a central role in the administration of the bankruptcy case." *Id.* at 856; see also *In re Artra Group, Inc.*, 308 B.R. 858, 860 (Bankr. N.D. Ill. 2003) ("Those who provide services to the debtor that would have been necessary even if the petition had not been filed are not considered professional persons, even though they may be members of a professional community."); *In re Seatrain Lines, Inc.*, 13 B.R. 980, 981 (Bankr. S.D.N.Y. 1981) ("For the purposes of section 327(a), 'professional person' is limited to persons in those occupations which play a central role in the administration of the debtor proceeding. Court approval is required for the retention of attorneys, accountants, appraisers, auctioneers and persons in other professions intimately involved in the administration of the debtor's estate.").

In all events, under the functional approach, determining whether H Informatics is a professional person requires examining the services it performed for the Fund and the extent to which those services played a role in the administration of the bankruptcy proceeding. Again, the existing record lacks definitive guidance. H Informatics' motion explains the post-petition services it provided as follows:

> During the Covered Period, H Informatics provided a variety of general administrative, bookkeeping, banking management and other administrative functions necessary for the [Fund's] operations. These include many of the duties identified in the Services Contract. They also include many other administrative responsibilities assigned or delegated to H Informatics by the [Fund] during the bankruptcy process.
> . . . .
> In the context of the bankruptcy proceeding, however, H Informatics instead provided servicing to the [Fund] which (i) provided *comparable* information utilized in the preparation of monthly operating reports, (ii) involved preparation of other written communications filed with the

> Court for dissemination to investors and other parties, such as the Net Invested Capital (NIC) chart, (iii) dealt with an increased volume of responses to investor inquiries via telephone and email correspondence, and (iv) handled the required minimum distributions communications and other investor requests such as IRA to Roth IRA conversion requests. H Informatics also worked on revisions to a new investor file sharing system and other projects that benefited the [Fund] and its investors. . . .
>
> During the bankruptcy case, many of H Informatics' routine and continuing services were utilized by [the Fund's] management in the course of the [Fund's] operations as a debtor-in-possession. For example, H Informatics' staff reconciled accounts for the bankruptcy accountants, maintained the NIC Chart, and provided investors with information and assistance as they completed claims forms and participated in the bankruptcy process, coordinated with bankruptcy counsel, dealt with other service providers, and otherwise provided administrative support necessary for the [Fund's] management to operate the [Fund] and comply with bankruptcy obligations.

ECF No. 1504, at 4-6. Although H Informatics says it "participated in the bankruptcy process [and] coordinated with bankruptcy counsel," *id.* at 6, it argues that it is not a "professional person" for purposes of section 327 because its services were not instrumental to the Fund's bankruptcy. It characterizes its role as providing "ongoing non-bankruptcy administrative and support services to [the Fund that] had nothing to do with administering the debtor's estate, negotiating with other parties, or engaging in other professional workout activities." ECF No. 1582, at 13. It styles its services during the Fund's bankruptcy as a mere continuation of services provided before bankruptcy and, on that basis, concludes that "it was not required to be retained under § 327(a)". *Id.* at 14.

But H Informatics' suggestion that its services were unrelated to administration of the bankruptcy case is seemingly inconsistent with at least some statements in Hull's and Kelly's supporting declarations. ECF No. 1504-1 & 1504-2. Hull states, "While

certain services listed in Exhibit A of the Services Contract were not required once [the Fund] filed bankruptcy, H Informatics was required to provide substantial *other* services as a result of the bankruptcy filing." *Id.* at 6. These other services, Hull further states, involved, at least in part, assisting the Fund in performing its duties as a debtor in possession:

> [D]uring the Covered Period [the period from the petition date through rejection of the services contract] the information and servicing H Informatics typically provided was repurposed to assist [the Fund's] managers with (i) the **drafting of monthly operating reports filed with the Court**, (ii) **preparation of other written communications filed with the Court for dissemination to investors and other parties**, **such as the Net Invested Capital (NIC) chart**, (iii) an increased volume of responses to investor inquiries via telephone and email correspondence, and (iv) the required minimum distributions communications and other investor requests such as IRA to Roth IRA conversion requests.

*Id.* at 6–7 (emphasis added). Kelly's declaration makes the same points and adds, "H Informatics assumed the duties of the fund administrator after the bankruptcy proceedings commenced." ECF No. 1504-2, at 3-4.

H Informatics' explanation of the post-bankruptcy services it provided the Fund and statements in its supporting declarations thus create material uncertainty about the nature of those services and whether at least some of those services qualify H Informatics as a professional person for purposes of section 327(a). See *In re Renaissance Residential of Countryside,* 423 B.R. at 861 (concluding that a bookkeeper's services that were "of an accounting, legal, and consulting nature" and "were directly related to the administration of the Debtor's estate" were professional services for which retention under section 327 was required). Consequently, the court cannot determine whether H Informatics performed services for which retention under section 327 was necessary without an evidentiary hearing.

2

What is more, even if the court determines that H Informatics was not a professional person for purposes of section 327, the court cannot determine the extent to which H Informatics' administrative expense claim should be allowed without hearing evidence. Section 503(b)(1)(A) allows administrative expenses only for "the actual, necessary costs and expenses of preserving the estate". And allowance of a claim for costs or expenses under that section requires proof that the cost or expense "(1) 'arise[s] from a transaction with the debtor-in-possession' and (2) is 'beneficial to the debtor-in-possession in the operation of the business'". *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984) (quoting *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976)). The party seeking to have the administrative expense claim allowed, here, H Informatics, bears the burden of establishing its claim by a preponderance of the evidence. *In re World Mktg. Chi., LLC*, 564 B.R. 587, 595 (Bankr. N.D. Ill. 2017) (first citing *Woods v. City Nat. Bank & Tr. Co. of Chi.*, 312 U.S. 262, 268 (1941), then citing *Dreamwerks Prod. Grp., Inc. v. Party Masters, Inc. (In re Party Masters, Inc.)*, Case No. 91 B 22949, Adv. No. 92ap00010, 1992 WL 106259, at *23 (Bankr. N.D. Ill. Apr. 23, 1992)).

As discussed above, H Informatics submitted the declarations of Hull and Kelly in support of its claim. Those declarations describe the work H Informatics performed for the Fund during the bankruptcy only in general terms and state in only a conclusory way that the flat fee charged by H Informatics is reasonable based on "industry norms". ECF No. 1504-1, at 7-8; ECF No. 1504-2, at 4. Both Hull's and Kelly's declarations attach a spreadsheet that purports to describe how H Informatics derives its fee, but neither the spreadsheet nor the declarations explain the valuation method for the Fund's "Assets under Service," to which H Informatics applies the contract rate to calculate its requested compensation. ECF No. 1504-1, at 3-4 & 44; ECF No. 1504-2, at 2-3 & 13.

The SEC and the United States trustee emphasize in their objections that the supporting declarations of Hull and Kelly lack sufficient detail to demonstrate that the

claimed compensation constitutes actual and necessary costs and expenses of preserving the estate. In response H Informatics attempts to avoid the need to present detailed supporting evidence by contending that, because the Fund elected to receive benefits under its contract with H Informatics post-petition, the Fund "is obligated to pay the reasonable value of those services", and precedent recognizes that "[t]he contract rate is . . . *one method* to assess the reasonableness of the charges for services performed on behalf of the debtor." ECF No. 1582, at 7 (quoting *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984)).

The extent to which the contract rate can be relied on to determine the reasonableness of an administrative claim "depend[s] on the circumstances", however, and "factors [other than the contract rate] may be pertinent as well, such as the actual amount of services provided to the debtor in possession." *In re Kmart Corp.*, 290 B.R. 614, 621 (Bankr. N.D. Ill. 2003) (first citing *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, then citing William L. Norton, Jr., 4 Norton Bankruptcy Law and Practice 2d ed. §42.20 (2002)). As explained above, H Informatics bears the burden to show that its request for administrative expenses is reasonable and meets the requirements of section 503(b)(1)(A). To the extent the existing record contains relevant undisputed facts, those facts do not afford a basis for finding as a matter of law that H Informatics has made the required showing.

As *Kmart* makes clear, "the court has discretion to determine the reasonable value of the administrative claim", including through an evidentiary hearing. *Kmart*, 290 B.R. at 621. As explained previously, the lack of detail provided in H Informatics' supporting declarations makes them an inadequate basis on which to resolve the parties' dispute over H Informatics' administrative expense claim. Additionally, the jury verdict and subsequent filings in the district court—which, as discussed above, at least suggests that H Informatics' calculation of its administrative expense claim uses

overstated asset values—further militate in favor of conducting an evidentiary hearing to determine whether to allow H Informatics' administrative expense claim.

III

On November 6, 2023, H Informatics filed a motion in limine and for summary judgment. ECF No. 1675. This motion requested, for various reasons, that the court narrow the scope of any evidentiary hearing to the receipt of evidence regarding (1) a contention made by the Fund (under new management) that the compromise agreement on H Informatics' administrative expense claim no longer binds the Fund because GAM II and Chrysalis breached the underlying settlement agreement and (2) the reasonableness of the parties' compromise under Rule 9019.

As explained part II, above, the court exercises its discretion under Rule 9019 to deny the motion in compromise. It will instead hold an evidentiary hearing to adjudicate allowance of H Informatics' administrative expense claim during which it expects to consider evidence relating to whether H Informatics provided professional services within the scope of section 327(a) and whether or to what extent H Informatics' administrative expense claim may be allowed under §503(b).

For these reasons, H Informatics' motion in limine and for summary judgment must be denied.

IV

For the foregoing reasons, IT IS ORDERED as follows:

1. The Fund's motion to compromise is denied.
2. H Informatics' motion in limine and for summary judgment is denied.
3. The court will hold an evidentiary hearing on H Informatics' request for approval of administrative expenses beginning on **March 6, 2024, at 9:30 a.m. and, if necessary, on March 8, 2024**. A separate order will address procedures and deadlines applicable to that hearing.

# # # # #