So Ordered.

Dated: February 8, 2024



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Greenpoint Tactical Income Fund LLC
n/k/a Alluvium Fund LLC, and

Case No. 19-29613-gmh

GP Rare Earth Trading Account LLC,

Case No. 19-29617-gmh
Chapter 11

Jointly Administered Debtors.

(Jointly Administered
Under Case No. 19-29613)

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FILED BY GREENPOINT ASSET MANAGEMENT II LLC AND CHRYSALIS FINANCIAL LLC FOR AN ORDER DIRECTING GREENPOINT TACTICAL INCOME FUND LLC TO COMPLY WITH ITS CONFIRMED CHAPTER 11 PLAN**

Greenpoint Tactical Income Fund LLC, now known as Alluvium Fund LLC (the "Fund") and GP Rare Earth Trading Account LLC ("GPRE") (collectively, the

"debtors") filed their chapter 11 petitions on October 4, 2019, and the court confirmed chapter 11 plans for each debtor on May 18, 2022. Greenpoint Asset Management II, LLC ("GAM II") and Chrysalis Financial LLC ("Chrysalis") were the managing members of the Fund until July 19, 2023. This opinion refers to GAM II and Chrysalis collectively as the "Former Managers." The Former Managers ask the court to order the Fund to comply with the terms of its confirmed chapter 11 plan because they believe that the Fund "has or will refuse to disburse funds . . . in clear violation of the unambiguous terms of the Plan."[1] ECF No. 1636, at 9.

I

A

In the Fund's bankruptcy case, the United States trustee appointed an Official Committee of Equity Security Holders (the "Committee"). The debtors, the Committee, the Former Managers, Christopher Nohl (president of Chrysalis), and Michael Hull (president of GAM II) engaged in extensive negotiations as part of a global effort to forge a chapter 11 plan acceptable to all interested parties. The negotiations resulted in an agreement under which the Fund proposed (i) a plan of reorganization that gave investors an option to redeem their investments over a four-year period ("Leave Class Investors") and (ii) a third amended operating agreement that, among other things, gave the investors greater management oversight.

The negotiations also led to a compromise "of various pre-petition claims asserted by [the Former Managers] for compensation and expense reimbursement, as

---

1 The Former Managers filed separate motions to compel and made some distinct arguments. For ease of explication, this opinion treats all the arguments as being applicable to both.

well as post-petition administrative expense claims for compensation and reimbursement". ECF No. 1366, at 1. Under that compromise, the Fund agreed that the Former Managers are entitled to an administrative claim for post-petition services separated into two periods: (1) from the petition date through April 30, 2021 (totaling $1,921,235.74) and (2) from May 1, 2021, through the plan's effective date (calculated at an annual rate of $575,000 for each of the Former Managers). *Id.* at 6-7. The Fund was to pay the full administrative claim on the plan's effective date or at some later mutually agreed time. *Id.* A May 6, 2022 order approved the compromise, and GAM II and Chrysalis subsequently agreed to an allocation of the total administrative claim due from the Fund under its plan. ECF No. 1453, at 3. That agreement entitles GAM II to $1,441,168.31 and Chrysalis to $1,689,930.45.[2]

On May 18, 2022, the court confirmed a modified version of the Fund's third amended chapter 11 plan, which became effective on May 19, 2022. ECF Nos. 1470 & 1476. The confirmed plan provided that the Fund's then-current managers would continue in that role "subject to the terms and conditions of th[e] Plan and the Third Amended Operating Agreement." ECF No. 1470 at 19, §6.3.A. One of those conditions was that if the Fund failed to make timely payments due to the Leave Class Investors beginning on the first anniversary of the plan's effective date, "then the [Former Managers would] be terminated automatically and without further action by anyone or any entity." *Id.* at 15, §3.3.2.II.c.

---

2 A stipulation signed by GAM II's counsel and Chrysalis's counsel provides that GAM II is entitled to $836,236.80 for services rendered from the petition date to April 30, 2021, and $604,931.51 for services rendered from May 1, 2021, through the plan's May 19, 2022 effective date, for a total claim of $1,441,168.31; and Chrysalis is entitled to $1,084,998.94 for services rendered from the petition date to April 30, 2021, and $604,931.51 for services rendered May 1, 2021, through the plan's effective date, for a total claim of $1,689,930.45. ECF No. 1693.

B

The Fund's projected asset sales did not materialize as expected after confirmation. The Fund consequently failed to pay the Leave Class Investors on the first anniversary of the plan's effective date. That failure triggered the automatic termination of the Former Managers, who were relieved of their managing authority on July 19, 2023, at the end of a two-month grace period. ECF No. 1636-2, at ¶4. Annette Kaja (a former member of the Committee and a co-chair of the Fund's oversight board) succeeded them, becoming the Fund's sole managing member effective July 20, 2023. ECF No. 1636-1, at ¶2; ECF No. 1647, at 7.

The Fund and its Former Managers also suffered an adverse litigation outcome in the year following plan confirmation. On August 2, 2022, a jury in the United States District Court for the Western District of Wisconsin found that the debtors, the Former Managers, Nohl, Hull, and a related entity had violated federal securities laws. *SEC v. Bluepoint Investment Counsel, LLC*, No. 19-cv-809 (W.D. Wis.) (the "SEC Action"), ECF No. 370. Following the liability verdict, the United States Securities and Exchange Commission, the plaintiff in that action, asked the district court to order numerous remedies, including "disgorgement of ill-gotten gains of $15,622,889 as to all Defendants on a joint and several basis determined by a reasonable approximation of the profits causally connected to the violations, along with prejudgment interest of $4,212,349, for a total of $19,835,237; and [ ] civil penalties of $10 million apiece against Hull and Nohl and penalties of $1 million apiece against Chrysalis Financial [and] GAM II". *Id.*, ECF No. 390, at 8.

The district court took the remedies matter under advisement. Shortly after the Fund's July 2023 management change, the SEC filed a "Notice of Subsequent Events" to

address post-verdict developments involving the Fund. *Id.*, ECF No. 433, at 1. The Notice alleges that Hull and Nohl were trying "to exert control over the assets of [the Fund]" after new management succeeded GAM II and Chrysalis. *Id.* at 2. Renewing SEC's request for injunctive relief, the Notice asserts that "[t]he conduct-based injunction sought by the SEC will ensure that Defendants have no further access to the proceeds of their fraud" and "[i]t is imperative that an independent manager take control of [the Fund's] assets without interference from Hull and Nohl". *Id.* at 4.

The Fund, acting under Kaja's direction, filed a response to the Notice on August 14, 2023. *Id.*, ECF No. 435. The response informed the district court that the Fund is now under Kaja's direction and contends that in "the best interests of investors" the court should (1) prohibit the Former Managers, Hull or Nohl and any entity they control from serving as a managing member; (2) "[e]xclude the Fund from being held individually or jointly or severally liable for any disgorgement orders, civil penalties, or any monetary judgment directed toward [the other] defendants"; (3) "[c]ancel all debt or liabilities that the Fund owes to Chrysalis, GAM II, Christopher Nohl[ or] Michael Hull . . . including but not limited to any fees or claims allowed by the Bankruptcy Court for the Eastern District of Wisconsin . . . , due to be paid pursuant to the Plan, and any fees of the [Former Managers] owed pursuant to the Operating Agreement"; (4) require the Former Managers "to compensate the Fund and its investors for all legal and professional fees and costs paid by the Fund which were related to the conduct of Chrysalis and GAM II that was found to have violated the law"; and (5) "[p]rohibit Chrysalis, GAM II, Christopher Nohl[ or] Michael Hull . . . from seeking indemnification or other reimbursement from the Fund related to disgorgement orders, civil penalties, or any monetary judgment in th[e SEC] Case." *Id.* at 3.

The Former Managers perceived the Fund's August 14 response as a collateral attack on the confirmed plan. GAM II and Chrysalis filed motions in this court for an order compelling the Fund to pay their administrative expense claims and post-confirmation compensation as provided by the plan. The Former Managers argued that, based on Fund's filing in the SEC Action and other actions taken by the Fund, including alleged payments made to other administrative claimants, the Fund will "refuse to pay anything to [the Former Managers] on [their] administrative expense[s] but will prefer others that are not entitled to payment before [them]." ECF No. 1624, at 6; see also ECF No. 1636, at 9.

The Fund objected to all of this and discovery ensued. After an initial round of briefing, during which the Fund advanced numerous arguments to support its assertion that it was not required to pay the Former Managers under the terms of the confirmed plan, the court entered a tentative ruling on several contested issues. Following further briefing the court announced in summary form the rulings that are the subject of this opinion. This opinion supersedes the earlier tentative and summary rulings.

II

The Former Managers assert the Fund is currently obligated to pay their administrative claims and that the court should order the Fund to pay them pro rata with other administrative claimants. They rely on §1142(b) of the Bankruptcy Code, which authorizes this court to "direct the debtor . . . to perform any [ ] act . . . that is necessary for the consummation of the [confirmed] plan." 11 U.S.C. §1142(b). The confirmed plan provides, as required by §1129(a)(9)(A) of the Code, that the Fund will pay allowed administrative claims on the plan's effective date, unless the claimant agrees to defer that payment. ECF No. 1470, at 12, §3.1; see also 11 U.S.C. §1129(a)(9)(A).

The Fund does not dispute that the Former Managers have such claims.

In opposing the Former Managers' demand for payment, the Fund makes several arguments: 1. The Former Managers agreed to later payment. 2. Their administrative claims were converted to equity interests by operation of paragraph 6.3.B of the plan. 3. Even if payments to the Former Managers are currently due under the plan, the court should not order the Fund to pay its Former Managers for at least three reasons: (a) the Fund lacks the cash to pay all administrative expense claims, (b) the Fund should not be directed to pay the Former Managers' claims before the district court adjudicates the SEC's remedies request, and (c) the Fund has other potential claims against the Former Managers, including for indemnification and breach of fiduciary duty, that it intends to prosecute and which may counter its payment obligations under the plan. 4. The Fund does not currently owe the Former Managers compensation for post-confirmation services because under paragraph 6.3.B of the plan that compensation was converted to Leave Class equity interests. 6. The court should not order the Fund to pay the Former Managers for their post-confirmation services because the Fund lacks the wherewithal to make those payments and claims to that compensation are subject to arbitration under the terms of the Fund's operating agreement.

For the following reasons, the court concludes that the Former Managers' administrative expense claims (for preconfirmation services) are currently due, but the court will not exercise its discretion under §1142(b) to order the Fund to pay those claims nor will it exercise its discretion under §1142(b) to adjudicate the Former Managers' right to payment of compensation for post-confirmation services.

A

The Fund argues that the Former Managers agreed to defer payment of their administrative claims until investors were paid as required by the plan. In support of this argument, the Fund points to the testimony of Hull and Nohl (as representatives of former managing members GAM II and Chrysalis, respectively) at the Fund's chapter 11 confirmation hearing. This testimony, says the Fund, demonstrates that the Former Managers agreed to defer payment of their administrative claims until the Fund "ha[s] sufficient funds to pay investors in accordance with the Plan". ECF No. 1647, at 11.

In the context of the Fund's ability to pay administrative claims as required by the plan, Hull testified that "if it's necessary for the debtors to . . . meet . . . their financial obligations under the plan, as of the effective date as well as other obligations including redemption obligations, [he, on GAM II's behalf, was] willing as managing member . . . to defer the payment of all of those claims . . . due [to GAM II] as managing member". ECF No. 1518, at 142:9-16. Hull also testified that the consideration for GAM II's agreement to defer those payments is that the Former Managers would "continue to operate th[e F]und as the managers." ECF No. 1518, at 161:25-162:4.

Nohl (on Chrysalis's behalf) similarly testified that "if the debtor[] lack[ed] the resources to pay th[e] financial obligations in full [under the plan] as of the one-year anniversary", then Chrysalis "as managing member [was] going to defer the payment of any compensation or other claims due [to Chrysalis]". ECF No. 1518, at 95:21-25. When asked whether the Fund would "have sufficient cash to pay all of the [amounts due on the] effective date", Nohl testified that the "plan was to defer the managing member payments pending their success on the sale of the fine minerals and

gemstones." ECF No. 1518, at 113:15-21.

The Former Managers thus unquestionably promised to defer the immediate payment of their administrative claims, which the plan otherwise required to be made soon after the plan's effective date. But their testimony affords an insufficient basis from which to conclude that they forfeited (or waived, to use the Fund's rubric) their rights to demand payment of those claims when the Fund was able to make those payments or when they were removed as the Fund's managers. See ECF No. 1518, at 95:21-25, 113:15-114:22, 115:13-23, 142:9-16, 161:8-162:19, & 193:8-15.

The Former Managers' testimony must be understood within the context in which it was given—to support confirmation of the Fund's chapter 11 plan. To confirm the plan, the Fund had to establish, among other things, that the Fund would be able to make all required payments and that confirmation would "not likely be followed by liquidation, or the need for further financial reorganization," unless provided for in the plan. 11 U.S.C. §1129(a)(11). Among those required payments were allowed administrative claims, including to GAM II and Chrysalis, which the Fund had to pay "as soon as reasonably practicable after the Effective Date", unless the parties subsequently agreed to "other treatment". ECF No. 1470, at 12, §3.1.

Hull and Nohl testified that under their continuing management they expected that the Fund would be able to liquidate several high-value assets in a short period resulting in sufficient revenue to meet the plan's payment obligations. It was in this context that Hull and Nohl testified that GAM II and Chrysalis would defer payment of their administrative claims if that proved necessary to ensure that the Fund could satisfy its other obligations under the plan. But neither Hull nor Nohl testified (or even suggested) that GAM II and Chrysalis would defer payment of their administrative

claims indefinitely, especially should the Fund come under the control of successor managers. Hull testified that *as one of the Fund's managers* GAM II would defer payment; Nohl testified that Chrysalis "as managing member" would defer payment of its administrative claim. ECF No. 1518, at 95:21-25 & 142:9-16. Understood in context the promised forbearance was that GAM II and Chrysalis would refrain as ***managers*** from directing the Fund to pay them before directing the Fund to meet its other obligations. Considering both how the court understood the testimony at the time it was presented and having reconsidered it in deciding the current controversy, the court is not persuaded that Hull's and Nohl's testimony implies that GAM II and Chrysalis promised not to require payment of their administrative expense claim after being terminated as the Fund's managers. The court concludes that the most it can reasonably infer from the testimony is that the Former Managers represented that they would not use their post-confirmation management authority to direct the Fund to pay their administrative claims if that payment would leave the Fund unable to meet its other obligations under the plan—not that the Fund was free to delay paying their administrative claims even after terminating them as managers.[3]

---

3 The Fund, in objecting to this same conclusion announced in the October 24, 2023 tentative ruling, argues that "there is no evidence that the Former [Managers'] deferment is in any way contingent upon them remaining managing members". ECF No. 1682, at 2. In so arguing the Fund relies on the same confirmation-hearing testimony discussed in this opinion and in the earlier ruling. For the reasons stated above, the Fund's argument remains unpersuasive. Although the testimony didn't directly address how long GAM II and Chrysalis might forgo payment, the court understands Hull's and Nohl's testimony to promise forgoing payment while GAM II and Chrysalis managed the Fund, not to forgo payment even after a change in management eliminates their ability to influence when the Fund pays them.

B

The Fund also argues that when GAM II and Chrysalis were terminated as managers, subparagraph 6.3.B.v. of the plan converted their allowed administrative claims to Leave Class equity interests. But the Fund's obligation to pay administrative claims is governed by subsection 3.1 of the plan, not paragraph 6.3.B. Paragraph 6.3.B governs management compensation for services rendered *after* plan confirmation, a dichotomy made clear by comparing the two provisions.

Article 3 of the plan contains subsections providing for the plan's "treatment of classes, claims, and interests", as its title states. ECF No. 1470, at 12 (capitalization altered and emphasis omitted). Subsection 3.1 of the plan, titled, "Administrative Claims in General", states,

> each holder of an allowed Administrative Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Administrative Claim: (a) the amount of such unpaid Allowed Administrative Claim in cash on or as soon as reasonably practicable after the Effective Date; or (b) such other treatment on such other terms and conditions as may be agreed upon by the Holder of such Administrative Claim and the Debtor, or as the Bankruptcy Court may order.

*Id*. The plan defines an "Administrative Claim" as "a claim for administrative expenses under Section 503(b) . . . that is an Allowed Claim and is entitled to priority in payment pursuant to Section 507(a)(1)". *Id.* at 4, §1.1. The Former Managers' allowed claims satisfy the definition—they are administrative claims under 11 U.S.C. §503(b)(1)(A) for post-petition management compensation. Subsection 3.1 therefore governs payment of those claims, as its text makes clear. *Id.* at 12, §3.1.

Article 6 of the plan, in contrast, governs "implementation of the plan [and the] effect of confirmation", as stated in its title. *Id.* at 19 (capitalization altered and emphasis

omitted). Subsection 6.3 of the plan, which the Fund casts as the provision that converts to equity the Former Managers' administrative claims for *pre*-confirmation services, is titled "Post-Effective Date Management and Compensation". *Id.* (emphasis omitted). Subsection 6.3.B makes clear that the section deals only with compensation for *post*-confirmation services, specifically, compensation for services provided from the plan's effective date through the date on which the Fund completes payment to the Leave Class Investors, a period the plan calls the "Transition Period":

> B. Managing Member Compensation. **Beginning on the Effective Date** through the date that all Class 2.A.II Leave Class Investors are paid in full (the "Transition Period"), the **Managing Members shall be entitled to the following compensation**:
>
> > i.    $575,000.00 for each Managing Member per year, **payable quarterly in arrears, which shall be payable on a prorated basis in the event of termination or resignation**.
> >
> > ii.   10% of Net Realized Gains for each Managing Member. . . .
> >
> >      . . . .
> >
> > iv.   **Within 45 days after compensation becomes due and payable during the Transition Period,** the Managing Members shall have the option to:
> >
> > > a.  Receive compensation in cash;
> > >
> > > b.  **Defer compensation,** which shall be treated as an unsecured liability of the Reorganized Debtor without security or interest, and can be payable at the Managing Members' discretion; or
> > >
> > > c.  Convert unpaid compensation to Priority A Equity

> Interests to be paid prior to any distribution to Class 2.A.I Stay Class Investors, but only after redemption in full of all Class 2.A.II Leave Class Investors.

> v. However, **if a Managing Member is terminated or resigns, then its Priority A Equity Interests or deferred compensation will be converted automatically to Class 2.A.II Leave Class Interests and paid pro rata with distributions to the Leave Class Investors**, and paid any amount that would have been paid if it had been allowed as such on the Effective Date.

ECF No. 1470, at 20-21, §6.3.B (bold added).

The Fund asks the court to treat the Former Managers' unpaid administrative claims as deferred compensation that subsection 6.3.B.v. converts into equity to be paid pro rata with the Leave Class. The subparagraph's plain text forecloses that reading. The deferred compensation to which it refers is compensation for services provided during the "Transition Period", a period that commences *after* the plan's effective date and which necessarily follows the May 18, 2022 confirmation order. See ECF No. 1470, at 7 & 18-19; §§1.30 & 5.2. Again, the Former Managers' administrative claims result from management services provided *before* plan confirmation, so neither subparagraph 6.3.B.v. or anything else in paragraph 6.3.B governs or alters the Fund's obligation to pay those claims. Those claims, therefore, were not converted to equity when the Fund terminated GAM II and Chrysalis as managers.

C

The Fund alternatively asks the court not to order it to pay the Former Managers' administrative claims because it lacks sufficient funds to pay all allowed administrative claims and should not be required to pay its Former Managers' claims before the district

court awards remedies in the SEC Action. The Fund argues that the district court's remedies award and final judgment may affect the Fund's obligation to pay the Former Managers and may give rise to offsetting claims. ECF No. 1647, at 2 & 12-13. In the Fund's view, these considerations warrant at least delaying enforcement of the plan's payment deadlines.

1

The Former Managers oppose any payment delay. They first dispute that the Fund has claims against them that survived approval of the Fund's compromise of their administrative claims and plan confirmation. The Former Managers alternatively contend that if the Fund has claims, those claims are now time-barred by operation of section 6.13.H of the confirmed plan.

a

The compromise between the Fund and its Former Managers—the approval of which the Former Managers contend precludes the Fund from asserting claims against them for pre-confirmation conduct—was delineated in the Fund's motion to approve that compromise in this case and GAM II's motion for approval of the same compromise in its separate bankruptcy case. In both instances, the parties described the portion of the compromise for which court approval was requested as governing the value of the claims—both post-petition administrative claims and pre-petition general unsecured claims—the amounts of which the Committee had disputed. See ECF No. 1366; see also Case 21-25900, ECF No. 131. The Fund stated that approval of the compromise was beneficial because "settlement of [the Former Managers'] claims [was] part of a larger and extensively negotiated agreement [to achieve] . . . consensual plans of reorganization and a revised governance structure." ECF No. 1366, at 8. The Fund

and GAM II both explained in their motions that absent the compromise, the Committee would dispute the "amount and allowance" of the claims, generating costly litigation unlikely to achieve a lower "value of the claims". ECF No. 1366, at 8; Case No. 21-25900, ECF No. 131, at 6-7.

Neither the Fund's motion nor GAM II's motion to approve the compromise of the Former Managers' pre- and post-petition claims refers to claims that the Fund may have against those managers or suggests that a release of claims by the Fund was part of the compromise. If the compromise included a release of claims the Fund might have against its Former Managers, the motions' omission of that fact would have made the requests for approval of the compromise materially misleading—especially given the fact that the court had earlier denied without prejudice the Committee's request for derivative standing to pursue claims it alleged the Fund had against its managers and others associated with them. Indeed, the term sheet that memorialized the global settlement, which included the compromise of the Former Managers' prepetition claims, administrative expense claims, and their entitlement to payment for future management services, does not purport to resolve claims that the Fund might have against those managers or others associated with them. To the contrary, the term sheet states, "[t]his settlement between the Debtors, Managing Members, Christopher Nohl, Michael Hull, and the Committee is of no precedential effect for resolution of the remainder of the Current Indemnity Claim or Potential Future Indemnity Claims"—claims for indemnity by the Former Managers, Nohl, and Hull. ECF No. 1634-2, at 19-20. And, while the parties agreed to a partial allowance and payment of the "Current Indemnity Claim", the term sheet expressly conditioned such payment "on there being no finding[s] by a court or agency with jurisdiction over the matter asserted that would

make the demand for indemnity inapplicable as described in the Second Amended and Restated Operating Agreement", such as, "in the event that a court determined that actions taken by an indemnified party were not actions that the Managing Member or member in good faith believed to be in or not opposed to the Company's best interests". *Id*. at 19-20. "In such event," the term sheet further provided, "the indemnified party would be required to return to [the Fund] amounts actually paid to it that were attributable to such finding." *Id.* at 20. Finally, the term sheet specified that "[t]he parties reserve all demands, claims, and defenses as to the remaining amounts of the Current Indemnity Claim and Potential Future Indemnity Claim that have been deferred for resolution at a later date as provided herein." *Id.*

While the term sheet defines "Current Indemnity Claims" and "Potential Future Indemnity Claims" by reference to an Excel spreadsheet that, as far as the court is aware, is not part of the record, these provisions counter the Former Managers' proposal that the court should infer from the approval of the compromise that the Fund released, waived or otherwise prejudiced whatever rights it may have under nonbankruptcy law to seek either contribution or indemnity from its Former Managers should the district court grant the SEC's request to order disgorgement from the Fund or to seek repayment of costs that the Fund advanced to the Former Managers to pay for their defense of the SEC's and Hallick's claims.

Ultimately nothing in either compromise motion or anywhere else in the record suggests that the approved compromise settled anything other than how much the Fund would pay the Former Managers for certain indemnity claims, their pre-confirmation management of the Fund, and the value of their ownership interests in the Fund. Even after being afforded an opportunity to take discovery, no party directs the

court to anything that suggests that the Fund agreed to release or otherwise forgo claims it might have against the Former Managers as part of the compromise. Consequently, the court concludes that to the extent the Fund had claims against the Former Managers at the time of the compromise, the compromise does not limit the Fund's ability to pursue those claims.

b

The Former Managers also contend that confirmation of the plan precludes any claims the Fund may have against them based on their pre-confirmation conduct. Generally, a confirmed plan precludes a reorganized debtor from prosecuting claims that could have been litigated before confirmation. Where a debtor "could have brought [an] action before the confirmation of the bankruptcy plan . . . res judicata ordinarily would bar it from bringing the action after the confirmation of the plan." *D & K Props. Crystal Lake v. Mut. Life Ins. Co. of N.Y.*, 112 F.3d 257, 259 (7th Cir. 1997); see also *P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1117–18 (7th Cir. 1998).

Section 1123(b)(3)(B) of the Bankruptcy Code, however, expressly authorizes chapter 11 plans to provide for the debtor's "retention and enforcement" "of any claim or interest belonging to the debtor or to the estate." If the plan reserves claims for the Fund, then confirmation of the plan does not preclude the Fund from litigating those claims. *D & K Props. Crystal Lake*, 112 F.3d at 259–60.

Section 6.13.E of the plan states, "[a]ll Causes of Action that are not otherwise compromised, settled, released or waived pursuant to the terms of this Plan shall be retained by the Reorganized Debtor and preserved" and the confirmed "Plan shall not preclude or estop the Debtor from pursuing any claims of the estate . . . against any of

the Debtor's Creditors or Interest Holders for offset or Causes of Action."[4] ECF No. 1470, at 25-26. This section plainly reserves for the reorganized debtor all claims for offset or "Causes of Action" that the Fund or its bankruptcy estate has against any of the Fund's "Creditors" or "Interest Holders". *Id.*

The Former Managers are both "Creditors" and "Interest Holders" under the plan. The Former Managers are "Creditors" as the plan uses that term because they asserted a right to payment from the Fund for services rendered both before and after the Fund filed its bankruptcy petition.[5] They are also "Interest Holders" because they both were members under the Fund's operating agreement.[6] The clear text of section 6.13.E, therefore, reserves for the Fund any right to assert recoupment or other claims, expressly including "claims . . . for offset",  against the Former Managers that belonged to the Fund or its estate before confirmation of the plan, including any claims for recoupment of legal expenses paid by the Fund for the Former Managers' defense against claims brought by the SEC and Hallick or for breaches of fiduciary duty that the

---

4 The plan defines "Causes of Action" to include "all rights of setoff, counterclaim, or recoupment and Claims for breach of contracts or for breaches of duties imposed by law or equity", as well as "actions . . . [and] rights of setoff[ or] recoupment rights . . . existing or hereafter arising, in contract or in tort, in law, in equity, or otherwise . . . based in whole or in part upon any act or omission or other event occurring on or prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date." ECF No. 1470, at 5, §1.9.

5 The plan defines "Creditor" to include "any person or assignee that holds a Claim against the Debtor". *Id.* at 6, §1.22. And the plan further states, "any right in existence on the Effective Date against the Debtor to . . . payment" is a "Claim" for this purpose. *Id.* at §1.13.

6 The plan defines "Interest Holder" as "a person or entity that has an Interest, that is a Member as defined by the [Second Amended and Restated Operating Agreement of Greenpoint Tactical Income Fund], who is issued either a Class A Unit(s) or a Class B Unit(s) as set forth in the [Second Amended and Restated Operating Agreement of Greenpoint Tactical Income Fund]." ECF No. 1470, at 8, §1.43. The Former Managers held Class B Units under the terms of the Second Amended and Restated Operating Agreement. See ECF No. 1470, at 17, §3.3.4.

Former Managers allegedly committed before the plan's May 19, 2022 effective date.[7] ECF No. 1470, at 25-26, §6.13.E. As explained above, no claims of these types were the subject of a compromise approved under Rule 9019 nor were any such claims released, waived, or otherwise provided for in the plan.

What is more, section 6.10 of the Third Amended Operating Agreement, which arose out of the same global settlement as the plan, provides, like the preceding operating agreement, that the Fund will indemnify managers for expenses and liabilities incurred in connection with actions they "in good faith believed to be in or not opposed to the [Fund's] best interests". *Id.* at 44, §6.10(a). The confirmed plan provides for payment of the Former Managers' pre-petition indemnification claims under the terms of the Fund's operating agreement, describing these claims as "partially contingent and partially noncontingent." ECF No. 1470, at 16, §3.3.3.II. But the plan, like the term sheet on which it is based, contemplates that the Former Managers would "continue to incur obligations for which they intend to assert indemnification Claims against the Debtor" and provides that "[t]he balance of any Class 3.B.II Pre-Petition Indemnity Claims are deferred for resolution at a later date by the Reorganized Debtor, Managing Members, and the Oversight Board pursuant to the provisions of the Insider Claim Order and Third Amended Operating Agreement."[8] *Id.* The plan specifies that

---

7 The confirmed plan has no effect on any claims the Fund may have that arose after confirmation. See *D & K Props. Crystal Lake*, 112 F.3d at 260–61.

8 The plan defines "Insider Claim Order" as the order approving the Fund's motion to compromise the claims with Chrysalis and GAM II. ECF No. 1470, at 8, §1.41. The Third Amended Operating Agreement provides that the Fund will advance its managers' legal expenses and costs incurred in connection with actions taken in their capacity as managers but states that the managers "agree to repay any amounts advanced or otherwise paid to or for the[ir] benefit . . . and otherwise forfeit any right of indemnification hereunder, if it shall ultimately be determined that [they] are not entitled to be indemnified". *Id.* at 45, §6.10(b).

the indemnification obligations the Fund owes to its current and former directors and agents as provided in its Operating Agreement "shall remain in full force and effect to the maximum extent permitted by applicable law and shall not be discharged, impaired, or otherwise affected by this Plan." ECF No. 1470, at 26-27, §6.14.[9]

The gist of all this is that the confirmed plan expressly provides that the balance of the Former Managers' prepetition indemnity claims are deferred for later resolution. In this context, the plan's reservation of "all rights, claims, defenses, setoffs, recoupment, and causes of action . . . against any third parties" and its express statement that plan confirmation "shall not preclude or estop the Debtor from pursuing . . . any . . . claims against any of the Debtor's Creditors or Interest Holders for offset or Causes of Action" (*id.* at 25-26, §6.13.E) makes clear to the Former Managers (who controlled the Fund when it proposed the plan) that the Fund unequivocally retains claims against them, including for offset and recoupment, in connection with at least the indemnification provisions of the Fund's operating agreements. See *P.A. Bergner & Co.*, 140 F.3d at 1117. Consequently, the plan reserves, and does not foreclose by omission, any claims that the Fund may have against its Former Managers for offset or

---

9 Subsection 6.14 of the confirmed plan provides:

> **6.14. Survival of the Debtor's Indemnification Obligations.** Any and all obligations of the Debtor pursuant to its corporate charters, agreements, bylaws, limited liability company agreements, memorandum and articles of association, or other organizational documents (including all indemnification obligations) to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtor or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtor shall remain in full force and effect to the maximum extent permitted by applicable law and shall not be discharged, impaired, or otherwise affected by this Plan.

ECF No. 1470, at 26-27.

recoupment.

c

The Former Managers next argue that paragraph 6.13.H of the plan bars any counterclaim against them because the Fund didn't file any such claims within 30 days after the Former Managers filed their administrative claims. Paragraph 6.13.H states (with added emphasis):

> All holders of an Administrative Claim, including but not limited to [ ] professional fees, **unless previously allowed on final basis by an order of the Court**, . . . must file with the Court their applications for allowance and payment of claims incurred through the Effective Date within thirty (30) days after the Effective Date and in accordance with the substantive and procedural requirements in the Bankruptcy Code and orders in this Chapter 11 Case. **Unless otherwise provided in this Plan, the Reorganized Debtor shall be responsible for the resolution of Claims and shall have standing to object to the allowance of any Claim and to assert and prosecute any counterclaim relative thereto** (without prejudice to any right of any other party in interest to do so under applicable law). **All such objections and counterclaims shall be filed within thirty (30) days after the filing of said claim.**

ECF No. 1470, at 26 (emphasis added).

This paragraph affords a process for the resolution of administrative claims that were **not** finally adjudicated before plan confirmation. The first sentence of paragraph 6.13.H clearly limits its application to holders of administrative claims that haven't already been "allowed on [a] final basis by an order of the Court." *Id.* The second sentence makes the reorganized debtor "responsible for the resolution" of the previously unadjudicated administrative claims and affords it "standing to object to [their] allowance . . . and to assert and prosecute any counterclaim relative thereto". *Id*. The third sentence requires the reorganized debtor to file "[a]ll such objections and

counterclaims" to those previously unadjudicated administrative claims "within thirty (30) days after the filing of said claim." *Id.*

Paragraph 6.13.H's counterclaim deadline thus plainly applies only to counterclaims asserted against a party who files an administrative claim that had not been previously allowed. As discussed above, the Former Managers' administrative claims *were* finally adjudicated before plan confirmation. Therefore, paragraph 6.13.H's deadline for filing counterclaims does not apply to any claims the Fund might have against them.

2

The Fund's potential ability to assert claims against the Former Managers must be considered in deciding whether to grant their request that the court order the Fund to pay them amounts due under the plan.

a

The Fund argues that in light of the Fund's potential claims against the Former Managers and the pending remedies ruling in the SEC Action, the court should allow the Fund to postpone payment of the Former Managers' administrative claims.[10] The

---

[10] The Fund proposes that the court delay payment of the Former Managers' administrative claims at least until the district court's decision awarding the SEC's remedies against the Former Managers, their principals, the Fund, and others for misleading investors, because the district court may bar the Fund from paying the Former Managers or award remedies against the Fund that will give rise to claims for indemnification, contribution, or reimbursement of defense costs from its Former Managers. While the Fund consistently made this argument in opposition to the Former Managers' motions to compel compliance with the plan, the Fund's final brief seems to retract this request, arguing that "this court need not wait indefinitely for the District Court to rule" and that the Fund "has specifically identified the currently existing claims it holds against the Former [Managers] of which it is currently aware and is prepared to adjudicate those claims notwithstanding the lack of a remedies ruling from the District Court if that is how the Court wishes to proceed." ECF No. 1684, at 15-16. To the extent that the Fund or any other party requests that the court adjudicate the Fund's underlying claims against the Former Managers in the context of these contested motions, the court, for the reasons explained below, denies that request.

Fund principally supports its position that this court has discretion to order a delay of payments due under the confirmed chapter 11 plan with citations to several bankruptcy opinions. Those opinions are inapplicable here, however, because they address payment of administrative claims *before confirmation*. See *In re Renew Energy, LLC,* No. 09-10491, 2009 WL 3320420 (Bankr. W.D. Wis. Sept. 30, 2009) (delaying a ruling on a request for administrative expenses pending resolution of the debtor's preference action against the claimant); *In re Modern Metal Prods. Co.*, No. 08 B 73908, 2009 WL 1362632, *3 (Bankr. N.D. Ill. May 13, 2009) (denying a request for immediate payment of an allowed administrative claim "until a Reorganization Plan is confirmed or a bar date is established for bringing claims for administrative expenses runs."); *S. Polymer, Inc. v. TI Acquisition, LLC (In re TI Acquisition, LLC)*, 410 B.R. 742, 751 n.5 (Bankr. N.D. Ga. 2009) (citing 11 U.S.C. §1129(a)(9)(A)) (Deferring payment of an administrative claim pending the determination of the claimant's liability in a preference action but observing, "[o]f course, in order to confirm a Plan of Reorganization, the administrative expense . . . would have to be paid in full on confirmation. This would be true regardless of whether the adversary proceeding has been finally resolved."); *In re Global Home Prods. LLC,* No. 06-10340, 2006 WL 3791955, *3 (Bankr. D. Del. Dec. 21, 2006) (citing *In re HQ Global Holdings, Inc.*, 282 B.R. 169 (Bankr. D. Del. 2002)) (emphasis added) (deferring payment of an administrative expense claim until after confirmation of the chapter 11 plan and noting that "[d]istributions to administrative claimants are generally disallowed ***prior to confirmation*** if there is a showing that the bankruptcy estate may not be able to pay all of the administrative claims in full."); and *In re Bookbinders' Restaurant, Inc.*, No. 06-12302, 2006 WL 3858020 (Bankr. E.D. Pa. Dec. 28, 2006) (scheduling an evidentiary hearing to determine whether the court should order immediate payment of a

§503(b)(9) claim before confirmation of a plan).

No opinions of which the court is aware suggest that this court may delay payment of administrative expenses in a way that contradicts the terms of the confirmed plan. Nor may the plan be modified to achieve that result, since section 1127(b), which governs post-confirmation modifications of chapter 11 plans, requires a modified plan to comply with the confirmation requirements of section 1129, one of which is that the plan provide for payment of administrative expenses on its effective date, unless the holder of the claim otherwise agrees. See 11 U.S.C. §§1127(b) & 1129(a)(9)(A).

The Fund separately contends that subsection 3.1 of the confirmed plan allows the court to "order" other treatment of the administrative claims, which the Fund reads to include delayed payment. Subsection 3.1 states:

**3.1 Administrative Claims in General.**

Unless otherwise provided for herein, **each holder of an allowed Administrative Claim shall receive** in full satisfaction, settlement, release, extinguishment and discharge of such Administrative Claim: (a) **the amount of such unpaid Allowed Administrative Claim in cash on or as soon as reasonably practicable after the Effective Date**; **or** (b) **such other treatment** on such other terms and conditions as may be agreed upon by the Holder of such Administrative Claim and the Debtor, **or as the Bankruptcy Court may order**.

ECF No. 1470, at 12 (emphasis added).

This section's first two payment options track the confirmation requirement imposed by section 1129(a)(9)(A) of the Bankruptcy Code: "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment", the plan must provide that on the plan's effective date the holder of an allowed administrative

expense (that is, "a claim of a kind specified in section 507(a)(2)") "will receive on account of such claim cash equal to the allowed amount of such claim". 11 U.S.C. §1129(a)(9)(A). Given this confirmation requirement, the additional provision in section 3.1 of the plan—"as the Bankruptcy Court may order"—cannot be read to give the court freewheeling authority to allow the Fund to unilaterally delay paying allowed administrative claims, since that construction would make the plan unconfirmable, see section 1129(a) ("The court shall confirm a plan only if all of the following requirements are met"), and would allow the Fund to achieve an outcome that is beyond the permissible reach of a post-confirmation amendment, see section 1127(b) (requiring post-confirmation plan modifications to comply with §1129).

In all events, the "as the Bankruptcy Court may order" provision at most gives the court discretion to order the Fund to pay administrative claims in a manner other than as the plan specifies—that is, other than "as soon as reasonably practicable" or "as agreed upon" by the parties, which are the only ways permitted by section 1129(a)(9)(A). If the plan gives the court that discretion, the court declines to exercise it to prevent the Fund from achieving an outcome inconsistent with sections 1127(b) and 1129(a)(9)(A) of the Bankruptcy Code.

b

GAM II's motion to compel compliance with the plan asks the court to order the Fund "to comply with the Confirmed Plan in all respects, including that [the Fund] withdraw all requests for relief in the SEC Action which run contrary to any provision of the Confirmed Plan" and to redistribute payments the Fund previously made to administrative claim holders so that GAM II might receive its pro rata share of those payments. ECF No. 1624, at 10. Chrysalis' motion requests that the court order the Fund

"to comply with the terms of the Plan and make payments on [] Chrysalis['] portion of the Administrative Claim and its Transition Period compensation" and "direct[] the [Fund] to cease pursuit of any purported 'remedies' in [the]  SEC Action which deviate from the Plan terms". ECF No. 1636, at 18. But the Former Managers' subsequent filings appear to largely, if not entirely, abandon requests for relief (1) directing the Fund to pay them now or (2) limiting the Fund's ability to litigate in the district court. See ECF No. 1658, at 2; ECF No. 1659, at 2 n.2; ECF No. 1683, at 2 & 8; and ECF No. 1685, at 5. Still, in case the Former Managers have not fully abandoned those requests, this opinion addresses them to ensure complete adjudication of the motions.

Section 1142(b), on which the Former Managers rely, gives the court broad authority to direct a debtor to implement a confirmed plan. It states (with emphasis):

> The court **may** direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, **and to perform any other act**, including the satisfaction of any lien, **that is necessary for the consummation of the plan**.

The statute's plain text makes this authority discretionary—the court "may" direct the debtor to perform acts "necessary for the consummation of the plan." *Id.*

The Fund's current circumstances do not support exercising that discretion to impose payment deadlines enforceable by contempt sanctions. No one asserts that the Fund currently has liquid assets sufficient to pay the Former Managers' administrative claims. Additionally, both the Fund and its Former Managers await the district court's ruling on the SEC's requested securities-law-violation remedies—remedies that potentially include an order requiring disgorgement of more than $19.8 million by defendants, including the Fund, its Former Managers, and the individuals who control

them. As discussed above, the Fund suggests that the district court's final judgment will undergird claims against the Former Managers for contribution, indemnification, and reimbursement of defense costs advanced by the Fund under the terms of its operating agreement.

Given these circumstances, to the extent that the Former Managers request that the court order the Fund to pay their past-due administrative claims now, to be followed, no doubt, by motions for contempt if the Fund fails to make those payments, the court exercises its discretion to decline that request. Pursuit of payments due the Former Managers under the plan is better left to requests for money judgments in civil actions, potentially proceeded by arbitration, as provided in the Fund's current operating agreement, all of which offers a better opportunity for the Fund and those seeking payment from it to fully litigate all claims and counterclaims the parties may have a good-faith basis to assert.

The court additionally declines on grounds of comity, judicial efficiency, and avoidance of administrative difficulties the invitation to impose a prior restraint on the Fund's ability to litigate in the district court, a proceeding that, at least as to the SEC's claims, is excluded from the §362(a) stay by §362(b)(4).[11]

---

11 GAM II and Hull, who are debtors in possession in distinct jointly administered bankruptcy cases, alleged that the letter the Fund filed in the SEC Action after GAM II was terminated as one of the Fund's managers violated the §362(a) stay in their cases and moved for imposition of sanctions under 11 U.S.C. §362(k). The Fund responded in part by filing an amended letter in the SEC Action that in effect retracts the requests that GAM II and Hull contend offend the §362(a) stay. *SEC v. Bluepoint Investment Counsel, LLC*, No. 19-cv-809, ECF No. 438, at 3. The Fund's retraction moots (as a practical matter) GAM II's request that this court order the Fund to withdraw the earlier letter it filed in the SEC Action, and, under the current circumstances, this court, as a matter of comity and deference to the district court presiding over the SEC Action, will not enter an order in this case that purports to restrict how the Fund litigates that action.

GAM II also initially requested that the court order Smith, Gambrell & Russell LLP, former counsel to the

D

In addition to seeking payment of their pre-confirmation administrative claims, the Former Managers initially requested that the court direct the Fund to pay them for their post-confirmation management services—so-called "Transition Period compensation," as provided in the plan. ECF No. 1636, at 18; ECF No. 1672, at 16-19. Transition Period compensation depends in part on calculation of "Net Realized Gains," as stated in the plan and the Fund's Third Amended Operating Agreement. See ECF No. 1470, at 20-21, §6.3.B.i & ii. GAM II asked the court to declare the amount of those gains to which it is entitled under the plan after determining how the Former Managers' termination impacts that calculation. ECF No. 1672, at 16-19.

Chrysalis subsequently limited its request for transition-period-related compensation to an order declaring "that the Transition Period compensation is due and payable in accordance with the terms of the Plan". ECF No. 1685, at 4. GAM II similarly limited its request, stating, "GAM II understands the Court's apparent hesitation to adjudicate the amount of realized gains owed the [Former Managers],

---

Committee and current counsel to the Fund, to disgorge administrative expense payments it received from the Fund after plan confirmation. ECF No. 1624, at 9-10. GAM II withdrew that request in its reply brief, see ECF No. 1658, at 9, but it subsequently filed a supplemental brief in which it requested that the court order "professionals and [the] managing member [to] disgorge payments made by the Fund after July 19, 2023[,] as being unauthorized by the confirmed plan and operating agreement". ECF No. 1672, at 7. GAM II's supplemental brief further requested that the court impose limits on the Fund's right to pay operating expenses and order the Fund to pay administrative expenses in full before making any payment to Leave Class Investors. ECF No. 1672, at 6-7. Chrysalis joined those requests. ECF No. 1673, at 21. But the Former Managers later abandoned those requests and limited the relief they seek to entry of an order declaring that the Former Managers have administrative claims that are due and owing under the Fund's chapter 11 plan. ECF No. 1683, at 2 & 8, ECF No. 1685, at 5 & 14. Consequently, the court concludes that the Former Managers have withdrawn all requests for non-declaratory relief, including disgorgement. To the extent the Former Managers did not abandon those requests, the court declines its discretion to order that relief on the current record for reasons of judicial economy and to avoid potentially unnecessary administrative complications and litigation costs.

given the presence of an arbitration clause" but "[i]f the Court were to issue an order declaring that the [T]ransition [P]eriod compensation was not converted to equity under the terms of the confirmed plan, this would leave for further adjudication the issue of calculating net realized gains." ECF No. 1683, at 7. Consequently, this opinion adjudicates only the following requests related to Transition Period compensation: (1) whether Transition Period compensation is due and payable in accordance with the plan and (2) whether the plan converted that compensation to equity when the Former Managers were terminated.

1

Like the arguments discussed above regarding whether the Former Managers are currently due payment of their administrative claims, the Fund argues in part that the Former Managers' confirmation-hearing testimony deferred payment of Transition Period compensation. Because these arguments implicate interpretation of the plan confirmed by this court and testimony presented in support of that confirmation, this opinion will address the deferral issue, even though the opinion otherwise leaves resolution of the Former Managers' claims to Transition Period compensation for another day and most likely another tribunal.

As noted above, the plan provides that the Former Managers are each entitled to $575,000 per year, during the "Transition Period", which began on the plan's effective date, May 19, 2022, and continues through the date that all Leave Class Investors are paid in full. See ECF No. 1470, at 20, §6.3.B.i. Subparagraph 6.3.B.iv affords the managing members the option to receive their compensation during the Transition Period in cash, to defer compensation, or to convert unpaid compensation to Priority A Equity Interests; it states (with added emphasis):

**Within 45 days after compensation becomes due and payable during the Transition Period**, the Managing Members **shall have the option** to:

a.     Receive compensation in cash;

b.      Defer compensation, which shall be treated as an unsecured liability of the Reorganized Debtor without security or interest, and can be payable at the Managing Members' discretion; or

c.     Convert unpaid compensation to Priority A Equity Interests to be paid prior to any distribution to Class 2.A.I Stay Class Investors, but only after redemption in full of all Class 2.A.II Leave Class Investors.

The next subparagraph, 6.3.B.v, governs *when* the Fund must pay Transition Period compensation *if* a managing member is terminated *and* that managing member has elected to defer compensation or convert that compensation to Priority A Equity Interests, as provided by subparagraph 6.3.B.iv. In that event, Transition Period compensation is "converted automatically to Class 2.A.II Leave Class Interests and paid pro rata with distributions to the Leave Class Investors, and paid any amount that would have been paid if it had been allowed as such on the Effective Date." *Id.* at 20-21, §6.3.B.v.

The Fund argues that the Former Managers' Transition Period compensation was converted to leave-class equity under §6.3.B.v because they were terminated and before they were terminated they elected deferred payment of that compensation under §6.3.B.iv. In support of its contention that the Former Managers deferred payment of this compensation, the Fund relies on the same May 2022 confirmation-hearing testimony by Hull and Nohl that is discussed above, supplemented by reference to two

documents recently produced in discovery, titled, "Deferred Compensation Agreement[s]". ECF No. 1684, at 13.

Under the plan's plain terms, any election to defer Transition Period compensation must be exercised "[w]ithin 45 days **after** compensation becomes due and payable". §6.3.B.iv (emphasis added). The plan also makes clear that Transition Period compensation does not become "due and payable" until *after* plan confirmation, see paragraph 6.3.B. Hull's and Nohl's pre-confirmation testimony cannot be understood as the Former Managers' exercising of a deferral option under subparagraph 6.3.B.iv because, among other things, that *post*-confirmation compensation was not due and payable, so the window in which to exercise the option (within 45 days *after* the compensation was due and payable) had yet to open. Moreover, as discussed above, the court did not, and does not, understand the Former Managers' confirmation testimony to defer all future compensation, including, in this case, Transition Period compensation—especially when the plan expressly leaves exercise of the option to defer that compensation until after it becomes due and payable.

The Fund also directs the court to the "deferred compensation agreements," documents the Former Managers apparently signed soon after confirmation, as grounds for concluding that the Former Managers exercised their option to defer payment of Transition Period compensation. These documents, however, are not sufficient to establish as a matter of law that the Former Managers exercised that option.

The documents, which GAM II asserts were prepared "in an apparent effort to memorialize [the Former Managers'] agreements to defer payment" (ECF No. 1658, at 6 n.2) purport to be effective "as of May 19, 2022", the same date the plan became effective. ECF No. 1684-1, at 2 & 9. The documents, which were reportedly drafted

without the assistance of counsel, appear incomplete. They consist almost entirely of boilerplate provisions and lack seemingly necessary terms, including any reference to the specific compensation that is purportedly deferred.[12] ECF No. 1684-1. Ultimately, the current record leaves their intent and effect, if any, indeterminable.[13]

---

12 The documents state that the Fund "has determined that it would be in the best interests of the [Fund] to grant [each Former Manager] a deferred compensation agreement provided for herein" and then the remaining operative portions of the document are as follows:

    1. Definitions
. . .
    "<u>Agreement</u>" means the right to receive the Amount set forth in this Agreement.

    "<u>Agreed Amount</u>" means an amount equal to the amount agreed pursuant to the Mediated Settlement Agreement
. . . .

    "<u>Mediated Settlement</u>" means the agreement mediated between the Official Committee of Equity Security Holders and the [Former Managers].

    "<u>Payment</u>" means payment of the amount determined in the Mediated Settlement.

    "<u>Payment Terms</u>" means the first administratively feasible date of payment. For the avoidance of doubt the first administratively feasible date is when the company has sufficient liquidity to make payment in full or in part as determined by [the Former Managers] in their sole discretion.

. . . .

    2. Payment. Upon the terms and subject to the conditions set forth in this Agreement, the [Fund] hereby agrees to make payment to the [Former Managers in] an amount pursuant to the Agreement in the Mediated Settlement.

ECF No. 1684-1, at 2-3 & 9-10. Neither the defined term "Payment Terms" nor "Agreed Amount" is used in the body of these agreements. Nothing in these documents identifies any specific compensation that is deferred.

13 The Fund argues these agreements "provide that the amounts agreed to be paid to the Former Manag[ers] . . . in the Term Sheet (which would include Transition Period compensation) are deferred until the Former Manag[ers] determine payment is administratively feasible 'in their sole discretion'", but the terms of those agreements do not identify *any* compensation that is deferred. ECF No. 1684, at 13.

Whatever effect the deferred compensation agreements might have, their existence does not alter the plain terms of subparagraph 6.3.B.iv, which, as explained above, provides for an option to defer payment of Transition Period compensation that may be exercised within 45 days *after* that compensation becomes payable. The plain terms of the plan and the Fund's amended operating agreement govern when Transition Period compensation becomes due, the options for payment or deferral, and the priority of payments to be honored. What is more, even if pre-confirmation testimony of the Former Managers could alter the operative effect of these governing documents, the court does not understand that testimony to have exercised—or to have been intended to exercise—the option under §6.3.B.iv to defer Transition Period compensation.

2

The Former Managers ask the court to enter an order that "establishes that the Transition Period compensation is due and payable in accordance with the terms of the Plan". ECF No. 1685, at 4. But the confirmed plan provides that "[d]uring the Transition Period, the following priority of payments shall be honored: a. Minimum annual percentage to the Leave Class Investors; b. Operating expenses; and c. Compensation to [the Former Managers]." *Id*. at 9 & 21, §§1.48 & 6.3.B.vi.

Leaving aside the Fund's obligation to pay outstanding administrative claims, all parties agree that the Leave Class Investors have not been paid. Because the plan gives preference to paying the Leave Class Investors over Transition Period compensation,

---

While this opinion concludes that the present record does not allow for a determination that the deferred compensation agreements have any effect on the Former Managers' right to payment under the plan, it does not resolve whether the deferred compensation agreements are enforceable or what effect they have if they are enforceable.

that compensation is not currently payable.

Even if Transition Period compensation was currently payable, additional considerations would weigh against the court exercising its discretion to order that the Transition Period compensation is due and payable. These considerations include questions about the enforceability, meaning, and effect of the deferred compensation agreements, which, as explained above, the court cannot resolve on the existing record, and that contested motion practice in this court is a poor vehicle for adjudicating those disputes. As discussed above, the just and efficient resolution of the parties' competing claims over the extent to which Transition Period compensation is due and payable is far more likely to be achieved through arbitration, as potentially provided for in the Fund's operating agreement, or litigation. Under the current circumstances, a motion to compel compliance with the plan pursuant to section 1142(b) of the Bankruptcy Code is not an appropriate vehicle, and the court declines to exercise its discretion to adjudicate that matter in the context of motions to compel compliance with the plan.

## III

### ORDER

For the reasons explained above, IT IS HEREBY ORDERED as follows:

1. Greenpoint Asset Management II, LLC, has an administrative claim in the amount of $1,441,168.31 against the Fund, and Chrysalis Financial, LLC, has an administrative claim in the amount of $1,689,930.45 against the Fund, and each administrative expense claim is due and owing under the Fund's chapter 11 plan as of July 19, 2023.

2. This order is without prejudice to any offsetting claims the Fund may have against recovery of those sums, or any counterclaims the Fund has for setoff or

otherwise.

3. The Former Managers' motions to compel are granted to the extent provided in this order and are otherwise denied.

# # # # #